**Nos. 22-3750, 22-3751, 22-3753, 22-3841, 22-3843, 22-3844**

# In the United States Court of Appeals for the Sixth Circuit

---

*In re National Prescription Opiate Litigation*

---

TRUMBULL COUNTY, OHIO, ET AL.,
*Plaintiffs-Appellees,*

v.

PURDUE PHARMA, L.P., ET AL.,
*Defendants,*

WALGREENS BOOTS ALLIANCE, INC., ET AL.,
CVS PHARMACY, INC., ET AL.,
WALMART INC.,
*Defendants-Appellants.*

---

On Appeal from the United States District Court for the
Northern District of Ohio, Eastern Division
(No. 1:17-md-2804) (The Hon. Dan Aaron Polster)

---

## CONSOLIDATED BRIEF FOR APPELLANTS

---

DONALD B. VERRILLI, JR.
GINGER D. ANDERS
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 220-1100

*Counsel for CVS Appellants*

NOEL J. FRANCISCO
JOHN M. MAJORAS
ANTHONY J. DICK
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
(202) 879-3939

*Counsel for Walmart Inc.*

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Counsel for Walgreens Appellants*

*(Additional counsel listed on signature page)*

## CORPORATE DISCLOSURE STATEMENT

Walgreens Boots Alliance, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock. Walgreen Eastern Co., Inc. and Walgreen Co. are direct or indirect wholly owned subsidiaries of Walgreens Boots Alliance, Inc.

CVS Pharmacy, Inc., directly owns 100% of the membership interests of CVS Indiana L.L.C., Ohio CVS Stores, L.L.C., and CVS TN Distribution, L.L.C., and 100% of the stock of CVS Rx Services Inc. CVS Health Corporation, a publicly traded corporation, owns 100% of CVS Pharmacy, Inc.'s stock.

Walmart Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

CVS Health Corporation is a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome. Appellants are not aware of any other publicly owned corporation that is not a party to the appeal with a financial interest in the outcome.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................i

STATEMENT REGARDING ORAL ARGUMENT ................................... xiii

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................7

STATEMENT OF THE ISSUES ...........................................................8

STATEMENT OF THE CASE ...............................................................9

    A.    Legal Background.......................................................9

        1.    Federal and state regulation of opioids................................9

        2.    The Ohio Product Liability Act............................12

    B.    Factual Background ........................................................14

        1.    The opioid MDL.......................................14

        2.    The liability trial and verdict.................................19

        3.    Post-trial motions......................................24

        4.    Remedial proceedings .........................................25

SUMMARY OF ARGUMENT....................................................28

ARGUMENT .................................................................................34

I.    OPLA FORECLOSES THE COUNTIES' CLAIMS ...........................35

    A.    OPLA's Text Unambiguously Bars The Counties' Claims ..........35

    B.    The Statutory History Confirms OPLA's Plain Meaning............44

II.    THE PHARMACIES' CONDUCT DOES NOT SUPPORT
    NUISANCE LIABILITY........................................................49

A.  The Pharmacies Did Not Commit Unlawful Conduct .................50

1.  The district court misconstrued 21 C.F.R. § 1306.04 .........50

2.  The district court misconstrued 21 C.F.R. § 1301.71 .........54

3.  The Counties failed to prove any actual violation of the CSA .................................................................................57

B.  The Counties Could Not Alternatively Rely On A Theory Of Intentional But Lawful Conduct .................................60

1.  Ohio does not authorize nuisance liability for intentional but lawful conduct under a regulatory scheme like the CSA .................................................61

2.  If Ohio law permitted nuisance liability for intentional conduct consistent with the CSA, federal law would preempt it .................................................63

a.  Congress and the DEA calibrated the CSA and its regulations to protect against diversion while permitting access to prescribed opioids ....................64

b.  The Counties' nuisance claims for "intentional conduct" are preempted by the CSA and related regulations....................................................66

C.  The Pharmacies Are Entitled To Judgment Or At Minimum A New Trial....................................................70

III.  THE PHARMACIES DID NOT PROXIMATELY CAUSE THE COUNTIES' ASSERTED INJURIES .........................................71

A.  Proximate Causation Requires A Direct Link Between The Pharmacies' Conduct And The Counties' Asserted Harm..........72

B.  The Counties' Claims Are Too Remote To Satisfy Proximate Causation .....................................................75

IV.  THE EGREGIOUS JUROR MISCONDUCT AT TRIAL REQUIRES A NEW TRIAL..................................................81

V.   THE ABATEMENT ORDER MUST BE VACATED ........................86

    A.   The Abatement Award Lacks Any Support In The Jury Verdict Or Traditional Equitable And Remedial Principles .......86

        1.   The district court's monetary award is untethered to the dispensing conduct for which the jury found the pharmacies liable ..................................................................87

        2.   The district court's monetary award far exceeds its equitable authority to order abatement ...............................90

            a.   The district court's award has no foundation in either state or federal equitable principles ...............91

            b.   The district court's award is an impermissible award of damages ........................................................97

        3.   The district court's award is not cabined by any remedial principles, whether legal or equitable.................98

    B.   The Abatement Award Violates Principles Of Apportionment....................................................................104

        1.   The district court's apportionment analysis was incomplete...........................................................................105

        2.   The district court erred in failing to allocate any share of the harm to prescribing physicians .....................107

        3.   The district court erred in declining to apportion a share of abatement costs to other pharmacies.................111

CONCLUSION.....................................................................................114

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF DISTRICT COURT DOCUMENTS

STATUTORY AND REGULATORY ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aluminum Co. of Am.* v. *Loveday*,
273 F.2d 499 (6th Cir. 1959)................................................................83

*Andler* v. *Clear Channel Broad., Inc.*,
670 F.3d 717 (6th Cir. 2012)......................................................99, 102

*Anza* v. *Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)......................................................................74, 76

*Arizona* v. *United States*,
567 U.S. 387 (2012)......................................................................64, 69

*Associated Gen. Contractors of Cal., Inc.* v. *California State
Council of Carpenters*,
459 U.S. 519 (1983)......................................................................98, 99

*Bank of Am. Corp.* v. *City of Miami*,
137 S. Ct. 1296 (2017) ......................................................................80

*Barnett* v. *Carr*,
2001 WL 1078980 (Ohio Ct. App. Sept. 17, 2001)..........................49

*Bemis* v. *Upham*,
30 Mass. (13 Pick.) 169 (1832)........................................................93

*In re Bendectin Litig.*,
857 F.2d 290 (6th Cir. 1988).............................................................81

*In re Beverly Hills Fire Litig.*,
695 F.2d 207 (6th Cir. 1982)......................................................*passim*

*State ex rel. Brinda* v. *Lorain Cnty. Bd. of Elections*,
874 N.E.2d 1205 (Ohio 2007)...........................................................2

*Brown* v. *County Comm'rs of Scioto Cnty.*,
622 N.E.2d 1153 (Ohio Ct. App. 1993)......................................49, 63

*Buckman Co.* v. *Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ................................................................. 69

*Camden Cnty. Bd. of Chosen Freeholders* v. *Beretta, U.S.A. Corp.*,
273 F.3d 536 (3d Cir. 2001) ................................................ 41, 45

*Carrel* v. *Allied Prods. Corp.*,
677 N.E.2d 795 (Ohio 1997) ...................................................... 44

*CFE Racing Prods., Inc.* v. *BMF Wheels, Inc.*,
793 F.3d 571 (6th Cir. 2015) .......................................... 100, 102

*City of Cincinnati* v. *Beretta U.S.A. Corp.*,
768 N.E.2d 1136 (Ohio 2002) ............................................ *passim*

*City of Cincinnati* v. *Deutsche Bank Nat'l Tr. Co.*,
863 F.3d 474 (6th Cir. 2017) ......................................... 3, 75, 99

*City of Cleveland* v. *Ameriquest Mortg. Sec., Inc.*,
615 F.3d 496 (6th Cir. 2010) ............................................. *passim*

*City of Cleveland* v. *JP Morgan Chase Bank, N.A.*,
2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013) ...................... 72

*City of Huntington* v. *AmerisourceBergen Drug Corp.*,
2022 WL 2399876 (S.D. W. Va. July 4, 2022) ................. 77, 94, 97

*City of New Haven* v. *Purdue Pharma, L.P.*,
2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019) .................. 15, 45

*City of Toledo* v. *Sherwin-Williams Co.*,
2007 WL 4965044 (Ohio Ct. Com. Pl. Dec. 12, 2007) ............ 46, 47

*Cronin* v. *Washington Nat'l Ins. Co.*,
980 F.2d 663 (11th Cir. 1993) .................................................. 71

*Crosby* v. *Twitter, Inc.*,
921 F.3d 617 (6th Cir. 2019) .................................................... 73

*Dassault Systèmes, SA* v. *Childress*,
828 Fed. Appx. 229 (6th Cir. 2020) .......................................... 83

*State ex rel. DeWine* v. *Purdue Pharma LP*,
    2018 WL 4080052 (Ohio Ct. Com. Pl. Aug. 22, 2018) .................................46

*In re E.I. DuPont de Nemours & Co. C-8 Personal Injury Litig.*,
    2022 WL 4149090 (6th Cir. Sept. 9, 2022) .......................................................91

*Eastwood Mall, Inc.* v. *Slanco*,
    626 N.E.2d 59 (Ohio 1994) ..............................................................................100

*Gabbard* v. *Madison Loc. Sch. Dist. Bd. of Educ.*,
    179 N.E.3d 1169 (Ohio 2021)............................................................................39

*Gaines* v. *Village of Wyoming*,
    72 N.E.2d 369 (Ohio 1947) ...............................................................................72

*Galayda* v. *Lake Hosp. Sys., Inc.*,
    644 N.E.2d 298 (Ohio 1994) ....................................................................99, 102

*Geier* v. *American Honda Motor Co.*,
    529 U.S. 861 (2000)....................................................................................31, 68

*Gonzales* v. *Raich*,
    545 U.S. 1 (2005)...............................................................................................65

*Greenbelt Co-op. Pub. Ass'n* v. *Bresler*,
    398 U.S. 6 (1970)...............................................................................................70

*Griffin* v. *United States*,
    502 U.S. 46 (1991).............................................................................................71

*Grupo Mexicano de Desarrollo, S.A.* v. *Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999)....................................................................................90, 91

*Hemi Grp., LLC* v. *City of New York*,
    559 U.S. 1 (2010).......................................................................................72, 74

*Holmes* v. *Securities Inv. Prot. Corp.*,
    503 U.S. 258 (1992)....................................................................................*passim*

*State ex rel. Hunter* v. *Johnson & Johnson*,
    499 P.3d 719 (Okla. 2021) ............................................................15, 45, 47, 94

*State ex rel. Jennings* v. *Purdue Pharma L.P.*,
2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) .......................................15, 45

*Johnson* v. *University Hosps. of Cleveland*,
540 N.E.2d 1370 (Ohio 1989) .......................................73

*Khalaf* v. *Ford Motor Co.*,
973 F.3d 469 (6th Cir. 2020) .......................................59

*Kisor* v. *Wilkie*,
139 S. Ct. 2400 (2019) .......................................53

*LaPuma* v. *Collinwood Concrete*,
661 N.E.2d 714 (Ohio 1996) .......................................44

*Lexmark Int'l, Inc.* v. *Static Ctrl. Components, Inc.*,
572 U.S. 118 (2014) .......................................72, 79, 81

*Little Miami R.R. Co.* v. *Commissioners of Greene Cnty.*,
31 Ohio St. 338 (1877) .......................................92

*Longbottom* v. *Mercy Hosp. Clermont*,
998 N.E.2d 419 (Ohio 2013) .......................................97

*Lynch* v. *Gallia Cnty. Bd. of Comm'rs*,
680 N.E.2d 1222 (Ohio 1997) .......................................47

*McClung* v. *North Bend Coal & Coke Co.*,
1 Ohio Dec. 247 (Ct. Com. Pl. 1894),
*aff'd*, 2 Ohio Dec. 531 (Cir. Ct. 1895) .......................................92

*Mills* v. *Maryland*,
486 U.S. 367 (1988) .......................................70

*Moody* v. *United States*,
958 F.3d 485 (6th Cir. 2020) .......................................96

*Mount Lemmon Fire Dist.* v. *Guido*,
139 S. Ct. 22 (2018) .......................................37, 39

*Mugler* v. *Kansas*,
123 U.S. 623 (1887) .......................................92

*In re National Prescription Opiate Litig.,*
　956 F.3d 838 (6th Cir. 2020)..............................................................17

*In re National Prescription Opiate Litig.,*
　2019 WL 7482137 (6th Cir. Oct. 10, 2019) ..................................... xiii

*Nian* v. *Warden, N. Cent. Corr. Inst.,*
　994 F.3d 746 (6th Cir. 2021)..............................................................82

*Nithiananthan* v. *Toirac,*
　2015 WL 1619097 (Ohio Ct. App. Apr. 13, 2015) ...........................97

*Olden* v. *LaFarge Corp.,*
　383 F.3d 495 (6th Cir. 2004)..............................................................38

*Oregon Prescription Drug Monitoring Program* v. *U.S. Drug*
　*Enf't Admin.,*
　860 F.3d 1228 (9th Cir. 2017).............................................................66

*Pang* v. *Minch,*
　559 N.E.2d 1313 (Ohio 1990)...........................................................105

*People* v. *Johnson & Johnson,*
　2021 WL 7160515 (Ill. Cir. Ct. Jan. 8, 2021) ...........................15, 45

*People* v. *Purdue Pharma L.P.,*
　2021 WL 7186146 (Cal. Super. Ct. Dec. 14, 2021) ...................15, 45

*Perry* v. *American Tobacco, Inc.,*
　324 F.3d 845 (6th Cir. 2003)..............................................................72

*State ex rel. Prade* v. *Ninth Dist. Ct. of Appeals,*
　87 N.E.3d 1239 (Ohio 2017) .............................................................38

*State ex rel. Ravnsborg* v. *Purdue Pharma, L.P.,*
　2021 WL 6102727 (S.D. Cir. Ct. Mar. 29, 2021).......................15, 45

*People ex rel. Ricks Water Co.* v. *Elk River Mill & Lumber Co.,*
　40 P. 486 (Cal. 1895)..........................................................................93

*Ruan* v. *United States,*
　142 S. Ct. 2370 (2022) ..................................................................52, 53

ix

*State ex rel. Schoener* v. *Board of Cnty. Comm'rs of Hamilton Cnty.*,
  619 N.E.2d 2 (Ohio Ct. App. 1992) ............................................ 49, 63

*Sheldon* v. *Cole*,
  2 Ohio N.P. 307 (Ct. Com. Pl. 1895) .............................................. 93

*Sonner* v. *Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ....................................................... 91

*State ex rel. Stenehjem* v. *Purdue Pharma L.P.*,
  2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019) ...................... 15, 45

*Stiles* v. *Lawrie*,
  211 F.2d 188 (6th Cir. 1954) ................................................... 82, 83

*Tamraz* v. *Lincoln Elec. Co.*,
  620 F.3d 665 (6th Cir. 2010) ...................................................... 103

*Tioga Pub. Sch. Dist. No. 15* v. *United States Gypsum Co.*,
  984 F.2d 915 (8th Cir. 1993) ............................................ 13, 44, 45

*United States* v. *Gonzales*,
  520 U.S. 1 (1997) ........................................................................ 36

*United States* v. *Wheaton*,
  517 F.3d 350 (6th Cir. 2008) ................................................... 83, 85

*United States* v. *Zadeh*,
  820 F.3d 746 (5th Cir. 2016) ................................................... 65, 67

*In re Walmart Inc.*,
  No. 22-3107 (6th Cir. Apr. 5, 2022) ............................................. 25

*Ward* v. *Herr Foods, Inc.*,
  1990 WL 118868 (Ohio Ct. App. Aug. 16, 1990) ......................... 103

*Wind* v. *State*,
  130 N.E. 35 (Ohio 1921) ..................................................... 33, 91, 92

*Wolcott* v. *Melnick*,
  11 N.J. Eq. 204 (Ch. 1856) ......................................................... 92

## Statutes

21 U.S.C. § 393 ..................................................................................9

21 U.S.C. § 801 ..........................................................................2, 64, 67

21 U.S.C. § 821 ................................................................................65

21 U.S.C. § 823 ................................................................................10

21 U.S.C. § 829 .............................................................................9, 51

21 U.S.C. § 871 ................................................................................10

28 U.S.C. § 1291 ................................................................................7

28 U.S.C. § 1292 ..............................................................................25

28 U.S.C. § 1331 ................................................................................7

28 U.S.C. § 1367 ................................................................................7

Ohio Rev. Code Ann. § 2307.71 .........................................................*passim*

Ohio Rev. Code Ann. § 2307.71 (1988) ..........................................13, 43

Ohio Rev. Code Ann. § 2307.72 .........................................................42

Ohio Rev. Code Ann. §§ 3719.01-3719.99 .....................................12

Ohio Rev. Code Ann. § 4729.35 .........................................................*passim*

## Legislative History

2004 Ohio Laws File 144 .............................................................13, 45

2006 Ohio Laws File 198 .......................................................13, 46, 48

## Regulations

21 C.F.R. § 1301.11 ........................................................................109

21 C.F.R. § 1301.71 .........................................................................*passim*

21 C.F.R. § 1306.04 ..................................................................*passim*

36 Fed. Reg. 7,776 (Apr. 24, 1971) ........................................................54

**Other Authorities**

Richard C. Ausness, *The Role of Litigation in the Fight Against Prescription Drug Abuse*, 116 W. Va. L. Rev. 1117 (2014)...................14, 79

William Blackstone, Commentaries ............................................................33, 91

CDC, *U.S. Opioid Dispensing Rate Maps*,
    https://www.cdc.gov/drugoverdose/rxrate-maps/index.html ...................100

1 CV Ohio Jury Instructions 621.09 (Aug. 2022)........................................31, 61

Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies* (3d ed.
    1993) ..................................................................................................92, 97

W. Page Keeton et al., *Prosser & Keeton on Torts* (5th ed. 1984).........105, 110

2 Joseph Story, *Commentaries on Equity Jurisprudence* (12th
    ed. 1877) ...............................................................................................92

Restatement (Second) of Torts ................................................................*passim*

Restatement (Third) of Torts......................................................................41, 81

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 34(a), appellants request oral argument in this appeal from the first bellwether trial in the national opioid multidistrict litigation. As this Court has recognized, the opioid MDL is "a case of . . . enormous public interest and significance." *In re National Prescription Opiate Litig.*, 2019 WL 7482137, at *2 (6th Cir. Oct. 10, 2019). This particular appeal presents several novel legal issues against the backdrop of a full trial and complex factual record. Appellants respectfully suggest that oral argument could materially assist this Court in understanding the legal issues and the record in this important case.

## INTRODUCTION

This case is part of the multidistrict litigation involving the abuse and diversion of prescription opioid medications. The claims asserted here by these plaintiffs, Lake County and Trumbull County, Ohio, are not against the pharmaceutical companies that manufactured and marketed opioids or the doctors who prescribed them. Rather, the Counties are suing *pharmacies*, for dispensing legal medications prescribed by doctors. The Counties rely on the common law of public nuisance, a tort theory that has historically been used for physical intrusions into a community's shared resources, like noxious fumes in the air or a chemical spill into a river. The Counties claim that the pharmacies contributed to a public nuisance when their pharmacists filled opioid prescriptions written by licensed doctors.

From the outset, the Counties' claims never should have seen the inside of a courtroom. In the Ohio Product Liability Act (OPLA), the Ohio General Assembly barred liability for "*any* [common-law] public nuisance claim" based on, among other things, the "marketing," "distribution," "or sale of a product." Ohio Rev. Code Ann. § 2307.71(A)(13) (emphasis added). The Counties' complaints literally track that language. They allege that pharmacies "created and maintained a public nuisance" by "marketing," "distributing," and

"selling" prescription opioids.  R. 3326 (Trumbull County Supp. Am. Compl.) at 495143 ¶ 619; R. 3327 (Lake County Supp. Am. Compl.) at 495350 ¶ 619.[1] The district court reasoned, based on OPLA's legislative history, that the Act was intended to abrogate only those public-nuisance claims that seek compensatory damages.  The court was wrong about the statute's purpose, but in any event the interpretive inquiry "begins with the statutory text, and ends there as well if the text is unambiguous."  *State ex rel. Brinda* v. *Lorain Cnty. Bd. of Elections*, 874 N.E.2d 1205, 1211 (Ohio 2007) (citation omitted).

That error alone disposes of this appeal, but it is far from the only reason the judgment should be reversed.  Even if OPLA does not bar the Counties' claims, Ohio nuisance law requires either unlawful conduct or intentional, culpable conduct.  The Counties argued below that the pharmacies committed unlawful conduct by violating two implementing regulations of the federal Controlled Substances Act, 21 U.S.C. § 801 *et seq.*  According to the Counties, those regulations impose a broad duty on pharmacy companies to prevent pharmacists from filling prescriptions that might be misused.  But the regulations do no such thing.  They say that pharmacies must guard against

---

[1]    Pursuant to Sixth Circuit Rule 28(a)(1), citations to the district court record correspond to the Page ID number of the referenced pages.

2

theft and that pharmacists may not fill prescriptions they know to be illegitimate. The regulations do not require pharmacies to establish systems to predict and prevent the diversion of prescription opioids by third parties. The pharmacies were thus held liable for violating a federal rule that does not exist.

The Counties' public-nuisance theory left them with another problem, too. Under Ohio law, plaintiffs in public-nuisance suits must show proximate causation, which requires a direct link between their alleged injury and the defendants' alleged conduct. This Court has twice dismissed similar Ohio public-nuisance suits for a lack of proximate causation. *See City of Cincinnati* v. *Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474 (6th Cir. 2017); *City of Cleveland* v. *Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010). Here, the Counties assert a causal chain at least as attenuated as those this Court has rejected: pharmacies allegedly failed to detect certain "red flags" that indicated some prescriptions might be invalid, which allowed pharmacy customers to divert some of their prescription opioids, which led some individuals to become addicted to legal opioids, which morphed into addiction to illegal opioids such as heroin and fentanyl, which fueled an illegal drug market, which led to bodily injuries, deaths, and societal harms that the

3

Counties spent resources to redress. That causal chain is several links longer than Ohio law permits.

Although this case should have been resolved in the pharmacies' favor as a matter of law, it proceeded to a jury trial. That trial was marred by egregious juror misconduct. During trial, the district court learned that a juror had conducted outside research into the testimony of one of the pharmacies' witnesses and printed fliers on the subject for every other juror. The court stated that the juror had violated "probably the most important instruction," R. 4065 (Trial Tr.) at 547001:13-14, adding that the court had never seen "anything like this" in 22 years. *Id.* at 546972:14-15. Even the Counties' lead counsel initially conceded that his professional obligations required him to agree that a "mistrial is appropriate." *Id.* at 547017:2. But the district court repeatedly pressed the Counties to rethink their position, and after dismissing the offending juror and questioning the rest, the court allowed the trial to proceed. Under this Court's cases, the correct response should have been a new trial. *See In re Beverly Hills Fire Litig.*, 695 F.2d 207, 215 (6th Cir. 1982).

Then at the remedies phase, the district court imposed a sweeping "abatement" remedy that "no federal [j]udge in history" had ever ordered

before.  R. 4611 (Abatement Order) at 596648.  The award requires the pharmacies to pay over $650 million for addiction treatment, with significant sums allocated to social programs such as "needle exchange programs," "vocational training," and "recovery-oriented workplaces"—all to help alleviate the "opioid epidemic."  *Id.* at 596649, 596678 n.49.  The scope of that award is completely divorced from the nuisance found by the jury.  According to the verdict form, the jury found that the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels," is a nuisance in the Counties.  R. 4176 (Verdict Form) at 556138, 556142.  The district court ordered the pharmacies to pay to abate something much broader:  the "opioid epidemic" writ large.

To make matters worse, the court then declined to properly apportion the abatement award to account for other actors in the prescription-opioid supply chain.  Most obviously, the court allocated nothing to prescribing physicians (even though the Counties' entire theory is that pharmacies erred in filling illegitimate prescriptions written by doctors) and the other pharmacies that collectively dispensed most of the red-flagged prescriptions in the Counties.  The pharmacies thus must pay more than a *half-billion dollars* to remediate harms caused by others and far removed from their own

alleged misconduct.  Extrapolated by population across the rest of Ohio, the award would grow to more than $17 billion.  Nationwide, the cost would exceed $496 billion, most of which is unconnected to any harms even arguably caused by these pharmacies.  Courts have overwhelmingly rejected using public-nuisance actions to fund massive public-health initiatives to address the opioid crisis.  This case should be no different.

From the outset of the MDL, the district court has stated that it shares the Counties' desire to use this litigation to address the larger opioid crisis.  At the initial MDL hearing—before any evidence or argument—the court tellingly asserted that "everyone shares some of the responsibility, and no one has done enough to abate it," including "the pharmacies."  R. 71 (Status Conference Tr.) at 462.  The court expressed its goal to "do something meaningful to abate this crisis" by ensuring "that we get some amount of money to [plaintiffs] for treatment."  *Id.* at 462-463.  In the name of that goal, the court has been willing to overlook one defect after another:  the text of OPLA, the requirements of Ohio public-nuisance law, egregious juror misconduct, and the limited nuisance actually found by the jury.  The net effect is that the pharmacies have wrongly been held liable for filling prescriptions for legal medications prescribed by licensed doctors—conduct that neither

Ohio nor the federal government has prohibited.  For each and all of these reasons, the judgment should not stand.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this case under 28 U.S.C. § 1331 because the Counties' original complaints against the pharmacies included federal claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*.  The court had supplemental jurisdiction over the Counties' state-law claims—including the claims at issue in this appeal—under 28 U.S.C. § 1367 because those claims are sufficiently related to the RICO claims as to form part of the same case or controversy.

This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment entered on August 22, 2022.  Each pharmacy timely filed an initial notice of appeal on September 7, 2022.  After the district court entered an order appointing Special Master David Cohen as Administrator on September 30, 2022, each pharmacy timely filed an amended notice of appeal on October 5, 2022.  On November 17, 2022, this Court consolidated the pharmacies' appeals and the briefing in this case.

## STATEMENT OF THE ISSUES

1.    Whether the Counties' public-nuisance claims fail because they are barred by the Ohio Product Liability Act.

2.    Whether the Counties' public-nuisance claims fail because the Counties did not prove that the pharmacies violated the federal Controlled Substances Act or any other applicable provision of law.

3.    Whether the Counties' claims that the pharmacies created a public nuisance through the intentional dispensing of prescription opioids fail because those claims are impliedly preempted by a comprehensive federal and state regulatory scheme that governs the dispensing of prescription medications.

4.    Whether the Counties' public-nuisance claims fail because the Counties' asserted injuries are too indirect to satisfy proximate causation.

5.    Whether a new trial is warranted because of juror misconduct.

6.    Whether the district court's abatement order should be vacated because it exceeds the proper scope of abatement relief and violates established principles of apportionment.

## STATEMENT OF THE CASE

### A.    Legal Background

#### 1.    Federal and state regulation of opioids

Both the federal government and the State of Ohio extensively regulate the distribution and sale of prescription opioid medications.  Under the federal Food, Drug, and Cosmetic Act, a prescription medication can be marketed and sold in the United States only after the Food and Drug Administration (FDA) approves the medication as safe and effective for its intended use.  21 U.S.C. § 393(b)(2)(B).  The FDA has repeatedly approved the prescription opioid medications at issue as safe and effective to treat, among other conditions, long-term chronic pain.  *See* R. 4093 (Trial Tr.) at 548144:1-23.

The Controlled Substances Act of 1970 (CSA) prohibits the non-medical sale of prescription opioids.  21 U.S.C. § 829.  The statute and its implementing regulations require that prescriptions be issued by a medical professional for a "legitimate medical purpose."  21 C.F.R. § 1306.04(a).  Responsibility for proper prescribing and dispensing falls in the first instance "upon the prescribing practitioner," but "a corresponding responsibility rests with the pharmacist who fills the prescription."  *Id.*  A person who "knowingly fill[s]" an "order purporting to be a prescription issued not in the usual course of

professional treatment" violates the CSA and is subject to legal penalties.  *Id.*
The U.S. Attorney General, acting through the Drug Enforcement
Administration (DEA), has exclusive authority to enforce the statute.
21 U.S.C. § 871.

The CSA further requires every entity that manufactures, distributes,
or dispenses controlled substances (including prescription opioids) to apply to
the DEA for registration and to periodically renew that registration. 21 U.S.C.
§ 822(a)(1)-(2).  Under the statute, when the DEA considers the registration
application of a "[m]anufacturer[]" or a "[d]istributor[]," it must consider the
applicant's "maintenance of effective controls against diversion of particular
controlled substances."  *Id.* § 823(a)(1), (b)(1).

The implementing regulations echo that "[a]ll applicants and registrants
shall provide effective controls and procedures to guard against theft and
diversion of controlled substances." 21 C.F.R. § 1301.71(a).  The next sentence
clarifies the meaning of "effective controls against diversion":  "In order to
determine whether a registrant has provided effective controls against
diversion, the Administrator shall use the security requirements set forth in
§§ 1301.72-1301.76 as standards for the physical security controls and
operating procedures necessary to prevent diversion."  *Id.*

Sections 1301.72 to 1301.76, in turn, provide detailed guidance for the physical security of prescription medications. For example, Section 1301.72 specifies, among other things, how much a safe used to store certain prescriptions should weigh. Section 1301.73 spells out certain safety controls specific to manufacturers. And Section 1301.74 provides certain requirements that pertain to the *distribution* of controlled substances, which involves the transfer of controlled substances from one DEA registrant to another. Distribution is distinct from the dispensing of controlled substances, which involves the filling of controlled-substance prescriptions for patients. Section 1301.74 requires distributors to "make a good faith inquiry" before distributing a controlled substance to an entity not known to be registered, to determine that the entity is in fact registered, and to "design and operate a system" to identify "suspicious orders of controlled substances." None of the listed provisions requires dispensing *pharmacies* to implement any such system, let alone regulates how they dispense medications to patients with prescriptions. *See id.* § 1301.74(a)-(b) (applying this "system" requirement only to distributors).

The State of Ohio imposes additional requirements on pharmacies through a comprehensive regulatory scheme administered by the Ohio Board

11

of Pharmacy. *See* Ohio Rev. Code Ann. §§ 3719.01-3719.99, 4729.01-4729.99. As relevant here, the dispensing rules under Ohio law are materially identical to those under the CSA. *See* p. 50 n.5, *infra*. The Board is tasked with enforcing these state regulations.

### 2. The Ohio Product Liability Act

A second statutory scheme is central to this appeal. The Ohio Product Liability Act is a comprehensive state statutory regime "intended to abrogate all common law product liability claims or causes of action." Ohio Rev. Code Ann. § 2307.71(B). OPLA defines a "product liability claim" to include two types of actions. First, a product-liability claim "means a claim or cause of action that is asserted in a civil action . . . and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property." *Id.* § 2307.71(A)(13). Second, a product-liability claim "*also* includes any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public." *Id.* (emphasis added). Taken together, these provisions abrogate product-based claims that either seek a particular remedy (certain

kinds of compensatory damages) or are based on a particular theory (the product contributed to a public nuisance).

When OPLA was first enacted in 1988, the statute did not expressly abrogate all product-liability claims, nor did it specifically address public-nuisance claims. *See* Ohio Rev. Code Ann. § 2307.71(M) (1988). In *City of Cincinnati* v. *Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-1145 (Ohio 2002), the Ohio Supreme Court allowed certain product-based public-nuisance claims, over a dissent's warning that the majority had taken "the ill-advised first step toward transforming nuisance into 'a monster that would devour in one gulp the entire law of tort,'" *id.* at 1158 (Cook, J., dissenting) (quoting *Tioga Pub. Sch. Dist. No. 15* v. *United States Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993)). After *Beretta* in 2005, the Ohio General Assembly amended OPLA to clarify that the statute is "intended to abrogate *all* common law product liability claims or causes of action." Ohio Rev. Code Ann. § 2307.71(B) (emphasis added); *see* 2004 Ohio Laws File 144. Then in 2007, the General Assembly amended the statute again to eliminate any doubt that abrogated product-liability claims "also include[] any [product-based] public nuisance claim" under Ohio common law. 2006 Ohio Laws File 198 (codified at Ohio Rev. Code Ann. § 2307.71(A)(13)).

Separate from OPLA, a different Ohio provision provides a specific statutory enforcement mechanism for certain public-nuisance suits related to dispensing controlled substances.  Ohio Rev. Code Ann. § 4729.35.  Plaintiffs bringing statutory public-nuisance claims under that provision may seek only injunctive relief, not abatement or damages.  *Id.*

## B.    Factual Background

### 1.    The opioid MDL

Across the country, States and municipalities struggling with the consequences of the abuse and diversion of opioids have turned to litigation to address those problems.  Early suits alleged that drug manufacturers had violated state fraud and false-advertising statutes, and had committed the common-law torts of negligence, unjust enrichment, and public nuisance.  *See* Richard C. Ausness, *The Role of Litigation in the Fight Against Prescription Drug Abuse*, 116 W. Va. L. Rev. 1117, 1148-1150 (2014).  Since the mid-2010s, the public-nuisance theory has become especially prominent, as States and local governments around the country have asserted common-law public-nuisance claims against companies that manufacture, distribute, and dispense

opioids.  Many state courts have rejected such claims as an impermissible expansion of the tort of public nuisance.[2]

The present cases, however, along with thousands of other public-nuisance cases consolidated in a nationwide federal multidistrict litigation presided over by Judge Dan Aaron Polster in Cleveland, were allowed to proceed.  In earlier public-nuisance cases brought by other Ohio plaintiffs in the MDL, a dispositive legal question quickly arose: whether OPLA abrogates common-law public-nuisance claims based on the manufacture, distribution, or sale of opioids.  In particular, Summit County and the City of Akron brought a common-law public-nuisance claim and sought purported "abatement."  The defendants in that case moved to dismiss the nuisance claim under OPLA, and then-Magistrate Judge David Ruiz agreed that "the plain language of the statute" abrogated the claims.  R. 1025 (Track One R. & R.) at 24870.

---

[2] *See, e.g.*, *State ex rel. Hunter* v. *Johnson & Johnson*, 499 P.3d 719, 721 (Okla. 2021); *People* v. *Purdue Pharma L.P.*, 2021 WL 7186146 (Cal. Super. Ct. Dec. 14, 2021); *State ex rel. Ravnsborg* v. *Purdue Pharma, L.P.*, 2021 WL 6102727 (S.D. Cir. Ct. Mar. 29, 2021); *People* v. *Johnson & Johnson*, 2021 WL 7160515 (Ill. Cir. Ct. Jan. 8, 2021); *State ex rel. Stenehjem* v. *Purdue Pharma L.P.*, 2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019); *State ex rel. Jennings* v. *Purdue Pharma L.P.*, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019); *City of New Haven* v. *Purdue Pharma, L.P.*, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019).

The district court rejected the magistrate judge's recommendation. R. 1203 (Track One Mot. to Dismiss Op.) at 29047. The court concluded without elaboration that the statutory text was ambiguous and instead focused on the "associated legislative history." *Id.* at 29043. Relying on that legislative history, the court concluded that the 2005 amendment of the statute—which abrogated "*all* common law product liability claims or causes of action"—was narrowly intended to overrule only an Ohio Supreme Court decision concerning negligent design. The court also brushed aside the 2007 amendment—which specifically forecloses *any* common-law public-nuisance suit—again based on the legislative history. In the court's view, although the statute abrogates "any" product-based public-nuisance claims, it actually abrogates only claims seeking compensatory damages, not those seeking a monetary judgment in the form of "equitable abatement." *See id*. at 29043-29045, 29047.

In 2020, the present cases took shape. The Counties had filed complaints in the MDL in December 2017. Those complaints alleged common-law public-nuisance claims against manufacturers and distributors, but not pharmacies. *See* Dkt. 1-2, No. 18-op-45032 (N.D. Ohio Jan. 11, 2018); Dkt. 1-2, No. 18-op-45079 (N.D. Ohio Jan. 18, 2018). In March 2019, the Counties amended their

complaints to add the pharmacies as defendants. *See* Dkt. 16, No. 18-op-45032 (N.D. Ohio Mar. 18, 2019); Dkt. 11, No. 18-op-45079 (N.D. Ohio Mar. 18, 2019). Then in April 2020, after this Court intervened on mandamus to prevent the district court from belatedly adding dispensing claims to a bellwether trial, *see In re National Prescription Opiate Litig.*, 956 F.3d 838 (6th Cir. 2020), the district court ordered the Plaintiffs' Executive Committee to identify a different bellwether case to decide "only public nuisance claims" "against only the pharmacy defendants," R. 3261 (Order Regarding Track 1B and Track Three) at 492714. The Committee identified the Counties' cases, and the court accepted its selection, granting the Counties leave to amend their complaints yet again to add more factual allegations. R. 3261; R. 3282 (Order Regarding Track Three); R. 3314 (Order Granting Leave to Am. Compls.). The court then severed the Counties' common-law public-nuisance claims against the pharmacies and allowed only those claims to proceed to trial, staying all remaining claims "for later discovery and trial." R. 3315 (Bifurcation Order) at 494853.

In their amended complaints, the Counties alleged that the pharmacies caused a public nuisance under Ohio common law by "fail[ing] to use data at the corporate level to assist pharmacists in evaluating red flags of diversion,"

17

R. 3326 at 495004 ¶ 209, 495029-495030 ¶¶ 285-289, and by failing to "implement policies and procedures at a corporate level to identify and address signs of diversion," *id.* at 495022 ¶ 261, 495057 ¶¶ 386-387. The complaints alleged that the pharmacies had caused injuries directly to the Counties, by "[i]ncreas[ing] costs and expenses" relating to treatment of opioid addiction as well as other "healthcare services, law enforcement, the criminal justice system, social services, and education systems." R. 3326 at 495144 ¶ 625(vi); R. 3327 at 495351 ¶ 625(vi). The Counties sought billions of dollars for these past and present harms, styled as "abatement" in their complaints. R. 3326 at 495150 ¶ 607(p); R. 3327 at 495357 ¶ 607(p).

The pharmacies moved to dismiss the Counties' claims as abrogated by OPLA and lacking the necessary elements of unlawful or intentional conduct and proximate causation. R. 3340-1 (Br. in Support of Mot. to Dismiss) at 495652-495660, 495668. The district court denied the motion. The court relied on its prior ruling on OPLA, and further concluded that the pharmacies' alleged conduct was not too remote from the asserted municipal injuries to support proximate causation. R. 3403 (Mot. to Dismiss Op.) at 497759-497760. Finally, the Court held that the Counties had stated a nuisance claim because the CSA and its implementing regulations supposedly impose affirmative

corporate-level duties on pharmacies to implement "effective controls and procedures" in their dispensing practices to guard against the filling of potentially invalid prescriptions. *Id.* at 497752. According to the court, although the CSA does not "specify exactly what 'effective controls and procedures' a pharmacy must use," it does require pharmacies to analyze data in their possession in an attempt to identify and block potentially invalid prescriptions. R. 3499 (Order Denying Recons.) at 502745-502747. The case proceeded to a jury trial on liability.

### 2.    The liability trial and verdict

From the start of the liability trial, the Counties sought to develop a theme that the pharmacies' supposed corporate greed led them to profit from opioid addiction. *See* R. 3991 (Trial Tr.) at 540287:24-540288:3. The Counties returned to that theme when, in response to a juror's question about whether Walgreens provides free naloxone—a life-saving medication that can reverse an opioid overdose—the Counties' counsel cross-examined a Walgreens employee to show that Walgreens charges customers for naloxone. R. 4057 (Trial Tr.) at 546486:3-546487:15.

After hearing that testimony, Juror #4 conducted independent internet research into the availability of naloxone. She printed copies of a flier stating

that naloxone was available elsewhere for free, made a copy available to each of the other jurors, and discussed the availability of free naloxone with them. R. 4065 (Trial Tr.) at 546964:22-546968:6. Upon learning of the misconduct, the district court dismissed Juror #4. *Id.* at 546972:4-25. Other jurors then confirmed that they had received the flier, that some had reviewed the flier, and that the flier or Juror #4 had informed some of them that naloxone is available elsewhere for free. *Id.* at 546974:12-547011:3.

Counsel for both sides immediately recognized the need for a mistrial. The Counties' counsel acknowledged that the information could favor his clients because it fed into their theory that the pharmacies were motivated by greed. R. 4065 (Trial Tr.) at 546970:7-12. He explained that, under the circumstances, a "mistrial is appropriate. That's my candor to the tribunal which I owe under my ethical obligation." *Id.* at 547017:1-3. The district judge also recognized that the juror misconduct was egregious, remarking that it violated "probably the most important instruction I give," and that in 22 years on the bench, he had never seen "anything like this." *Id.* at 547001:13-14, 546972:14-15. The court nevertheless warned that "[i]f we have to stop this trial, I'm not making any commitment as to when or if I will retry the case." *Id.* at 547026:11-13.

20

The pharmacies promptly moved for a mistrial.  R. 4068 (Mot. for Mistrial).   But following the district court's admonitions, the Counties reversed course and argued that a mistrial was unnecessary.  R. 4069 (Opp. to Mot. for Mistrial).  The court denied the pharmacies' motion on the ground that because the juror misconduct had been revealed before the jury reached a verdict, the court could assess any influence on the remaining jurors through individualized questioning.  R. 4078 (Trial Tr.) at 547247:5-547251:24.  The court then brought in each remaining juror for one to two minutes and asked whether the juror could remain impartial after Juror #4's misconduct.  *Id.* at 547258:23-547270:25.  After each juror denied bias, the trial proceeded.

Throughout the trial, the Counties did not attempt to prove that a single prescription filled by any of the pharmacies was in fact illegitimate, meaning that it was not written by a licensed doctor for a legitimate medical purpose. Instead, the Counties presented two expert witnesses who testified that the pharmacies filled numerous opioid prescriptions that bore "red flags"— *i.e.*, something about the prescription, patient, or surrounding circumstances, in the experts' view, could indicate that the prescription might be illegitimate. *See* R. 4005 (Trial Tr.) at 541480-541518, 541531-541532 (testimony of Carmen Catizone); R. 4032 (Trial Tr.) at 544723, 544730-544732 (testimony of Craig

21

McCann).  The Counties' experts made clear that such "red flags" did not mean a prescription *was* illegitimate and did not mean that it should not be filled. *See* R. 4005 (Trial Tr.) at 541483-541484.  Rather, they testified that the pharmacist should resolve a "red flag" before filling the prescription, and there was not adequate documentation that pharmacists had resolved each of the red flags the experts identified.  *See id.* at 541480; R. 4032 at 544730-544732.

The Counties also presented testimony that the pharmacies' corporate policies did not list all of the "red flags" that the Counties' experts described. *See* R. 4131 (Pltfs.' Omnibus Opp. to Rule 50(a) Mots.) at 552954-552991.  The Counties further faulted the pharmacies for not blocking prescriptions written by certain doctors, who were licensed by both the State of Ohio and the DEA, and for not providing their pharmacists with enough "tools" to identify "red flags." *Id.*  In short, rather than attempting to prove that pharmacists knowingly filled illegitimate prescriptions, the Counties built their case around the pharmacies' asserted failure to develop corporate systems directed to red flags.

At the close of evidence, the district court instructed the jury that the pharmacies could be held liable for a "public nuisance" based on their

dispensing of prescription opioid medications in either of two ways. First, they could be liable if they filled prescriptions without first instituting "effective controls" to guard against "diversion"—which the court told the jury was required by both state and federal law. R. 4153 (Trial Tr.) at 554648:12-15. Second, the court instructed the jury that even if the pharmacies did not violate any dispensing regulations, they could still be liable if they engaged in "intentional conduct" by filling prescriptions for opioid medications that risked harm to public health or public safety. *Id.* at 554649:8-13. As to causation, the court instructed the jury that defendants could be liable if they were "a substantial factor in creating the public nuisance." *Id.* at 554650:5-9.

On November 23, 2021, the jury returned a verdict finding all three pharmacies liable for contributing to a public nuisance. The verdict form stated that the jury had found that the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels," is a nuisance in the Counties. R. 4176 at 556138, 556142. The jury further found that the Counties had proved that the pharmacies "engaged in intentional and/or illegal conduct which was a substantial factor in producing the public nuisance"—*i.e.*, the oversupply and diversion of legal prescription opioids. *Id.* at 556139, 556143.

### 3.    Post-trial motions

On December 21, 2021, the pharmacies filed motions for judgment as a matter of law under Rule 50(b) and for a new trial under Rule 59. They argued that the Counties' public-nuisance claims were abrogated by OPLA, inconsistent with and preempted by the CSA, and lacked the requisite proximate causation. R. 4202 (Defs.' Rule 50(b) Mot. for JMOL) at 557743-557765. They also argued that the district court had erred by failing to require a mistrial after Juror #4's egregious misconduct. R. 4204 (Defs.' Rule 59 Mot. for New Trial) at 557823-557826. The district court denied both motions. R. 4295 (Rule 50(b) Op.); R. 4296 (Rule 59 Op.). The court concluded that the evidence supported a finding that the pharmacies had engaged in unlawful conduct under the CSA, or alternatively, intentional and culpable conduct (*i.e.*, the intentional dispensing of prescription opioids), amounting to a nuisance. R. 4295 at 572078-572098. The court also reiterated its earlier conclusions on proximate causation and juror misconduct. *Id.* at 572099-572103; R. 4296 at 572141-572146.

On the OPLA issue, the district court elaborated on its prior analysis. As explained above, the court had previously held that OPLA abrogates only those common-law public-nuisance claims that seek certain compensatory

damages. R. 1203 at 29042-29047. The court's Rule 50(b) opinion further concluded that OPLA abrogates only statutory claims, and only claims alleging a defective design, warning, or warranty. R. 4295 at 572104-572107.

The pharmacies also moved under 28 U.S.C. § 1292(b) to certify for interlocutory appeal the district court's orders denying their motion to dismiss and denying a mistrial. The court declined to certify an interlocutory appeal, and Walgreens and Walmart sought mandamus in light of the district court's clear errors. Pet. for Writ of Mandamus, *In re Walmart, Inc.*, No. 22-3107 (6th Cir. Feb. 7, 2022). A panel of this Court denied the petition. The panel did not address the merits, and held only that mandamus relief was unnecessary because an appealable final judgment would follow soon after the bench trial on remedies. Order at 2, *In re Walmart, Inc.*, No. 22-3107 (6th Cir. Apr. 5, 2022).

### 4. Remedial proceedings

In May 2022, the district court conducted a bench trial to determine the scope of the remedies. On August 17, 2022, the district court issued an abatement order and an accompanying injunction. The court determined that the nuisance to be abated was the broad category of downstream harms in the Counties relating to the opioid crisis: opioid use disorder, addiction, overdose,

death, inability to work, and related strains on public resources.  R. 4611 at 596656, 596659-596662.  The court acknowledged that the jury had found a much narrower nuisance on the verdict form—the "oversupply and diversion of legal prescription opioids"—but the court concluded without explanation that, in light of the jury instructions, the jury had necessarily found a broader nuisance relating to the "opioid epidemic" generally.  *Id.* at 596660.  The court adopted the Counties' proposed abatement plan in large part, and awarded a monetary judgment of $650.6 million, to be paid by the pharmacies over 15 years.

The district court used as its baseline "Plaintiffs' top-line estimated total cost numbers," reasoning that "from a fairness standpoint," it was appropriate to "err on the side of the wronged party to ensure . . . that there are sufficient funds to abate the nuisance."  R. 4611 at 596682.  To account for the level of opioid addiction that even the Counties' experts admitted would exist independent of prescription opioids, the court discounted the Counties' cost estimates by 33.8% for Lake County and 39.3% for Trumbull County.  The court then approved the vast majority of the Counties' proposed programs to remediate the downstream effects of the abuse and diversion of opioids.  The court excised a handful of programs (collectively representing just 6.3% of the

award to Lake County, and 7.9% for Trumbull County) that it determined were not "reasonably calculated" to abate the "opioid nuisance," including grief counseling, HIV treatment, and stigma-reduction training for police officers. *Id.* at 596680.

Because the district court believed the manufacturers and distributors also had played a role in the crisis, the court held the pharmacies responsible for one-third of the total abatement costs. R. 4611 at 596688. That allocation of liability did not account for any of the other actors that the Counties had admitted were also responsible for the harms they sought to remediate, such as doctors, the federal government, or other pharmacies within Lake and Trumbull Counties. Instead of distributing the final $650 million sum across a defined set of approved programs, the district court awarded a lump sum to be paid annually.

The district court also issued an injunction. R. 4611-1 (Inj. Order). The injunction requires the pharmacies to scrutinize prescribing data, identify potential doctors of concern, and "block[]" licensed doctors from filling prescriptions at defendant pharmacies nationwide unless those concerns are resolved. *Id.* at 598405-598406 § X. It also establishes a court-appointed Administrator, whose fees the pharmacies must pay, to interpret and enforce

the order's vague terms (potentially for the next 15 years). *Id.* at 598397 § I.B, 598408-598409 § XVI.A. The Administrator is empowered to disburse the funds to the Counties after verifying that "the specific programs the Counties want to fund are reasonably calculated to abate the nuisance." R. 4611 at 596707.

On September 30, 2022, after the district court entered final judgment, it entered another order appointing the MDL's Special Master, David R. Cohen, as Administrator. R. 4652 (Appointment Order) at 599849.

## SUMMARY OF ARGUMENT

The district court's judgment should be reversed or vacated because of several independent, fundamental errors.

I. Most simply, reversal is required because Ohio law bars the Counties' public-nuisance claims. OPLA is "intended to abrogate all common law product liability claims or causes of action." Ohio Rev. Code Ann. § 2307.71(B). The statute defines two categories of abrogated "product liability claim[s]": (1) claims that "seek to recover compensatory damages from a manufacturer or supplier" for certain product-related harms, and (2) "any public nuisance claim or cause of action at common law" that is based on, among other things, the "marketing," "distribution," "or sale of a product."

28

*Id.* The Counties' common-law public-nuisance claims fall squarely within the second category, and thus are barred under Ohio law.

Instead of applying the statute as written, the district court looked to an associated statement of legislative intent to conclude that the Ohio legislature meant to bar only those public-nuisance claims that fall under the first category—that is, claims for certain compensatory damages. The court's reasoning ignored both the statutory text and historical context. The Ohio legislature added the key language defining an abrogated "product liability claim" to "also include[] *any* public nuisance claim or cause of action at common law" following a series of Ohio Supreme Court decisions that parted ways with other state and federal courts by recognizing increasingly expansive product-based public-nuisance suits. The Ohio General Assembly sought to curb suits exactly like these, and it did so in plain language that the district court ignored.

II.    Even if the Counties' claims were not abrogated, reversal would be required because the Counties failed to establish a core element of their nuisance claims. Under Ohio law, a nuisance plaintiff typically must establish that the defendant committed either "unlawful" or "intentional, culpable" conduct. In a highly regulated industry, however, a defendant cannot be held

liable for conduct that complies with all applicable laws and regulations. The Counties thus had to prove that the pharmacies engaged in unlawful conduct. They failed to do so.

A.    The Counties did not establish that the pharmacies committed any unlawful conduct. The Counties argued that the pharmacies violated two implementing regulations of the CSA—21 C.F.R. §§ 1306.04 and 1301.71—by failing to design and implement systems to prevent diversion, including by detecting "red flags" suggesting potentially invalid prescriptions and blocking certain doctors. But neither regulation requires dispensing pharmacies to implement systems to predict and prevent the filling of illegitimate prescriptions for opioids that may be diverted. Section 1306.04 prohibits only the "knowing" filling of invalid prescriptions. The Counties never proved (or even attempted to prove) that any pharmacist ever knowingly filled an invalid prescription. Section 1301.71 requires DEA registrants to "provide effective controls and procedures to guard against theft and diversion of controlled substances," as specified in the "security requirements set forth in §§ 1301.72-1301.76." Those provisions, in turn, impose no duties on pharmacies to implement red-flag systems to detect illegitimate prescriptions for opioids

that may be diverted.  The Counties thus could not satisfy the public-nuisance element of "unlawful" conduct.

B.     Nor could the Counties alternatively rely on a theory of lawful but intentional, culpable conduct.  Under Ohio law, a company operating in a highly regulated environment cannot be held liable for a public nuisance if it complies with all applicable laws and regulations.  *See* 1 CV Ohio Jury Instructions 621.09 (Aug. 2022).  And even if Ohio permitted nuisance liability for lawful conduct in these circumstances, the CSA would preempt such liability.  The CSA and its implementing regulations strike a nuanced balance between competing policy concerns:  minimizing harm resulting from the improper use of controlled substances on the one hand, and permitting the sale of prescription medications for legitimate medical uses on the other.  The Counties' alternative liability theory would disrupt that balance and conflict with Congress's objects in the CSA.  *See Geier* v. *American Honda Motor Co.*, 529 U.S. 861, 864-865 (2000).

C.     At a minimum, if the Court agrees with the pharmacies on either prong, the jury verdict must be vacated because the verdict form does not specify whether the jury rested its decision on a finding of unlawful or intentional conduct.

III.    The Counties also failed to satisfy another element of the Ohio public-nuisance tort:  proximate causation.  Proximate causation requires a direct link between the defendant's conduct and the plaintiff's asserted harm. *City of Cleveland* v. *Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010) (applying Ohio law).  A causal chain that extends past the "first step" is typically too attenuated to support proximate causation.  *Holmes* v. *Securities Inv. Prot. Corp.*, 503 U.S. 258, 272 (1992) (citation omitted).  The Counties' causal chain here requires many steps:  the pharmacies' failure to develop systems to catch red flags (i) caused individual pharmacists to dispense too many prescription opioids; (ii) which led some individuals to illegally divert some prescription opioids; (iii) which caused some individuals to develop addictions to prescription opioids; (iv) which led some individuals to seek out and become addicted to illicit opioids like heroin; (v) which caused some of those individuals to overdose, to commit crimes, and to require more healthcare, education, and social services; (vi) which caused the Counties to spend more on treatment and social services.  That causal chain is far too attenuated to satisfy proximate causation.

IV.    Although the trial in this case never should have happened, at least it should have been fair.  Instead it was tainted by egregious juror misconduct.

Under this Court's precedent, when outside evidence is introduced to the jury on a core disputed issue, a mistrial is the only appropriate remedy. *See In re Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1982). Here, a juror introduced outside research probative of a key issue in the trial—the pharmacies' supposed greed and profit motivation. As a result, the district court's refusal to grant a mistrial was error and requires vacatur.

V.     Finally, at the very least, the unprecedented $650 million abatement award that the district court ordered should be vacated.

A.     The award exceeds the district court's equitable authority because abatement is limited to relief that stops the condition that constitutes a nuisance. *See Wind* v. *State*, 130 N.E. 35, 36 (Ohio 1921); 3 William Blackstone, Commentaries *168. Here, the jury found a specific nuisance: the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market." R. 4176 at 556138, 556142. But the court's $650 million award does not seek to stop the nuisance-causing conduct that the jury found. Instead, the sweeping abatement plan was designed to address the vast downstream costs of the opioid epidemic writ large. The award funds everything from treatment of opioid addiction to needle exchanges to additional drug courts, and far exceeds the traditional equitable authority of federal courts.

B.    The district court's order also violates established principles of apportionment.  The court recognized that the pharmacies should not bear liability for all of the Counties' projected abatement costs, but it failed to apportion the award appropriately.  Although the court correctly held that opioid manufacturers and distributors should bear a portion of the costs, it failed to account for at least two groups proven at trial to bear significant responsibility for the Counties' harms:   the doctors who wrote invalid prescriptions in the first place, and other pharmacies in the Counties.

## ARGUMENT

The district court committed three errors that independently require reversal, and two that require remand.  The judgment should be reversed because (I) OPLA's plain text bars the Counties' common-law public-nuisance claims; (II) the Counties have not shown that the pharmacies committed unlawful or intentional conduct, as Ohio nuisance law requires; and (III) the causal chain between the pharmacies' conduct and the Counties' alleged injuries is too indirect and remote to support proximate causation.  At a minimum, the case should be remanded because (IV) the jury verdict was tainted by egregious juror misconduct and (V) the abatement remedy that the court ordered is far broader than the nuisance that the jury actually found,

exceeds the proper scope of abatement, and is improperly apportioned. Although the OPLA issue pertains only to Ohio cases and the juror-misconduct issue pertains only to this particular trial, the remaining issues affect all of the 2,500 cases in the MDL.

# I.   OPLA FORECLOSES THE COUNTIES' CLAIMS

OPLA abrogates the Counties' only claims here.  OPLA's text and history make clear that the statute abrogates all common-law public-nuisance claims involving the sale of products, regardless of the remedy sought.  And the Counties brought common-law public-nuisance claims involving the sale of prescription opioids, which are indisputably products.

## A.   OPLA's Text Unambiguously Bars The Counties' Claims

1.   OPLA is "intended to abrogate all common law product liability claims or causes of action."  Ohio Rev. Code Ann. § 2307.71(B).  The Act defines the scope of preempted "product liability claims" as follows:

> "Product liability claim" means a claim or cause of action that is asserted in a civil action pursuant to sections 2307.71 to 2307.80 of the Revised Code and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:
>
> > (a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

(b) Any warning or instruction, or lack of warning or instruction, associated with that product;

(c) Any failure of that product to conform to any relevant representation or warranty.

"Product liability claim" also includes any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public.

*Id.* § 2307.71(A)(13).

As that definition makes clear, OPLA covers two categories of abrogated "product liability claim[s]."  First, "product liability claim" means a claim "that seeks to recover compensatory damages from a manufacturer or supplier" for certain harms resulting from a design defect, failure to warn, or failure to conform to any warranty.  Ohio Rev. Code Ann. § 2307.71(A)(13). Second, "product liability claim" "also includes *any* public nuisance claim or cause of action at common law" that is based on, among other things, the "marketing," "distribution," "or sale of a product."  *Id.* (emphasis added). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *United States* v. *Gonzales*, 520 U.S. 1, 5 (1997) (citation omitted).

On its face, OPLA's expansive language is not limited to only public-nuisance claims seeking certain compensatory damages, as the district court held. R. 1203 at 29046. The *first* category of "product liability claim" is indeed tied to whether a claim, of any kind, seeks compensatory damages from a manufacturer or supplier for the harm caused by a product. But the *second* category is additive and directly on point: the set of abrogated claims "*also includes* any public nuisance claim" based on the distribution or sale of a product. Ohio Rev. Code Ann. § 2307.71(A)(13) (emphasis added); *see Mount Lemmon Fire Dist.* v. *Guido*, 139 S. Ct. 22, 25 (2018) ("'[A]lso' is a term of enhancement; it means 'in addition; besides' and 'likewise; too.'") (citation omitted). The second category thus adds a set of abrogated claims based solely on the legal theory asserted rather than the relief requested: all public-nuisance claims based on the distribution or sale of a product.

The Counties have not offered any plausible explanation for how their claims escape that plain text. To the contrary, the Counties' claims track the precise language of the statute. The Counties alleged in their complaints that the pharmacies "created and maintained a public nuisance" because their "marketing," "distributing," and "selling" of prescription opioids "unreasonably interfere with the public health, welfare, and safety." R. 3326

at 495143 ¶ 619; R. 3327 at 495350 ¶ 619; *see* Ohio Rev. Code Ann. § 2307.71(A)(13). The Counties have never disputed that prescription opioids fall within the broad statutory definition of a "product." *See* Ohio Rev. Code Ann. § 2307.71(A)(12) ("product" includes "any object, substance, mixture, or raw material" that is tangible personal property, capable of delivery, and produced and sold for commercial use). That should be the end of the analysis.

2. The district court's contrary analysis was wrong at every step. In its initial OPLA decision, the district court declined to start with OPLA's plain language. Instead, it simply declared the text ambiguous—without identifying what language the court found unclear—and reasoned backward from excerpts of the "associated legislative history." R. 1203 at 29043. That exercise was unnecessary because OPLA's abrogation of "any [common-law] public nuisance claim" involving the sale of a product is unambiguous. Ohio Rev. Code Ann. § 2307.71(A)(13). When "the meaning of a statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary." *State ex rel. Prade* v. *Ninth Dist. Ct. of Appeals*, 87 N.E.3d 1239, 1242 (Ohio 2017) (per curiam) (citation omitted); *see Olden* v. *LaFarge Corp.*, 383 F.3d 495, 502 (6th Cir. 2004) (warning against the

"incentive to interpret what we believe to be unambiguous as ambiguous, in order to open the door to the legislative history").

When the district court turned to the statutory language, it erred again. The court focused on the fact that OPLA defines "product liability claim" to "also *include*[] any public nuisance claim." R. 1203 at 29045-29046 (emphasis added). In the court's view, the use of "include" means that the second category of abrogated claims (public-nuisance claims) is only a subset of the first category of abrogated claims (those seeking compensatory damages). *Id.* Although the word "includes" on its own often introduces an illustrative example, the full phrase "also includes"—which appears in a new statutory paragraph that the General Assembly separately added in 2007—is plainly additive. *See Mount Lemmon*, 139 S. Ct. at 25; pp. 45-46, *infra*. The court thus made the error of focusing on a single word rather than the text as a whole. *See Gabbard* v. *Madison Loc. Sch. Dist. Bd. of Educ.*, 179 N.E.3d 1169, 1178 (Ohio 2021) ("Our precedent requires courts to read a statute as a whole and to not dissociate words and phrases from that context.").

In its Rule 50(b) ruling, the district court doubled down on its incorrect reading. In its initial OPLA decision, the court had wrongly imported the compensatory-damages limitation from the first category of "product liability

claim" into the second, additive category. In its Rule 50(b) decision, the court went further and made the *entire* second category a subset of the first. R. 4295 at 572103-572107. On the court's latest reading, the second category—"any public nuisance claim or cause of action at common law" based on the distribution or sale of a product, Ohio Rev. Code Ann. § 2307.71(A)(13)— applies only if the claim (i) is based on a statute, (ii) seeks compensatory damages, and (iii) alleges a defective design, warning, or warranty, *id*.

Importing all of those limitations turns the second category of product-liability claims into a null set. OPLA's second category abrogates "any public nuisance claim . . . *at common law*." Ohio Rev. Code Ann. § 2307.71(A)(13) (emphasis added). By contrast, the first category covers "a claim or cause of action that is asserted in a civil action *pursuant to sections 2307.71 to 2307.80 of the Revised Code*." *Id*. (emphasis added). On the district court's reading, OPLA would never abrogate any common-law public-nuisance claim, because such a claim is never asserted pursuant to any of the listed statutes (or any statute). Similarly, the second category abrogates public-nuisance claims based on the "distribution" or "sale of a product," while the first addresses only allegations of defective design, warning, or warranty. *Id*. Those textual differences underscore that OPLA's separate preemption of common-law

40

nuisance claims must be additive and independent. It cannot be merely a subset of the first category.

The district court was reluctant to read OPLA according to its plain terms because it believed that the statute otherwise "does not provide for any form of equitable remedy." R. 1203 at 29045. That concern was misplaced for at least two reasons. First, the court assumed that plaintiffs like the Counties simply must be able to bring common-law public-nuisance claims for equitable relief like abatement based on product sales. But States are the masters of their own common law. The Ohio General Assembly reasonably chose to foreclose relief—including equitable relief—for product-based common-law public-nuisance claims. That is hardly a novel choice. Many jurisdictions adhere to a similar "boundary between the well-developed body of product liability law and public nuisance law." *Camden Cnty. Bd. of Chosen Freeholders* v. *Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001); *see* pp. 45 n.3, *infra* (collecting cases). Indeed, "most courts" have rejected nuisance claims based on product sales, "because the common law of public nuisance is an inapt vehicle for addressing" product-related harms. Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (2020 ed. Oct. 2022 update). Reading OPLA according to its plain terms does not create any aberrant result, but

simply confirms that Ohio's public-nuisance law sides with the majority position.

Second, the district court was wrong to say that the pharmacies' reading of OPLA would not allow for any equitable remedy. In fact, the statute does allow claims for equitable relief, including "in the form of the abatement of a nuisance," for "contamination or pollution of the environment." Ohio Rev. Code Ann. § 2307.72(D)(1). So OPLA permits equitable remedies for some product-based nuisance claims; it simply does not permit them in this type of case. The Ohio General Assembly chose to abrogate certain novel product-based claims for equitable relief, while allowing such claims in the narrow, more traditional context of environmental nuisances. Indeed, the specific exception for environmental claims would serve little purpose if OPLA did not otherwise abrogate product-based nuisance claims seeking abatement relief. The district court brushed this provision aside in a footnote, concluding that the provision was meant to "carv[e] out . . . all forms of relief for pollution of the environment from preemption by federal environmental protection laws and regulations." R. 1203 at 29045 n.12. That explanation makes little sense, however, because States cannot "carve out" relief from federal preemption.

Instead, the logical explanation is that Ohio permits only certain, traditional product-based nuisance claims but precludes others.

That is not all. In a more targeted statute, the General Assembly specifically addressed public-nuisance liability for the sale of controlled substances, but it conspicuously did not authorize the type of claim in this case. Section 4729.35 of the Ohio Revised Code allows certain plaintiffs to sue pharmacies for *statutory* public nuisances relating to the sale of controlled substances. Such plaintiffs may claim a violation of Ohio or federal law "controlling the distribution of a drug." Ohio Rev. Code Ann. § 4729.35. And such plaintiffs may obtain equitable relief, but only in the form of an *injunction*. *Id.* (authorizing "an action in the name of the state to enjoin [a] person from engaging in [a] violation [of the law]"). To be sure, a plaintiff might prefer to seek sweeping "abatement" relief under the common law rather than pursue a statutory claim for an injunction. But the Ohio General Assembly did not afford that option. It broadly abrogated product-based public-nuisance claims at common law, but allowed such claims based on a statute or regulation, for selling a particular product (drugs), and seeking a particular relief (an injunction to stop an ongoing legal violation).

**B.    The Statutory History Confirms OPLA's Plain Meaning**

OPLA's statutory history confirms its plain text.  When OPLA was first enacted in 1988, the statute did not abrogate all product-liability claims, nor did it specifically address public-nuisance claims.  *See* Ohio Rev. Code Ann. § 2307.71(M) (1988).  In the years following OPLA's enactment, the Ohio Supreme Court applied the statute narrowly.  In *LaPuma* v. *Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996), for example, the court held that OPLA abrogated only those product-liability claims that sought non-economic damages.  And in *Carrel* v. *Allied Products Corp.*, 677 N.E.2d 795, 800 (Ohio 1997), the court held that OPLA did not abrogate "the common-law action of negligent design."

The Ohio Supreme Court went a step further in *City of Cincinnati* v. *Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-1145 (Ohio 2002).  There, the court allowed product-based public-nuisance claims based on the sale of handguns.  That holding marked a significant expansion of public-nuisance law.  *See id.* at 1158 (Cook, J., dissenting).  Indeed, the dissent warned that the *Beretta* majority had taken "the ill-advised first step toward transforming nuisance into 'a monster that would devour in one gulp the entire law of tort.'" *Id.* at 1157 (quoting *Tioga Pub. Sch. Dist.*, 984 F.2d at 921).  Courts around the

country had repeatedly rejected comparable product-based public-nuisance claims. *See, e.g., Tioga Pub. Sch. Dist.*, 984 F.2d at 921; *Camden Cnty.*, 273 F.3d at 540 (distributing "non-defective, lawful products . . . cannot be a nuisance without straining the law to absurdity").[3]

In 2005, not long after *Beretta*, the Ohio General Assembly amended OPLA to clarify the statute's intended broad scope. The amendment specified that OPLA is "intended to abrogate *all* common law product liability claims or causes of action." Ohio Rev. Code Ann. § 2307.71(B) (emphasis added); *see* 2004 Ohio Laws File 144. In making that change, the General Assembly sought to bring Ohio in line with other jurisdictions that had rejected product-based public-nuisance claims. *See id.* Despite the 2005 amendment, the City of Toledo brought a high-profile lawsuit against lead-paint manufacturers for

---

[3] In the years since, multiple courts have recognized that public-nuisance law does not apply in the specific context of opioid lawsuits like this one. *See, e.g., State ex rel. Hunter* v. *Johnson & Johnson*, 499 P.3d 719, 721 (Okla. 2021); *People* v. *Purdue Pharma L.P.*, 2018 WL 1902557 (Cal. Super. Ct. Dec. 14, 2021); *State ex rel. Ravnsborg* v. *Purdue Pharma, L.P.*, 2021 WL 6102726 (S.D. Cir. Ct. Mar. 29, 2021); *People* v. *Johnson & Johnson*, 2021 WL 7160515 (Ill. Cir. Ct. Jan. 8, 2021); *State ex rel. Stenehjem* v. *Purdue Pharma L.P.*, 2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019); *State ex rel. Jennings* v. *Purdue Pharma L.P.*, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019); *City of New Haven* v. *Purdue Pharma, L.P.*, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019).

allegedly contributing to a public nuisance.  *See City of Toledo* v. *Sherwin-Williams Co.*, 2007 WL 4965044 (Ohio Ct. Com. Pl. Dec. 12, 2007).

While that lawsuit was pending, the General Assembly responded yet again, and this time it left no room to maneuver.  In the 2005 amendment, the Assembly had abrogated "all common law product liability claims."  Ohio Rev. Code Ann. § 2307.71(B).  In 2007, the Assembly further amended the statute to specify that "'[p]roduct liability claim' *also includes any public nuisance claim or cause of action at common law in which it is alleged that the* design, manufacture, *supply*, marketing, *distribution*, promotion, advertising, labeling, *or sale of a product* unreasonably interferes with a right common to the general public."  2006 Ohio Laws File 198 (codified at Ohio Rev. Code Ann. § 2307.71(A)(13)) (emphasis added).  The Ohio Court of Common Pleas promptly dismissed Toledo's public-nuisance claim against the paint manufacturers, recognizing that the 2005 and 2007 amendments overruled *Beretta* and abrogated all common-law public-nuisance claims involving products.  *Sherwin-Williams Co.*, 2007 WL 4965044, at n.2.[4]

---

[4]    A different Ohio trial judge later suggested that *Beretta* still permits certain product-based public-nuisance claims.  *See State ex rel. DeWine* v. *Purdue Pharma LP*, 2018 WL 4080052, at *4 (Ohio Ct. Com. Pl. Aug. 22, 2018).  That decision discussed only the first category in the "product liability claim"

The district court's conclusion that OPLA abrogates only public-nuisance claims for compensatory damages is impossible to square with the 2007 amendment.  Before 2007, OPLA *already* barred any product-liability claim, including one sounding in nuisance, against manufacturers or suppliers for compensatory damages.  The whole point of the 2007 amendment was to make clear that the prohibition "*also* includes *any* public nuisance claim" based on the distribution or sale of a product.  Ohio Rev. Code Ann. § 2307.71(A)(13) (emphasis added).  Yet on the district court's interpretation, the 2007 amendment accomplished nothing.  *See Lynch* v. *Gallia Cnty. Bd. of Comm'rs*, 680 N.E.2d 1222, 1224 (Ohio 1997) ("When confronted with amendments to a statute, an interpreting court must presume that the amendments were made to change the effect and operation of the law.").  Even more perversely, under the court's reasoning, product-based public-nuisance claims would be permitted in Ohio—which has expressly abrogated them by statute—even though they are disallowed in many common-law States, *see, e.g.*, *State ex rel. Hunter* v. *Johnson & Johnson*, 499 P.3d 719, 721 (Okla. 2021).

definition; it failed to mention either the 2007 amendment or *Sherwin-Williams*.

47

The district court relied on the General Assembly's 2007 statement of intent to conclude that the 2005 and 2007 amendments were not intended to "change[] much" from the 1988 version of OPLA. R. 1203 at 29044. Read in full, however, the statement of intent reinforces what the statutory text and history already make clear: the General Assembly amended OPLA to overrule judicial decisions that had applied the statute too narrowly. In particular, the General Assembly explained that the 2007 amendment was "not intended to be substantive but [was] intended to clarify the General Assembly's original intent in enacting the Ohio Product Liability Act . . . , as initially expressed in [the 2005 amendment], *to abrogate all common law product liability causes of action including common law public nuisance causes of action*." 2006 Ohio Laws File 198 (emphasis added). In other words, the 2007 amendment corrected state judicial decisions that had misinterpreted the 2005 amendment—a correction that the district court has now undone.

*        *        *

For the reasons above, this Court need go no further. Because OPLA abrogates the only claims at issue, the Court should reverse with instructions to enter judgment in the pharmacies' favor.

48

## II.   THE PHARMACIES' CONDUCT DOES NOT SUPPORT NUISANCE LIABILITY

Even if OPLA did not bar their claims, the Counties failed to establish a core element of Ohio nuisance law:  that the pharmacies engaged in unlawful conduct.  *See, e.g.*, *Barnett* v. *Carr*, 2001 WL 1078980, at *10-11 (Ohio Ct. App. Sept. 17, 2001).  The Counties argued below that the pharmacies' conduct was unlawful because it violated federal dispensing regulations under the CSA.  But the two CSA regulations the Counties identified do not require pharmacies to set up systems to predict and prevent the filling of illegitimate prescriptions for opioids that may be diverted, as the Counties and the district court believed.

Nor can the pharmacies be held liable in the alternative for intentional conduct that fully complied with the law.  For businesses like pharmacies that operate under a comprehensive set of statutes and regulations, state law does not allow liability for "intentional" conduct that complies with all applicable laws and regulations.  *See* Restatement (Second) of Torts § 821B cmt. f; *see also Brown* v. *County Comm'rs of Scioto Cnty.*, 622 N.E.2d 1153, 1159 (Ohio Ct. App. 1993); *State ex rel. Schoener* v. *Board of Cnty. Comm'rs of Hamilton Cnty.*, 619 N.E.2d 2, 6 (Ohio Ct. App. 1992).  And even if state law did allow for such liability, federal law would preempt it.

### A.     The Pharmacies Did Not Commit Unlawful Conduct

The Counties claimed that the pharmacies had created a "public nuisance" by filling prescriptions written by licensed doctors. According to the Counties, that conduct violated the Controlled Substances Act and its implementing regulations. *See* R. 3327 at 495352 ¶¶ 629-630. In particular, the Counties pointed to two CSA regulations, 21 C.F.R. § 1306.04(a) and 21 C.F.R. § 1301.71, which the district court interpreted to apply here.[5] Properly read, however, the pharmacies did not violate either of those regulations.

### 1.     The district court misconstrued 21 C.F.R. § 1306.04

The district court held that the pharmacies violated 21 C.F.R. § 1306.04 by filling opioid prescriptions without establishing "tools" and "systems" to block potentially illegitimate prescriptions, including by detecting "red flags" suggesting a prescription was invalid. *See* R. 4295 at 572115. Section 1306.04 imposes no such duty. The regulation's text is express and more limited: it prohibits the *knowing* filling of illegitimate prescriptions—*i.e.*, prescriptions

---

[5]     The Counties also relied on Ohio's materially identical state-law rules for the dispensing of controlled substances. *See* R. 4075-1 (Pltfs.' Proposed Jury Instrs.) (citing Ohio Rev. Code § 4729.55(D); Ohio Admin. Code § 4729-9-05 (repealed Feb. 29, 2020)).

that lack "a legitimate medical purpose."  21 C.F.R. § 1306.04(a).  It does not say a word about any affirmative legal obligation for pharmacies to establish and implement red-flag systems to screen prescriptions that might be suspect. The pharmacies were thus held liable for violating a federal rule that does not exist.

Under the CSA, licensed pharmacists may dispense controlled substances only pursuant to "the written prescription of a practitioner." 21 U.S.C. § 829(a).  The implementing regulation promulgated by the DEA— Section 1306.04—specifies that a prescription should be issued only "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).  Doctors have primary "responsibility for the proper prescribing and dispensing of controlled substances," but "the pharmacist who fills the prescription" also bears a "corresponding responsibility."  *Id.*  That corresponding responsibility (which the regulation places on the pharmacist, not the pharmacy company) is defined in the very next sentence of the regulation:  a pharmacist may not "knowingly fill[]" a prescription not issued "in the usual course of professional treatment or in legitimate and authorized research."  *Id.*

The district court erred in ignoring the plain text of Section 1306.04, which prohibits only "knowingly" filling invalid prescriptions. Section 1306.04 sets a high bar for a prescription to be invalid, requiring a doctor to act so egregiously that he or she is not even "acting as a physician." *Ruan* v. *United States*, 142 S. Ct. 2370, 2389 (2022) (Alito, J., concurring in the judgment). Short of determining that a doctor has wholly failed to "act[] as a physician," it is not a pharmacist's role to second-guess a prescribing physician's medical judgment. Pharmacists practice pharmacy, not medicine. And doctors have far better insight into patients' circumstances, symptoms, comorbidities, and needs than do their pharmacists. Pharmacists are thus entitled to rely on a doctor's prescription unless they *know* the doctor was acting outside his professional role.

As the Supreme Court recently explained, it is crucial for courts to respect the CSA's knowledge requirement to avoid penalizing healthcare professionals who engage in the "socially necessary" conduct of providing pain medication to patients who need it. *Ruan*, 142 S. Ct. at 2378-2380. Healthcare professionals, after all, regularly "dispens[e] drugs via prescription," and "[w]e normally would not view such dispensations as inherently illegitimate; we expect, and indeed usually want, [professionals] to [dispense] the

52

medications that their patients need." *Id.* at 2377. Holding pharmacists liable for filling prescriptions that they do not know to be invalid would lead to "overdeterrence," hindering access to medication for patients who need it to alleviate severe and chronic pain. *Id.* at 2378 (citation omitted).

In adopting a contrary view, the district court relied on an opinion of a DEA Administrative Law Judge, finding that pharmacies violated the CSA for filling prescriptions under circumstances that the ALJ believed "should raise a reasonable suspicion." R. 4295 at 572078 n.2 (quoting *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195; Decision and Order*, 77 Fed. Reg. 62,316, 62,341 (Oct. 12, 2012)). Deference to that ALJ opinion is inappropriate, however, because when "there is only one reasonable construction of a regulation," "a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense." *Kisor* v. *Wilkie*, 139 S. Ct. 2400, 2415 (2019). Here, both the text of Section 1306.04 and the Supreme Court's decision in *Ruan* make clear that the "knowledge" requirement is "critical" to the CSA. *Ruan*, 142 S. Ct. at 2379.

In addition, neither the district court nor the ALJ opinion addressed the history of Section 1306.04. The DEA's predecessor agency added the knowledge requirement in Section 1306.04(a) in direct response to

pharmacists' concerns that they should not bear an affirmative "responsibility . . . to determine the legitimacy of a prescription." 36 Fed. Reg. 7,776, 7,777 (Apr. 24, 1971). The agency thus compromised in Section 1306.04: pharmacists need not affirmatively determine the legitimacy of prescriptions, but they must refrain from filling prescriptions they "know[]" to be illegitimate. The district court gutted that compromise. It required pharmacies to establish "red-flag" systems to detect and screen out illegitimate prescriptions—the very duty that the DEA declined to impose in Section 1306.04.

### 2.    The district court misconstrued 21 C.F.R. § 1301.71

As an alternative basis for its theory that pharmacies have an affirmative obligation to create systems, policies, and procedures to detect and block potentially illegitimate prescriptions, the district court relied on 21 C.F.R. § 1301.71. That regulation requires "[a]ll applicants and registrants" under the CSA to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *Id.*; *see* R. 3403 at 497752. In the district court's view, Section 1301.71 represents the CSA's "fundamental mandate" for pharmacies to establish "effective controls" to detect and block potentially illegitimate prescriptions when dispensing

54

medications. *Id.*; *see* R. 3499 at 502745-502746. From there, the court crafted the pharmacies' supposed obligation to "design and implement systems, policies, or procedures to identify red flag prescriptions." R. 3403 at 497752.

Contrary to the district court's view, Section 1301.71 does not establish some generic "effective controls and procedures" requirement, which the Counties' experts could flesh out with various red-flag and other anti-diversion "systems." Instead, the regulation expressly defines the precise "controls and procedures" required. Immediately after requiring applicants and registrants to "provide effective controls and procedures to guard against theft and diversion of controlled substances," it states: "*In order to determine* whether a registrant has provided effective controls against diversion, the Administrator shall use the security requirements set forth in §§ 1301.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion." 21 C.F.R. § 1301.71(a) (emphasis added). The next subsection makes a similar point, providing that "[s]ubstantial compliance with the standards set forth in §§ 1301.72-1301.76 may be deemed sufficient" in certain circumstances. *Id.* § 1301.71(b). Most of the remaining subsections likewise cross-reference Sections 1301.72 to 1301.76. *See id.* § 1301.71(c), (d), (e). As the regulation thus repeatedly makes

clear, whether a pharmacy maintains the necessary "effective controls and procedures to guard against theft and diversion" is "determine[d]" by the more specific "security requirements" laid out in Sections 1301.72 to 1301.76.

Those cross-referenced sections impose no duties on pharmacies relating to dispensing controlled substances. The only duties in those sections that apply to pharmacies involve "stor[ing]" opioids in a certain way, 21 C.F.R. § 1301.75; "not employ[ing]" certain felons at pharmacies, *id.* § 1301.76(a); and "notify[ing]" the DEA of theft, *id.* § 1301.76(b). To be sure, other sections impose duties of the type that the district court applied to the pharmacies here—*i.e.*, practices to prevent diversion of prescription opioids—but on *other* regulated entities. For example, Section 1301.74 requires distributors, not dispensers, to prevent diversion by "design[ing] and operat[ing] a system to disclose to the registrant suspicious orders of controlled substances." But the Counties are suing the pharmacies as dispensers, not as distributors. Indeed, the Counties affirmatively abandoned all distribution claims against the pharmacies at trial, apparently recognizing that they could not prove those claims. *See* R. 4153 (Trial Tr.) at 554661:24-553662:3. That dooms their case, as nothing in Sections 1301.72 to 1301.76 imposes a comparable anti-diversion duty on pharmacies when dispensing controlled substances.

### 3.     The Counties failed to prove any actual violation of the CSA

As explained above, Section 1306.04 says that pharmacists may not *knowingly* fill illegitimate prescriptions; and Section 1301.71 says that pharmacies must guard against theft and diversion by adhering to the specific security requirements in Sections 1301.72 to 1301.76.  Yet the district court did not require the Counties to prove either type of violation.   The court specifically ruled that the Counties were not "required to show Defendants' pharmacists [knowingly] filled specific illegitimate prescriptions."  R. 4295 at 572078.  The court instead allowed the jury to find that the pharmacies had acted unlawfully if they had "knowingly failed to take adequate measures to guard against diversion of prescription opioids" for illegitimate uses, even without evidence that (1) any pharmacist had knowingly filled an invalid prescription or (2) any pharmacy had failed to adhere to the specific security requirements in Sections 1301.72 to 1301.76.  *Id.*

Because the Counties relied on that sweeping theory, they did not even try to prove that any pharmacist "knowingly fill[ed]" any illegitimate prescription under Section 1306.04.    Indeed, the Counties expressly *disclaimed* the need to make that showing.  Pharmacists could be doing a "superb" job of dispensing, the Counties argued, and still the pharmacies that

employed them could be liable for failing to maintain affirmative company-wide controls to detect and block potentially invalid prescriptions. R. 4153 (Trial Tr.) at 554742:20; *see, e.g., id.* at 554679. That theory formed the entire basis of the Counties' case and was the focus of all of their evidence. As an example, one of the Counties' experts, Carmen Catizone, faulted the pharmacies for not establishing systems to detect various "red flags," but he did not testify that the CSA compelled as much, let alone tie red-flag or anti-diversion systems to the specific security requirements in Sections 1301.72 to 1301.76. R. 4005 (Trial Tr.) at 541514.

After trial, the district court upheld the jury's verdict on the ground that the pharmacies had "failed to take adequate measures to guard against diversion of prescription opioids." R. 4295 at 572078; *id.* at 572085 (faulting CVS for "dispensing opioids without effective controls and procedures to guard against diversion"), 572087 (same for Walgreens), 572090 (same for Walmart). The court relied on evidence that the pharmacies had failed to establish company-wide systems "to identify and resolve 'red flags' prior to dispensing" opioid medications. R. 4295 at 572078.[6] The jury thus found the

---

[6]    A "red flag," the district court stated, is a "circumstance that does *or should* raise a reasonable suspicion as to the validity of a prescription." R.4295

pharmacies liable, and the court upheld that verdict, on the lone ground that the pharmacies did not put in place systems for flagging suspicious prescriptions.

None of that violates Section 1306.04(a) or Section 1301.71, neither of which requires such systems. Because of how the Counties chose to present their case—which the district court permitted based on an incorrect interpretation of the CSA regulations—there is no evidence in the record that any pharmacist employed by any of the pharmacies knowingly filled even a single invalid prescription, or that any of the pharmacies failed to observe even a single security control required by the DEA. In short, there is no evidence here that *the pharmacies violated federal law, properly understood*. Since that is the Counties' only basis for finding the "unlawful" conduct necessary to establish a common-law public nuisance, the pharmacies are entitled to judgment as a matter of law. *See Khalaf* v. *Ford Motor Co.*, 973 F.3d 469, 482,

---

at 572078 n.4 (emphasis added). The court observed that "red flags" are not necessarily "suspicious on their face." R. 3403 at 497750. Indeed, a "red flag" might be "nearly impossible for any individual pharmacist to discern" alone. *Id.* For example, the court held that a "red flag" exists if different prescriptions are "presented over time for the same drugs or combinations of drugs, in the same quantities, issued by the same doctor (and possibly presented to different pharmacists in different stores owned by the same pharmacy)." *Id.*; *see* R. 4295 at 472081-472092 (applying this standard to assess sufficiency of the evidence).

493 (6th Cir. 2020) (directing judgment as a matter of law after "a full trial on the merits" because of "the lack of evidence" on an essential element) (citation omitted); *see also* Section II.B, *infra* (explaining unavailability of separate "intentional" prong).

At the least, even if this Court believed that evidence in the record could somehow establish a violation of either Section 1306.04(a) or Section 1301.71, the Court would still need to vacate and remand. The jury was not instructed on the actual requirements of those regulations. The jury instructions said only that pharmacies "are required to provide effective controls and procedures to guard against theft and diversion" in their dispensing practices. R. 4153 (Trial Tr.) at 554648:14-15. The Counties were thus able to argue, and the jury was able to find, that the pharmacies should be held liable for failing to implement red-flag systems that lack any tie to the CSA or its implementing regulations. Because the jury was able to (and obviously did) rely on a legally erroneous instruction, its verdict must be vacated. *See* Section II.C, *infra*.

## B.  The Counties Could Not Alternatively Rely On A Theory Of Intentional But Lawful Conduct

The absence of unlawful conduct resolves this case, because Ohio law does not permit nuisance liability for intentional but lawful conduct under a

comprehensive regulatory scheme like the CSA. Even if Ohio law did permit such liability, the CSA would preempt its application here.

>    **1.    Ohio does not authorize nuisance liability for intentional but lawful conduct under a regulatory scheme like the CSA**

Because the CSA specifically governs the dispensing of prescription opioids, the pharmacies may not be held liable for a public nuisance if they engaged in intentional—but not unlawful—conduct. The Ohio pattern jury instruction on this point is straightforward: "A defendant's activity pursuant to and in compliance with specific statutory authority or a regulatory scheme cannot constitute an absolute nuisance." 1 CV Ohio Jury Instructions 621.09 (Aug. 2022). Despite the pharmacies' repeated requests, *e.g.*, R. 4146-1 (Defs.' Proposed Jury Instrs.) at 554080, the district court refused to give that Ohio instruction. Instead, the court allowed the Counties to argue during closing arguments that the pharmacies could be held liable for intentional conduct *even if* their conduct did not violate the CSA or its regulations. R. 4153 (Trial Tr.) at 554742-554745 (asserting that intentional conduct need not also be unlawful under the CSA); *see* R. 4241 (Pltfs.' Omnibus Op. to Rule 50(b) Mots.) at 571251 (defending theory of liability based on "dispensing conduct that does not violate the CSA").

The district court similarly instructed the jury that the pharmacies could be liable if they engaged in "one or both" of "unlawful conduct" or "intentional conduct." R. 4153 (Trial Tr.) at 554644:20-25. The instructions separately defined unlawful and intentional conduct, emphasizing that the latter includes any conduct that "is done purposely, not accident[al]ly." *Id.* at 554645. Not until two pages later did the instructions define what counts as "unlawful conduct": "acting in a certain way that is prohibited by law," or "failing to act in a certain way that is required by law." *Id.* at 554647. The definition then added: "Conduct that is fully authorized by a statute, ordinance, or regulation cannot create a public nuisance because it is lawful conduct." *Id.* But since that was part of the definition only of "unlawful conduct," it did not inform the jury that the same rule precluded a finding of liability under the independent "intentional conduct" prong mentioned pages earlier. As a result, the unmistakable message was that liability could rest on a finding of mere "intentional"—but not unlawful—conduct.

The district court's refusal to give a proper instruction on this point is baffling, as the court itself recognized elsewhere that nuisance liability could not rest on lawful conduct under the circumstances here. *See, e.g.*, R. 4295 at 572085 (recognizing that liability turns on whether the pharmacies violated

their "licensing and regulatory obligations"); *id.* at 572098 n.78, 572112, 572118. The court's other statements were correct, as "conduct that is fully authorized by statute, ordinance or administrative regulation" cannot support nuisance liability. Restatement (Second) of Torts § 821B cmt. f; *see Brown*, 622 N.E.2d at 1159; *Board of Cnty. Comm'rs of Hamilton Cnty.*, 619 N.E.2d at 6. But because the jury instructions allowed for liability on a theory that even the district court itself recognized was erroneous, the verdict cannot stand. *See* Section II.C, *infra.*[7]

### 2.    If Ohio law permitted nuisance liability for intentional conduct consistent with the CSA, federal law would preempt it

Even if the Counties' "intentional conduct" theory of liability were permitted by Ohio law, it would be preempted by the CSA, making the district court's decision to allow that theory doubly erroneous. By seeking to impose massive tort liability on pharmacies for conduct that complies with the CSA,

---

[7] Although the Counties made clear at trial and in post-trial briefing that their "intentional conduct" theory sought to hold the pharmacies liable for conduct that did not violate the CSA, and the district court similarly instructed the jury, the court later appeared to construe the Counties' claims as seeking only to impose liability for conduct that *does* violate the CSA. R. 4295 at 572118-572119 (denying JMOL on that ground). Under that view, the Counties' intentional-conduct theory would not add anything to their unlawful-conduct theory, and it was error to instruct the jury that it could find liability on an "intentional but lawful conduct" theory.

the Counties' intentional-conduct claims threaten the careful federal policy balance embodied in the CSA and its regulations—a balance designed to ensure that pharmacies are able to dispense medically appropriate opioids to patients, even at the cost of risking potential diversion. The Counties' intentional-conduct theory therefore is preempted "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the CSA. *Arizona* v. *United States*, 567 U.S. 387, 399 (2012) (citation omitted).

> a.  **Congress and the DEA calibrated the CSA and its regulations to protect against diversion while permitting access to prescribed opioids**

The CSA reflects a nuanced legislative balance between competing public-policy concerns. On one hand, Congress found that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2). On the other, Congress recognized that "[m]any [regulated drugs] have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people." *Id.* § 801(1). Congress therefore developed a "comprehensive framework for regulating the production,

64

distribution, and possession" of controlled substances with medical uses, to "foster the beneficial use of those medications" and at the same time "prevent their misuse." *Gonzales* v. *Raich*, 545 U.S. 1, 24 (2005).

The DEA, which exercises delegated regulatory authority under the CSA, has implemented Congress's policy judgment by promulgating targeted regulations that protect against diversion of controlled drugs while enabling beneficial access. *See* 21 U.S.C. § 821 (charging the Attorney General with promulgating regulations related to "dispensing of controlled substances"); *United States* v. *Zadeh*, 820 F.3d 746, 752 (5th Cir. 2016). Those regulations (1) impose specific diversion controls while avoiding obligations that could cause pharmacies to refuse to dispense legitimate prescriptions; and (2) calibrate pharmacies' liability for diversion to ensure that pharmacies need not second-guess prescribing physicians, even if that means that pharmacies will unknowingly fill some illegitimate prescriptions.

As explained above, the regulation addressing pharmacies' dispensing responsibilities carefully avoids encouraging pharmacies to decline to fill legitimate prescriptions. Section 1306.04(a) defines the pharmacist's "corresponding responsibility" as a responsibility to not "knowingly fill[]" an illegitimate prescription. The necessary consequence of that standard is that

pharmacists will unknowingly dispense some illegitimate prescriptions. Similarly, Section 1301.71(a) requires pharmacies to "provide effective controls and procedures to guard against theft and diversion"—but the required "controls" do not relate to pharmacies' dispensing practices. The DEA could have provided stricter standards, which might have led to detection of more illegitimate prescriptions. But those standards would have required pharmacists to independently second-guess prescribing physicians, with the inevitable result that some legitimate prescriptions would go unfilled, potentially harming patients with legitimate medical needs. The DEA struck the balance in favor of permitting more dispensing, even at the risk of some unknowing dispensation of illegitimate prescriptions.

> **b.    The Counties' nuisance claims for "intentional conduct" are preempted by the CSA and related regulations**

Recognizing the need to protect the integrity of the federal policy balance, Congress included in the CSA "an express preemption provision," under which "state law is preempted whenever 'there is a positive conflict between [a] provision of th[e CSA] and [a] State law so that the two cannot consistently stand together.'" *Oregon Prescription Drug Monitoring Program* v. *U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1236 (9th Cir. 2017)

(quoting 21 U.S.C. § 903). The CSA thus expressly invokes the doctrine of conflict preemption, including circumstances in which "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Gade* v. *National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)); *see Zadeh*, 820 F.3d at 752. Here, the Counties' intentional-conduct theory would impose potentially billions of dollars in tort liability on pharmacies for dispensing opioids in compliance with the CSA, thereby upsetting the balance set by federal law and interfering with the federal goal of providing access to drugs "necessary to maintain the health and general welfare of the American people." 21 U.S.C. § 801(1).

The Counties' intentional-conduct theory is that even if the pharmacies dispensed opioids in full compliance with the CSA, they still acted unreasonably and caused (as the verdict form put it) an "oversupply of legal prescription opioids" that interfered with public health. R. 4176 at 556138, 556142; *see* R. 4241 at 571251; *see* R. 4295 at 572095; R. 2565 (Track One Summ. J. Op.) at 412913. In effect, the Counties argued that the fewer opioids dispensed, the better. Under their theory, once the pharmacies became aware of the opioid crisis, they should have gone beyond the CSA's requirements and refused to dispense prescriptions that the CSA's regulations permitted them

to fill.  R. 4153 (Trial Tr.) at 554742:20 (arguing to the jury that the pharmacies' dispensing conduct, even if "superb," was intentional and culpable); *id.* at 554646:2-5 (jury instruction that "[i]f a person learns that circumstances resulting from their conduct interfere with public health or public safety, and the person continues that conduct, then the subsequent conduct is intentional").  But Congress and the DEA made a more nuanced policy judgment designed to ensure that there are not too many—but also not too few—opioids dispensed to patients.  The Counties cannot override that judgment by using state tort law to impose liability for failing to reduce dispensing of opioids below the level set by the DEA.

The Supreme Court has held that a similar use of state tort law was preempted by federal law.  In *Geier* v. *American Honda Motor Co.*, 529 U.S. 861 (2000), the Court held that Department of Transportation regulations gradually phasing in airbags preempted a state-law negligence claim asserting that the defendant automobile manufacturer should have installed airbags in its cars even though federal law did not yet require it.  *Id.* at 864-865.  The plaintiffs argued that state tort claims calling for more airbags than federal regulations required would not hinder federal goals because "the more airbags, and the sooner, the better."  *Id.* at 874.  The Court rejected that

argument because the regulations balanced the goal of widespread airbag adoption with other countervailing objectives, including supporting "a mix of different devices," and achieving a range of technical and consumer-acceptance goals. *Id.* at 875.

So too here:  DEA regulations reflect a balance among several policy objectives, including preventing diversion, fostering medically appropriate dispensing of opioids, placing physicians as the primary judges of medical need, and maintaining rules that are clear and administrable.  Permitting state tort law to require pharmacies to stop dispensing activities that are permitted by the CSA and its regulations—under threat of massive tort liability—could deprive patients of legitimate medication, contrary to Congress's intent.  More generally, as the verdict below shows, the uncertainties caused by open-ended state tort liability would impose crushing and excessive compliance burdens on pharmacies, destroying the efficiency of Congress's comprehensive federal regime.  *See Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001). Even if allowed under Ohio law, the Counties' intentional-conduct theory is therefore preempted.  *Arizona*, 567 U.S. at 399.

## C.    The Pharmacies Are Entitled To Judgment Or At Minimum A New Trial

The district court instructed the jury that it could find for the Counties on their public-nuisance claims based on either of two theories:  that the conduct was "unlawful," *or* that, even if lawful, it was "intentional."  R. 4206-1 (Final Jury Instrs.) at 557910; R. 4153 (Trial Tr.) at 554644:18-554645:2; *see* R. 4176 at 556139, 556143 (verdict form asking whether evidence has established "intentional and/or illegal conduct").  Because the record cannot support a finding that the pharmacies engaged in unlawful conduct, Section II.A, *supra*, and because any claims for lawful-but-intentional conduct are impermissible under Ohio law or preempted by federal law, Section II.B, *supra*, the Counties could not prevail on either theory, and the pharmacies were entitled to judgment.

Even if this Court were to conclude that one of the two theories is viable, a new trial would still be required.  A verdict "must be set aside if it could be supported on one ground but not on another, and the reviewing court [is] uncertain which of the two grounds was relied upon by the jury in reaching the verdict."  *Mills* v. *Maryland*, 486 U.S. 367, 376 (1988); *see Greenbelt Co-op. Pub. Ass'n* v. *Bresler*, 398 U.S. 6, 11 (1970) (remand required if jury may have relied on "an impermissible ground").  Here, because the instructions

70

permitted the jury to find liability for either unlawful or intentional conduct, there is no way to know whether the jury relied on the impermissible theory. *See, e.g.*, *Cronin* v. *Washington Nat'l Ins. Co.*, 980 F.2d 663, 669 n.7 (11th Cir. 1993) (where jury returned general verdict, "a party seeking a new trial need only show that the evidence is insufficient to support one of the plaintiff's theories of liability"); *see also Griffin* v. *United States*, 502 U.S. 46, 52 (1991) (where jury was instructed on alternative theories, one of which is legally invalid, "the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected") (citation omitted).[8]

## III. THE PHARMACIES DID NOT PROXIMATELY CAUSE THE COUNTIES' ASSERTED INJURIES

Reversal is required for another, independent reason.  Even if the pharmacies' conduct is actionable under Ohio law, that conduct did not proximately cause the sweeping downstream injuries that the Counties assert.

---

[8]    The pharmacies requested a question on the verdict form asking the jury to indicate which theory of liability they relied on, R. 4146-2 at 554141, but the district court rejected that request, R. 4176 at 556137-556143.

### A.    Proximate Causation Requires A Direct Link Between The Pharmacies' Conduct And The Counties' Asserted Harm

To maintain an action for public nuisance, a plaintiff must show that the defendant's unlawful or intentional conduct was the proximate cause of the plaintiff's alleged injuries. *See Gaines* v. *Village of Wyoming*, 72 N.E.2d 369, 498 (Ohio 1947); *City of Cleveland* v. *Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010) (applying Ohio law). Proximate causation incorporates two different concepts: directness and foreseeability. Directness is the "central element" of proximate causation at issue in this case. *Perry* v. *American Tobacco, Inc.*, 324 F.3d 845, 848 (6th Cir. 2003).

Directness refers to the number and type of steps in the causal chain between the defendant's conduct and the alleged harm. *See Lexmark Int'l, Inc.* v. *Static Ctrl. Components, Inc.*, 572 U.S. 118, 133 (2014). "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Grp., LLC* v. *City of New York*, 559 U.S. 1, 9 (2010) (citation omitted). Ohio law incorporates the same proximate-cause concept of directness. *See Ameriquest*, 615 F.3d at 503 ("[T]he Ohio Supreme Court has adopted the [Supreme] Court's proximate cause analysis.") (citing *Beretta*, 768 N.E.2d at 1148-1149); *see also City of Cleveland* v. *JP Morgan Chase Bank, N.A.*, 2013 WL 1183332, at *4-6 (Ohio Ct. App. Mar. 21, 2013).

The directness requirement serves the important function of restricting liability to causes that bear a close link to the purported harm. "In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events." *Johnson* v. *University Hosps. of Cleveland*, 540 N.E.2d 1370, 1377 (Ohio 1989) (citation omitted). But "[a]s a practical matter," the law must set "[s]ome boundary," *id.* (citation omitted), that is, "a line somewhere in the sand—refusing to extend liability beyond a certain point," *Crosby* v. *Twitter, Inc.*, 921 F.3d 617, 623 (6th Cir. 2019). As a general matter, proximate causation sets that boundary at "the first step" in the causal chain. *Holmes* v. *Securities Inv. Prot. Corp.*, 503 U.S. 258, 272 (1992) (citation omitted).

For example, in *Holmes*—the "seminal" decision on directness, *Ameriquest*, 615 F.3d at 503—the Supreme Court held that a causal chain with two links was too remote to support recovery. There, a defendant's stock-manipulation scheme that harmed certain broker-dealers did not allow a claim by the broker-dealers' customers. *Id.* at 270-271. The *Holmes* Court offered three practical reasons for requiring a direct causal connection. First, the more remote an injury is, "the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from

other, independent factors." *Id.* at 269. Second, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages" among plaintiffs and could lead to duplicative recoveries. *Id.* Third, "directly injured victims can generally be counted on to vindicate the law as private attorneys general." *Id.*

Since *Holmes*, the Supreme Court has reaffirmed the importance of the directness requirement for proximate causation. In *Hemi Group LLC* v. *City of New York*, for example, the Court considered the City of New York's theory that an out-of-state cigarette distributor's fraud on the *State* of New York made it easier for taxpayers to harm the City by failing to pay taxes. 559 U.S. at 11. The Court deemed that causal chain too attenuated. *Id.*; *see Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).

Guided by the *Holmes* line of cases, this Court has dismissed two similar Ohio-law public-nuisance suits for lack of proximate causation. In *Ameriquest*, the City of Cleveland alleged that defendant banks had made cash available to subprime lenders, (i) which used those funds to make subprime loans; (ii) which caused a foreclosure crisis in Cleveland; (iii) which led to property neglect, fires, looting, and other harms in the City; (iv) which caused the City to spend money on fire, police, maintenance, and demolition expenses and cost

it tax revenues. 615 F.3d at 499. This Court held that causation had been attenuated by the "voluntary choices" and "independent decisions" of intermediaries in the causal chain. *Id.* at 505. For example, the "eyesores, fires, drug deals, and looting" that the City had to redress were "likely started by negligent or malicious individuals or occurred because a home was poorly built." *Id.*

Similarly, in *City of Cincinnati* v. *Deutsche Bank National Trust Co.*, 863 F.3d 474 (6th Cir. 2017), this Court dismissed another Ohio public-nuisance suit alleging that Wells Fargo had failed to maintain properties following foreclosure, which eventually led to decreased tax revenue and increased municipal expenditures. *Id.* at 480. The failure to establish a direct link between Wells Fargo's actions and the claimed damages defeated the City's efforts to plead proximate causation.

## B.    The Counties' Claims Are Too Remote To Satisfy Proximate Causation

Applying those principles of directness here, the sweeping downstream injuries alleged by the Counties are too remote from the pharmacies' conduct to satisfy proximate causation.

1.    From the start of this case, the Counties have alleged a long, attenuated causal chain. Their theory is that the pharmacies' corporate-level

failure to develop systems to catch red flags (i) caused individual pharmacists to dispense at least some prescription opioids that should not have been prescribed; (ii) which led individuals to illegally divert some prescription opioids; (iii) which caused community members to develop addictions to prescription opioids; (iv) which led some of them to seek out and become addicted to illicit opioids, including heroin and fentanyl; (v) which caused some of those individuals to overdose, to commit crimes, and to require more healthcare, education, and social services for them and their families; (vi) which has caused and continues to cause the Counties to have to spend more on treatment, law enforcement, and other municipal services. *See* R. 3326 at 494947-494950 ¶¶ 2-15; R. 3327 at 495160-495163 ¶¶ 2-15. Suffice to say, the Counties' theory would extend liability far "beyond the first step" permitted by proximate causation. *Holmes*, 503 U.S. at 271 (citation omitted).

In fact, the asserted causal chain here is even more remote than the two-, three-, and four-step links rejected in *Holmes*, *Anza*, and *Ameriquest*. As in those cases, there are "independent actors" between the pharmacies' corporate conduct and the Counties' asserted injuries. *Ameriquest*, 615 F.3d at 505. And just as in *Ameriquest*, the "voluntary choices" and "independent decisions" of individuals attenuated the pharmacies' conduct from the

76

Counties' asserted injuries. *Id.* Many of those independent choices involved criminal conduct, as individuals illegally diverted their prescription medications, sought out illicit opioids like heroin, and committed crimes. This "diversion of the drugs to illegal usage" was correctly identified by a different judge in the MDL as an attenuating cause that defeated liability under West Virginia's similar proximate-causation doctrine. *See City of Huntington* v. *AmerisourceBergen Drug Corp.*, 2022 WL 2399876, at *67 (S.D. W. Va. July 4, 2022).

The present cases exemplify several of the rationales for *Holmes*'s directness requirement. Most importantly, indirectness "adds to the difficulty of determining which damages can be attributed to the defendant's misconduct." *Ameriquest*, 615 F.3d at 504. That difficulty is amplified when the injury "could have been caused by many other factors unconnected to the [pharmacies'] conduct." *Id.* Here, the district court itself acknowledged that "[a pharmacy's] pills reached individuals in multiple ways, far beyond only the people who physically filled a prescription written in their name," and so the harm to the Counties "is not capable of division based on specific evidence regarding where certain individuals had their prescriptions filled." R. 4611 at 596690-596691.

77

That problem is even more complex because non-pharmacy actors in the opioid supply chain unquestionably contributed to any alleged nuisance.  By the Counties' own account, manufacturers and distributors played a significant role, as did prescribing doctors, the FDA, and the DEA.  *See* R. 4064 (Trial Tr.) at 546805:10-546806:5.  The district court agreed (at least in part), as it acknowledged that "many, many" different actors even outside of the supply chain were responsible for the opioid epidemic.  R. 4296 at 572205.  The court divided the total asserted liability into thirds to account for "three categories of actors along the pharmaceutical supply chain—that is, manufacturers, distributors, and dispensers."  R. 4611 at 596694.  Once again, the court's own abatement order reveals "the difficulty of determining which damages can be attributed to the defendant's misconduct."  *Ameriquest*, 615 F.3d at 499.

Another administrative rationale applies here:  there are more immediate victims who could potentially sue.  *Ameriquest*, 615 F.3d at 506.  The direct victims of any oversupply of opioids are the actual citizens of the Counties who overdosed or suffered other physical harms from opioid abuse.  Those citizens could pursue relief against more proximate actors in the causal chain under any number of legal theories more direct than the Counties' public-nuisance theories.  *See id.*  For example, in the early years of opioid

litigation, individuals brought claims against drug manufacturers for, among other things, failure to warn, breach of implied warranty, and violation of state consumer protection statutes. *See* Ausness, *supra*, at 1122-1130 (canvassing liability theories in individual opioid lawsuits).

The possibility of relief for other potential plaintiffs underscores that the Counties' asserted injuries here are derivative of the claims of others. A claim is ordinarily too indirect to satisfy proximate causation when the asserted harm is "purely derivative of misfortunes visited upon a third person by the defendant's acts." *Lexmark*, 572 U.S. at 133 (internal quotation marks omitted). The Counties contend that they suffered non-derivative injuries based on the resources they spent on treatment and various other social services. *See* R. 3326 at 495144 ¶ 625, 495148 ¶ 640; R. 3327 at 495351¶ 625, 495355 ¶ 640. But these injuries are plainly derivative of the injuries suffered by the Counties' citizens, because the Counties would not have needed to make those expenditures but for the citizens' injuries. These were not merely preventative expenditures that the Counties would need to make "[e]ven if no individual is harmed." *Beretta*, 768 N.E.2d at 1148 (citation omitted). The asserted expenditures flow from injuries to third-party individuals, and their remoteness forecloses the Counties' public-nuisance claims.

2.    Throughout these cases, the district court offered two rationales for rejecting the pharmacies' remoteness arguments:  that the harms were foreseeable, and that the pharmacies were a substantial factor in creating those harms.  Both rationales are separate from, and irrelevant to, the remoteness inquiry.

First, in instructing the jury, the court rejected the pharmacies' proposed jury instructions on remoteness, *see* R. 4146-1 at 554090; R. 4146-2 (Defs.' Objs. to Ct.'s Instrs.) at 554132-554133, and instead instructed that "[a] defendant's conduct proximately caused a public nuisance if the circumstances that constitute the nuisance are the natural and foreseeable result of that conduct."  R. 4153 (Trial Tr.) at 554649:17-20.  That instruction ignored *Ameriquest*'s teaching that "the requirement of a direct injury . . . is distinct from foreseeability."  615 F.3d at 502; *cf. Bank of Am. Corp.* v. *City of Miami*, 137 S. Ct. 1296, 1305, 1306 (2017) ("[F]oreseeability alone is not sufficient to establish proximate cause under the [Fair Housing Act]," which is "analogous to a number of tort actions recognized at common law.") (citation omitted). The district court erred in conflating what should have been two distinct requirements.

Second, in its Rule 50(b) opinion, the district court took a different tack. It rejected the pharmacies' remoteness arguments because "the existence of other possible causation factors did not preclude the jury from determining that the conduct of each Defendant played a substantial role in creating the nuisance." R. 4295 at 572102. The substantial-factor test applies when there are "simultaneous actors, [any one] of whose acts could have been 'but for' causes of plaintiffs' injuries." *In re Bendectin Litig.*, 857 F.2d 290, 311 (6th Cir. 1988); *see* Restatement (Third) of Torts: Phys. & Emot. Harm § 26 cmt. j (2020 ed. Oct. 2022 update). For example, if three people fire bullets simultaneously at the victim, each cannot escape liability because two others caused the same harm. But the directness aspect of proximate causation is a separate requirement altogether. It demands that the causal connection between any one of those "simultaneous actors" and the plaintiff's injuries be sufficiently close to support liability. *See Lexmark*, 572 U.S. at 133. Here, the pharmacies' alleged conduct is simply too remote from the Counties' injuries to satisfy the requirement of proximate causation.

## IV.    THE EGREGIOUS JUROR MISCONDUCT AT TRIAL REQUIRES A NEW TRIAL

Although the trial in this case never should have happened at all, at least it should have been fair. Instead, it was tainted by the introduction of outside

evidence to the jury, under circumstances that everyone—the Counties, the pharmacies, and the district court—recognized as egregious. At a minimum, therefore, the case should be remanded for a new trial.

A.   A jury's consideration of outside evidence on a contested issue requires a mistrial, absent clear harmlessness. As this Court explained in *In re Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1982), the "jury's receipt of such extraneous information 'requires that the verdict be set aside, unless *entirely devoid of any proven influence or the probability of such influence* upon the jury's deliberations or verdict.'" *Id.* at 215 (emphasis added) (quoting *Stiles* v. *Lawrie*, 211 F.2d 188, 190 (6th Cir. 1954)). It is generally "not for the court to say" whether relevant "evidence improperly received" by the jury "could have had no influence on the verdict." *Stiles*, 211 F.2d at 190. Instead, a mistrial is appropriate when the outside evidence relates to a contested issue. *Id.* Accordingly, this Court has cautioned that "a juror introducing extraneous information into deliberations 'can rarely be viewed as harmless.'" *Nian* v. *Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 758 (6th Cir. 2021) (quoting *Beverly Hills*, 695 F.2d at 215).

Following that rule, this Court "has not hesitated to declare mistrials" when a jury reviews relevant outside evidence that pertains to a core disputed

issue in the case. *Beverly Hills*, 695 F.2d at 213; *see, e.g.*, *Dassault Systèmes, SA* v. *Childress*, 828 Fed. Appx. 229, 246-248 (6th Cir. 2020) (juror acquired information about the defendant's income and settlement posture); *Aluminum Co. of Am.* v. *Loveday*, 273 F.2d 499, 499-500 (6th Cir. 1959) (juror traveled to the plaintiff's property to view allegedly injured cattle); *Stiles*, 211 F.2d at 190 (juror consulted Highway Department manual on skid marks made by cars driving at different speeds). By contrast, this Court has declined to require a new trial when extrinsic evidence is not "in any way" related to the elements of the offense or claim or is indisputably cumulative. *United States* v. *Wheaton*, 517 F.3d 350, 361-362 (6th Cir. 2008) (juror looked up distance between two towns and replayed CD that was already admitted into evidence).

The outside evidence here was relevant to a contested issue at trial: whether the pharmacies' dispensing practices were driven by improper motives. The flier that Juror #4 distributed to other jurors fed directly into the Counties' narrative that corporate greed drove the pharmacies to fill opioid prescriptions improperly. It showed that Walgreens charged customers for life-saving naloxone when other organizations made it available for free. Even the Counties' own counsel acknowledged that the outside evidence could favor

83

the Counties "because Walgreens is charging for something that's commercially available for free." R. 4065 (Trial Tr.) at 546970:7-12. And there is no need for guesswork about whether the jury considered the information relevant: a juror had asked whether Walgreens offered naloxone "for free" to customers, R. 4057 (Trial Tr.) at 546486:22, leading to the testimony that prompted Juror #4's outside research. For that reason, the Counties' counsel later acknowledged that the outside evidence bore on "*an issue in the case that has been questioned*." R. 4065 (Trial Tr.) at 546970:14-15 (emphasis added).

B.    The district court refused to grant a mistrial for two reasons. First, the court speculated that any relevance was limited because the parties might not even "mention" the issue "in final argument." R. 4078 (Trial Tr.) at 547248:12. But that is not the test for relevance. In any event, the Counties *did* address the pharmacies' profit motive in closing arguments, telling the jury that the pharmacies are "making money off every pill they sell." R. 4153 (Trial Tr.) at 554668:22-554669:1. In assessing whether that narrative was true, jurors naturally would have considered evidence that the pharmacies were charging for life-saving drugs that others dispensed for free.

84

Second, the district court concluded that a mistrial is necessary only when a juror's misconduct "[comes] to light after the verdict," because otherwise the court may solve the problem by questioning and instructing the jury. R. 4078 (Trial Tr.) at 547247:22-23. The court did not point to any apposite authority limiting *Beverly Hills* that way. Nor would such a rule make sense. No matter when misconduct comes to light, a jury's exposure to relevant extraneous evidence that "was not subject to scrutiny or cross-examination by any party" can yield "[h]ighly misleading results." *Beverly Hills*, 695 F.2d at 214-215. Although jurors may be able to set aside extraneous evidence that is irrelevant to a case, *see Wheaton*, 517 F.3d at 361, briefly asking jurors whether they are biased cannot uncover the potential effect of outside evidence on deliberations on a core contested issue, because jurors might not yet be aware of its influence or might be instinctively inclined to reaffirm their impartiality. For the same reasons, merely directing the jury not to consider such evidence does not necessarily cure unconscious bias that may have already formed. As even the Counties' own counsel asserted, outside evidence on contested issues "affects everybody *whether they recognize it or not*." R. 4065 (Trial Tr.) at 547016:13-14 (emphasis added). Under the circumstances of this case, a mistrial was the only solution.

## V.   THE ABATEMENT ORDER MUST BE VACATED

### A.    The Abatement Award Lacks Any Support In The Jury Verdict Or Traditional Equitable And Remedial Principles

The district court's "abatement" order is unprecedented.  It orders the pharmacies to fund a comprehensive slate of government public-health programs designed to address the broad downstream health, social, and criminal-justice effects of the opioid crisis for the next half-generation.  That remedy goes far beyond the nuisance for which the jury found the pharmacies liable.  It also cannot be reconciled with fundamental equitable principles.  The court's authority to order abatement was, at most, limited to addressing the precise nuisance found by the jury—here, the oversupply and diversion of prescription opioids.  Addressing the downstream *effects* of a nuisance falls outside the scope of abatement and instead constitutes damages, which the Counties expressly disavowed and cannot receive.  And simply as a general remedial matter, the pharmacies cannot be made to pay more than a half-billion dollars, based on speculative estimates and aspirational targets, to address harms far removed from their dispensing conduct in two Ohio Counties.

86

1.    **The district court's monetary award is untethered to the dispensing conduct for which the jury found the pharmacies liable**

The district court's $650.6 million award adopted virtually wholesale the Counties' proposed abatement plan, which is a sweeping and aspirational public-health program. As one of the Counties' experts, Dr. Alexander, aptly put it, the court-ordered plan is "very similar" to the plan he would propose to a governor or a legislature. R. 4446 (Remedies Trial Tr.) at 580310:14. It is not a remedy for the pharmacies' specific conduct or for the nuisance that the jury actually found, and the district court should not have adopted it.

a.    As explained below, the jury found that the pharmacies committed the nuisance of contributing to the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market." R. 4176 at 556138, 556142. But the district court adopted an abatement plan much broader in scope. The Counties' expert explained that any abatement plan "worth its salt" would address the opioid crisis writ large. R. 4446 (Remedies Trial Tr.) at 580275:15. He therefore designed "a comprehensive plan to address the opioid epidemic" in Lake and Trumbull Counties. *Id.* at 580296:19-20. Extending for 15 years, the plan overhauls the public-health, social-service, and criminal-justice apparatuses within the Counties to address the opioid

crisis and its broad second- and third-order effects. The district court largely adopted the plan, making adjustments that did not fundamentally alter its sweeping scope.

**_Treatment programs._** The vast majority of the $650 million award is slated for treatment programs that address opioid misuse and addiction, including heroin and fentanyl addiction, R. 4446 (Remedies Trial Tr.) at 580275, and cover a wide range of treatments. The plan also funds harm-reduction programs for illicit drug users, including needle exchanges and fentanyl test strips. _Id._ at 580283-580284. And it funds long-term medical care for persons with hepatitis C and endocarditis—"rare but serious" conditions that can result from intravenous (not prescription) drug use. R. 4219-1 (Expert Report of Dr. Alexander) at 568397-568398.

**_Healthcare sector._** The plan proposes to reinvent the healthcare sector in Lake and Trumbull Counties. _See_ R. 4446 (Remedies Trial Tr.) at 580287. It funds additional peer-recovery coaches, medical social workers, first responders, and other professionals, _id._ at 580285-580286, as well as programs to help these workers avoid burnout, _id._ at 580287-580288. It funds efforts to increase the number of healthcare providers licensed to treat pain, _id._ at 580287-580278, and retraining for doctors about appropriate pain

management, *id.* at 580277.    It funds special treatment measures for individuals whose care is complicated by homelessness or mental-health issues.  *Id.* at 580279-580280.

**Law enforcement and social services.**    The plan contemplates sweeping changes to law enforcement and social services as well.  The plan funds the creation and expansion of pretrial diversion programs, specialized opioid units within police departments to investigate illicit opioid trafficking, and drug courts.  R. 4446 (Remedies Trial Tr.) at 580289.  It funds reentry programs for formerly incarcerated persons suffering from opioid use disorder (OUD), including vocational training and job-placement programs. *Id.* at 580289-580290.  It funds programs to address housing insecurity.  *Id.* at 580294-580295.  It funds foster care, special education, and counseling for children affected by the opioid crisis.  *Id.* at 580294.  And it funds community prevention and resiliency programs intended to "strengthen social bonds" in the wake of the crisis.  *Id.* at 580283:7-9.

b.    The plan the district court adopted was sweeping and aspirational in other ways as well.  The plan is admittedly not tailored to the pharmacies' dispensing conduct or to the Counties' actual needs.  Instead, the plan covers treatment for the total number of people with OUD in the Counties, whether

or not they were ever exposed to prescription opioids dispensed by the pharmacies. Its scope and cost estimates also are based on aspirational "targets" designed to take advantage of what the Counties' expert called the "enormous opportunity" provided by the verdict to fund vastly expanded social programs. *E.g.*, R. 4447 (Remedies Trial Tr.) at 580414, 580471:12, 580566-580573; R. 4446 (Remedies Trial Tr.) at 580315, 580379-580383. And the plan extends for 15 years, based on nothing more than the Counties' expert's statement that "*I believe* that [the plan] can reduce cumulative opioid overdoses and opioid-related harms by 50% over fifteen years." R. 4219-1 at 568427 (emphasis added).

## 2. The district court's monetary award far exceeds its equitable authority to order abatement

The district court described its remedy as "something no federal [j]udge in history has had to do" and as something for which there "is no existing model." R. 4611 at 596648. The court's remedy is indeed unprecedented—which underscores that the remedy exceeds the court's equitable authority. Federal courts' equity jurisdiction is limited to those remedies "traditionally accorded by courts of equity" in 1789, when the Judiciary Act conferred jurisdiction over "all suits . . . in equity." *Grupo Mexicano de Desarrollo, S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-319 (1999). Without

congressional authorization, federal courts have no authority to "accord a type of relief that has never been available before" in courts of equity. *Id.* at 322.

For these reasons, a plaintiff must establish that an equitable remedy "is confined within the broad boundaries of traditional equitable relief." *Grupo Mexicano*, 527 U.S. at 322; *accord In re E.I. DuPont de Nemours & Co. C-8 Personal Injury Litig.*, 2022 WL 4149090, at *5 n.6 (6th Cir. Sept. 9, 2022) ("[D]istrict courts purporting to issue equitable remedies under the federal equity power are constrained to those remedies 'traditionally accorded by courts of equity.'") (citation omitted). The same limit on federal courts' equitable power applies in cases arising under state law. *See id.* (applying federal principles to injunctive relief for Ohio law claims); *Sonner* v. *Premier Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020). Here, whether the district court's abatement award is considered under traditional equity principles or Ohio equity practice, the answer is the same: the award falls far outside the bounds of the district court's remedial authority.

### a. The district court's award has no foundation in either state or federal equitable principles

i. Abatement is a prospective equitable remedy that is intended to abate—meaning stop—a condition that constitutes a nuisance. *See, e.g., Wind* v. *State*, 130 N.E. 35, 36 (Ohio 1921); 3 William Blackstone, Commentaries *168

(The "expression, of abating . . . signifies to quash, beat down, or destroy."); *Id.* at \*5 ("[S]uch nuisance [sic] may be abated, that is, taken away or removed, by the party aggrieved thereby."); Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies* § 5.7(3) (3d ed. 2018). For a public nuisance, traditional abatement relief required the defendant to stop the activity causing harm to the public. *See, e.g.*, *Mugler* v. *Kansas*, 123 U.S. 623 (1887); *Little Miami R.R. Co.* v. *Commissioners of Greene Cnty.*, 31 Ohio St. 338, 343 (1877); *Wind*, 130 N.E. at 36; *Wolcott* v. *Melnick*, 11 N.J. Eq. 204, 208 (Ch. 1856). And even that limited remedy was "rare." 2 Joseph Story, *Commentaries on Equity Jurisprudence* § 923 (12th ed. 1877).

The district court did not cite a single case suggesting that the traditional scope of equitable abatement encompasses broad injunctive relief addressing the downstream effects of the nuisance, rather than stopping the nuisance itself. Since the days of the divided bench, the consistent practice (including in Ohio) has been to award injunctive relief limited to stopping the specific activity found to be a nuisance—even when the nuisance likely had downstream consequences on the public.[9] The district court therefore had

---

[9]    *See, e.g.*, *McClung* v. *North Bend Coal & Coke Co.*, 1 Ohio Dec. 247, 257 (Ct. Com. Pl. 1894), *aff'd*, 2 Ohio Dec. 531 (Cir. Ct. 1895) ("[T]he decree shall

equitable authority to order only a remedy tailored to stopping the nuisance found by the jury:  the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market."  R. 4176 at 556138, 556142.  The court did not have authority to order the pharmacies to fund remediation of the broad, downstream public health and societal impacts of the opioid crisis writ large.

The district court acknowledged that the relief it ordered here is unprecedented.  *See* R. 4464 (Remedies Trial Tr.) at 582351:5-12 ("No judge in history" has granted an award like the "completely uncharted" relief the Counties sought here).  Indeed, the pharmacies are unaware of any abatement order ever encompassing similarly expansive downstream relief.  In fact, courts have uniformly rejected attempts to use the abatement remedy to require defendants to pay for downstream effects of opioid-related nuisances.

---

prevent the defendant from the manufacture of coke by the process as now carried on by it, whereby injury is done to the rights of the plaintiff."); *Sheldon* v. *Cole*, 2 Ohio N.P. 307 (Ct. Com. Pl. 1895) (defendant must "abate the nuisance created by the erection of the embankment or dam on his east line, by leveling to the ground or removing said embankment"); *Bemis* v. *Upham*, 30 Mass. (13 Pick.) 169 (1832) ("The nuisance or cause of damage is the flowage, and that is occasioned by the dam, sluices and gates, and the nuisance might be abated by hoisting the gates, or removing the planks from a wasteway."); *People ex rel. Ricks Water Co.* v. *Elk River Mill & Lumber Co.*, 40 P. 486, 487 (Cal. 1895) (injunction against continuing to pollute stream).

For instance, in *State ex rel. Hunter* v. *Johnson & Johnson*, 499 P.3d 719 (Okla. 2021), the Supreme Court of Oklahoma reversed an order—much like the district court's order here—directing Johnson & Johnson to pay $465 million to fund appropriations to "21 government programs for services to combat opioid abuse." *Id.* at 722. The court held that the remedial order was "not an abatement" because it was designed to address downstream "social, health, and criminal issues arising from conduct alleged to be a nuisance." *Id.* at 729. Similarly, in another track within these MDL proceedings, a different district court rejected an abatement plan materially identical to this one, finding that it was "not . . . abatement" because it was not tailored to the nuisance as defined in that case (manufacturers' wrongful conduct) but instead sought "recovery for the extensive harms of opioid abuse and addiction." *City of Huntington*, 2022 WL 2399876, at *1, *67-68.

ii.    The district court attempted to justify the sweeping scope of its remedial order by rewriting the jury's findings, declaring that the jury "actually found" that the "nuisance" was the "widespread prevalence of opioid use disorder ('OUD') and addiction" in the Counties. R. 4611 at 596661. That assertion conflicts with the court's own verdict form and jury instructions.

94

At the liability phase, the verdict form asked the jury to decide whether the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels, is a public nuisance" in each County.  R. 4176 at 556138, 556142.  If the jury answered "yes," the next question asked whether each of the three defendants had engaged in "intentional and/or illegal conduct which was a substantial factor in producing the public nuisance that you found exists in [the prior question]."  R. 4176 at 556139, 556143.  The jury was never asked to determine whether the "widespread prevalence of opioid use disorder and addiction" constituted a public nuisance, or whether the pharmacies had contributed to that condition.  The verdict form thus leaves no doubt that the only public nuisance the jury found is the "oversupply of legal prescription opioids and diversion of those opioids."

The district court asserted that the verdict form's reference to "oversupply and the resulting diversion" meant the pharmacies' *conduct*, and the relevant public nuisance was the *harm* caused by that conduct (*i.e.*, the downstream effects of the opioid crisis).  R. 4611 at 596657.  On its face, the verdict form refutes that reading.  The verdict form asked the jury to determine whether the "oversupply of legal prescription opioids, and diversion

95

of those opioids into the illicit market outside of appropriate medical channels," was a "public nuisance."  R. 4176 at 556138, 556142.  The verdict form then separately asked whether the pharmacies had engaged in "intentional and/or illegal conduct which was a substantial factor in producing the public nuisance."  R. 4176 at 556140, 556143.  As a matter of plain English, the verdict form treated the diversion of legal prescription opioids—not the downstream consequences of such diversion—as the potential public nuisance at issue.

The district court also invoked the general rule that a verdict form must be evaluated "in the context of the instructions as a whole."  R. 4611 at 596656 (quoting *Moody* v. *United States*, 958 F.3d 485, 491 (6th Cir. 2020)).  But the court did not identify any part of the jury instructions that altered the verdict. Those instructions stated:  "Each plaintiff alleges that each defendant *dispensed opioid products* in a manner that endangered public health or safety . . . .  Specifically, each plaintiff claims that each defendant substantially contributed to *an oversupply of legal prescription opioids and to diversion of those opioids* into the illicit market outside of appropriate medical channels, thereby endangering public health or safety."  R. 4153 (Trial Tr.) at 554643:25-554644:7 (emphasis added).  The jury instructions are thus fully consistent

with the verdict form.  They instructed the jury to determine whether the oversupply and diversion of prescription opioids was a public nuisance.

### b. The district court's award is an impermissible award of damages

Because the monetary award is specifically designed to remediate the downstream effects of the nuisance that the jury found, it impermissibly operates as an award of damages.  An award of compensation for "the cost of eliminating the nuisance effects," rather than compensation for the costs of abating the nuisance itself, has long been understood as a damages remedy. *See* Dobbs & Roberts, *supra*, § 5.7(3) (distinguishing between "damages" for eliminating nuisance's "effects," and an injunction ordering "abatement of the offending condition"); *City of Huntington*, 2022 WL 2399876, at *68 (characterizing costs of the "downstream harms of opioid use and abuse" as damages).  Ohio courts have similarly distinguished between monetary relief to address effects of a nuisance and injunctive relief to end the conduct constituting the nuisance.  *See, e.g.*, *Longbottom* v. *Mercy Hosp. Clermont*, 998 N.E.2d 419, 421 (Ohio 2013) (identifying an award of "anticipated medical expenses" as future damages); *Nithiananthan* v. *Toirac*, 2015 WL 1619097, at *2 (Ohio Ct. App. Apr. 13, 2015).

The district court took the view that damages are exclusively "backward-looking," and therefore any forward-looking award of funding must constitute abatement. R. 4611 at 596664 n.36 (citation omitted). But as the federal and state authorities above explain, the relevant question is not whether a monetary award is backward- or forward-looking. Rather, the question is whether the monetary award abates the nuisance itself (even if in the future) or the effects of the nuisance. Because the award here does the latter, it is damages. And the parties and the court agreed below that the Counties could obtain only abatement, not damages, during the remedial phase of this public-nuisance action. *See* R. 4342 (Joint Reply Br. Regarding Remedies Issues) at 575669. Because the district court awarded what are actually damages under the label of "equitable abatement," its remedial order should be vacated.

### 3. The district court's award is not cabined by any remedial principles, whether legal or equitable

Even setting aside traditional equitable principles, the award here violates general *remedial* principles that govern all cases, whether law or equity. First, "the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Associated Gen. Contractors of Cal., Inc.* v. *California State Council of Carpenters*, 459 U.S. 519, 536 (1983).

Yet the district court's award redresses a wide range of downstream effects that are far removed from the pharmacies' dispensing conduct (and in some instances could not have been caused by the pharmacies' conduct at all). Second, the award is founded on concededly speculative estimates and targets that have nothing to do with the Counties' actual needs and costs and that fall far short of any "reasonabl[y] certain[]" calculation of future costs. *Andler* v. *Clear Channel Broad., Inc.*, 670 F.3d 717, 726 (6th Cir. 2012) (citation omitted); *Galayda* v. *Lake Hosp. Sys., Inc.*, 644 N.E.2d 298, 301 (Ohio 1994).

a.    The monetary award violates principles of remedial causation by requiring the pharmacies to finance sweeping public health initiatives designed to address nearly "every conceivable harm" resulting from the opioid crisis. *Associated Gen. Contractors*, 459 U.S. at 536.   In the context of damages, a court may award only those damages with a "direct relation" to the defendant's "injurious conduct." *Deutsche Bank*, 863 F.3d at 480; *Ameriquest*, 615 F.3d at 504-506.[10]  Similarly, in the context of equitable relief, any order—including an abatement order, R. 4611 at 596649-596651—must be "closely

---

[10]  Although the lack of proximate cause should have been grounds to dismiss the suit entirely, *see* Part III, *supra*, the requirement of a direct relationship between the pharmacies' conduct and the remedy ordered is no less important or binding at the remedial stage. *See Deutsche Bank*, 863 F.3d at 480.

tailor[ed]" to the harm that the plaintiff has suffered as a result of the defendant's conduct. *CFE Racing Prods., Inc.* v. *BMF Wheels, Inc.*, 793 F.3d 571, 595 (6th Cir. 2015) (citation omitted); *Eastwood Mall, Inc.* v. *Slanco*, 626 N.E.2d 59, 62 (Ohio 1994). The award violates those principles.

The award's 15-year duration ensures that the pharmacies will be compelled to remediate alleged harms that their dispensing conduct could not possibly have caused. The pharmacies are now bound by an injunction against "further improper dispensing," which the court described as "sufficient" to prevent the pharmacies "from continuing their nuisance-causing conduct." R. 4611 at 596641, 596709-596710 (emphasis omitted); R. 4611-1 at 598404 § VIII.F, 598405 § IX.B.[11] As the Counties' expert admitted, the pharmacies therefore must fund treatment for people who are *first exposed* to opioids in 2024 and acquire OUD by 2027. R. 4446 (Remedies Trial Tr.) at 580298. It strains credulity to think that the pharmacies' pre-2022 conduct could directly cause thousands of people in the Counties to seek OUD treatment (and a wide range of other social services) years in the future.

---

[11] This injunctive relief was awarded despite the Counties' failure to present any evidence of the pharmacies' current dispensing practices or policies. In reality, opioid dispensing has plunged over the past five years. *See* CDC, *U.S. Opioid Dispensing Rate Maps*, https://www.cdc.gov/drugoverdose/rxrate-maps/index.html.

The award also requires the pharmacies to pay for a wide range of social services whose causal connection to their dispensing conduct is vanishingly remote.  For instance, the court approved funds for long-term medical treatment for hepatitis C and endocarditis, even though those downstream complications would occur only if someone who obtained prescription opioids from a pharmacy began using intravenous drugs such as heroin, and then contracted an admittedly "rare" infection from that intravenous drug use. R. 4219-1 at 568397-568398.  The court also approved funds for measures that would become necessary only after several intervening causes:  for instance, drug courts to provide addiction treatment to individuals who commit criminal offenses, and foster care and mental-health counseling for children of parents with OUD.  *Id.* at 568406, 568419; R. 4592-6 (App. E of Dr. Alexander's Report, Trumbull County) at 591512-591513.  The court even approved funds to change doctor/patient practices, although the pharmacies had no role in overprescribing by doctors, and despite the court's refusal to allocate any liability to those same doctors.  R. 4219-1 at 568371, 568400.  All of these measures are highly attenuated from the pharmacies' dispensing conduct.

b.    The abatement award suffers from a second major flaw: it violates the principle that relief may not be speculative.  A court may not award

damages unless the plaintiff establishes both "certainty that the damages will occur" and "reasonable certainty as to the amount of those damages." R. 4611 at 596669 (citing Restatement (Second) of Torts § 912); *see Andler*, 670 F.3d at 726; *Galayda*, 644 N.E.2d at 301. The district court disregarded that narrow-tailoring principle, asserting that it has "limited applicability in the abatement-remedy context." R. 4611 at 596669. That is wrong. For the reasons described above, the award is properly characterized as damages. But even if it were characterized as equitable abatement, an equitable order to pay costs that are based on speculation rather than on an assessment of the Counties' actual costs is by definition not closely tailored to the violation. *CFE Racing Prods*, 793 F.3d at 595; *Rogers*, 676 F.2d at 1214.

Some of the most important underpinnings of the award are based on "targets" with no relation whatsoever to realities in the Counties. Consider the Counties' estimate of the costs of providing OUD treatment for 15 years, which made up approximately 75% of the total award. The Counties assumed that 40-60% of each county's OUD population would be in treatment at any given time. R. 4592-6 at 591525; R. 4447 (Remedies Trial Tr.) at 580469-580472. The Counties conceded, however, that those figures were aspirational "targets," and their own evidence showed that only 20-30% of individuals with

OUD sought treatment at any given time.  R. 4592-6 at 591526; R. 4446 (Remedies Trial Tr.) at 580379-580383; R. 4447 (Remedies Trial Tr.) at 580471. Because the district court adopted the Counties' proposed plan nearly wholesale, it relied on treatment numbers that were much too high.

The Counties and the district court also ignored data on how much it actually costs the Counties to treat OUD.  For instance, although in 2019 Lake County had funded treatment for 232 individuals for $1,563 per person, it proposed in just the first year of its plan to treat up to 4,534 individuals, and to do so at a far higher cost of approximately $7,940 per person.  R. 4592-9 (Expert Report of Drs. John Burke & Harvey Rosen) (internal pagination at 65-92, 234-261); R. 4592-6 at 591525; R. 4592-5 (App. E of Dr. Alexander's Report, Lake County) at 591505; R. 4447 (Remedies Trial Tr.) at 580469-580473; R. 4593-7 (Defs.' Ex., Lake County).  The largest single portion of the award (targeted at treating OUD) was thus based on inflated treatment targets multiplied by inflated costs—all resulting in a massive award that rests on one speculative leap after another.  *Tamraz* v. *Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010); *Ward* v. *Herr Foods, Inc.*, 1990 WL 118868, at *5 (Ohio Ct. App. Aug. 16, 1990) (plaintiff must prove "more than mere possibility or speculation").

The Counties also conceded that the award's 15-year duration makes its projection of far-in-the-future needs and costs particularly speculative. One of the Counties' experts, Dr. Alexander, acknowledged that analysis of the plan's year-by-year effects would be "prone to uncertainty." R. 4446 (Remedies Trial Tr.) at 580311:20-23. Indeed, the district court itself initially recognized at a pre-abatement hearing conference that "no one can really determine with any reasonable degree of certainty what's going to happen in 15 years." R. 4420 (Pretrial Tr.) at 579341:24-579342:1. Yet the court ordered the pharmacies to pay about $43 million per year to fund future social services whose nature and use is completely unknown, cannot be reliably predicted, and is ultimately up to the Counties' near-absolute discretion. That is the very definition of an award that is not based on "reasonable certainty."

## B.   The Abatement Award Violates Principles Of Apportionment

The district court's abatement award must also be vacated because the court erroneously refused to apportion shares of the nuisance to at least two other categories of actors that unquestionably bore significant responsibility: prescribing physicians and the other pharmacies that collectively dispensed most of the red-flagged prescriptions in the Counties. As a result, the $650.6

million award far exceeds the defendant pharmacies' contribution to any public nuisance.

### 1. The district court's apportionment analysis was incomplete

It is a bedrock principle of tort law that if the alleged harm is caused by multiple actors, and there is a reasonable basis to apportion that harm among them, a defendant should not pay any more than its share. Ohio law requires liability "to be apportioned among two or more causes" when the defendant establishes that "there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) of Torts § 433A(1) (1965); *Pang* v. *Minch*, 559 N.E.2d 1313, 1323-1324 (Ohio 1990). That rule follows from the principle that "each person contributing to the nuisance" should be liable only for his own contribution, not for "that of others." Restatement (Second) of Torts § 840E (1979). Apportionment does not require absolute precision. Rather, the defendant need only provide a "rough practical apportionment" based on the parties' relative contributions. W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 52, at 345 (5th ed. 1984); Restatement (Second) of Torts § 840E & cmt. b; *see id.* § 433A.

The district court correctly recognized that the alleged nuisance— whether characterized as the oversupply and diversion of prescription opioids,

or as the opioid crisis as a whole—was "caused by a confluence of failures by virtually everyone," and that the resulting costs should be apportioned among actors that contributed to the nuisance. *See* R. 4296 at 572205; R. 4611 at 596645, 596694-596695. That conclusion followed from the Counties' own evidence that numerous actors other than pharmacies had contributed to the opioid crisis: opioid manufacturers, wholesale distributors, doctors, other pharmacies, people who diverted properly dispensed pills, federal and state regulators, illegal drug dealers, and others. *See, e.g.*, R. 4000 (Trial Tr.) at 541031-541033 (Lembke); R. 4064 (Trial Tr.) at 546752, 546779-546780 (Alexander); R. 4065 (Trial Tr.) at 546932-546939, 546940 (Keyes); R. 4153 (Trial Tr.) at 554751 (Counties' counsel); R. 4611 at 596694-596695.

The district court nevertheless held that only two other categories of actors—opioid manufacturers and distributors—should bear a portion of the abatement costs. The court found a "rational basis" for allocating responsibility to manufacturers and distributors because (1) the "numerous defendants named in these MDL proceedings" were "overwhelmingly" manufacturers, distributors, or pharmacies, R. 4611 at 596694-596695; (2) other plaintiffs in the MDL had proffered evidence that manufacturers and distributors had "contributed to creating the opioid epidemic," *id.* at 596695

106

n.72; and (3) pharmacies, manufacturers, and distributors are all regulated by the CSA. The court then apportioned the nuisance equally: 33% each to pharmacies, manufacturers, and distributors. *Id.* at 596693-596695. The court incorrectly refused, however, to further apportion the nuisance to account for the contributions of other responsible actors including, most notably, prescribing physicians and the many non-defendant pharmacies that served residents of the Counties.

### 2. The district court erred in failing to allocate any share of the harm to prescribing physicians

The district court's sole justification for declining to apportion any share of the harm to prescribing physicians was its unexplained assertion that "the evidentiary record does not provide a reliable basis for the Court to allocate responsibility" to prescribing physicians. R. 4611 at 596696 n.73. That reasoning disregards the basic legal and factual premises on which the pharmacies were held liable in this case, as well as the overwhelming evidence presented *by the Counties* that prescribing physicians were centrally responsible for the oversupply of opioids and the opioid crisis.

a. The district court's reasoning cannot be squared with the fact that the pharmacies' liability is premised on their filling illegitimate prescriptions *written by doctors*. The core of the Counties' nuisance claims was that the

107

pharmacies should have detected prescriptions that were illegitimate.  If the pharmacies contributed to the oversupply of prescription opioids by failing to *detect* illegitimate prescriptions, then prescribing physicians necessarily contributed to the same nuisance by *writing* those illegitimate prescriptions. The jury's finding of liability therefore necessarily establishes—and easily provides a reasonable basis to conclude—that prescribing physicians contributed to the nuisance as well.

That conclusion is reinforced by the CSA's implementing regulations, which place "[t]he responsibility for the proper prescribing and dispensing of controlled substances" upon the "prescribing practitioner."  21 C.F.R. § 1306.04(a).  Pharmacist liability thus arises only if the prescribing practitioner has *also* violated his legal duties.  Indeed, the district court recognized elsewhere that the CSA framework provided a reasonable basis for apportionment, as it described manufacturers, distributors, and pharmacies as a "natural grouping" consistent with the "tripartite opioid supply scheme contemplated by the Controlled Substances Act."  R. 4611 at 596695.  But that description of the CSA is legally erroneous:  it overlooks the fact that the CSA and its regulations assign "significant and independent responsibilities" to doctors as well.

As the Counties' own witnesses acknowledged, doctors are also DEA registrants and participate in the opioid delivery system, and they also bear responsibility for ensuring that prescriptions are medically appropriate and that dangerous substances are not diverted. *See* 21 C.F.R. § 1301.11; R. 4005 (Trial Tr.) at 541411:16-24 (Catizone). The Counties' experts uniformly testified that many doctors overprescribed, or prescribed for illegitimate purposes, and that this conduct substantially contributed to the opioid crisis in the Counties. *See* R. 4438 (Remedies Trial Tr.) at 579559:11-15, 579560:10-14; R. 4000 (Trial Tr.) at 540962:22-540963:4; *see id.* at 540984:14; R. 4023 (Trial Tr.) at 542958:7-22; R. 4005 (Trial Tr.) at 541486:10-14. In addition, the Counties' experts, Dr. McCann and Mr. Catizone, presented evidence that the "red flags" that the pharmacies allegedly failed to investigate largely concerned indicia of prescriber misconduct or negligence. *See* R. 4005 (Trial Tr.) at 541498:20-22.[12] During closing arguments, the Counties stressed prescribers' contribution to opioid abuse in Lake and Trumbull Counties. *See*

---

[12] Specifically, Red Flags Nos. 12-13 are directed to detecting prescribers who write multiple prescriptions for the same opioids with the same strength to multiple patients. Red Flags Nos. 6-8 are directed to identifying prescribers who write prescriptions for suspicious cocktails or combinations of medications. *See* R. 4005 (Trial Tr.) at 541481:8-541513:7.

R. 4153 (Trial Tr.) at 554667:18-20 ("And are doctors to blame for this?  Oh, without a doubt.  A lot of doctors.  99 percent.").

b.   To the extent the district court believed that prescribing physicians did not share the characteristics that made it appropriate to apportion responsibility to manufacturers and distributors, R. 4611 at 596694-596695, the court erred.  The court reasoned that manufacturers and distributors were defendants in other MDL proceedings.  But in apportioning costs, "it is immaterial whether all or any of such persons [contributing to the nuisance] are joined as defendants in the particular action."  Restatement (Second) of Torts § 433A(1) cmt. a.  And prescribers were absent only because the Counties chose not to sue them (despite their view that prescribers bore significant responsibility)—and the district court refused the pharmacies' request to add them to the case.  R. 3561 (Order Striking Pharmacies' Third-Party Compls.).

Finally, if the district court believed that it lacked a "reliable" basis to determine how *large* a share of the harm should be apportioned to prescribers, that suggestion is meritless and inconsistent with the court's own reasoning elsewhere.  As noted above, a "rough practical apportionment" is sufficient. *Prosser & Keeton on Torts* § 52.  The pharmacies presented expert testimony

that equal shares of harm should be apportioned to each category of actors in the pharmaceutical chain—a chain that included prescribing physicians. R. 4460 (Remedies Trial Tr.) at 582260-582272 (Chandra). The court evidently accepted that analysis with respect to manufacturers and distributors. It did not explain why that methodology does not apply equally to the prescriber sector—where, if anything, the argument for parity with prescriber liability is unusually strong because of the derivative nature of pharmacy liability.

### 3. The district court erred in declining to apportion a share of abatement costs to other pharmacies

The district court also committed legal error in refusing to further apportion abatement costs within the pharmacy sector. The court held that "improper conduct in the pharmacy sector" should be assigned 33% of the abatement costs, but then assigned that entire share to just three pharmacy chains out of the many pharmacies in the Counties. R. 4611 at 596696. The "pharmacy sector" in the Counties includes numerous pharmacies other than the defendants here, including pharmacies that were defendants in this case but settled (Rite Aid and Giant Eagle), and pharmacies (largely independent pharmacies) that the Counties chose not to sue. According to the Counties' own analysis of red-flagged prescriptions, these other pharmacies collectively

accounted for *76.6%* of the red-flagged prescriptions in Trumbull County, and *49.2%* of red-flagged prescriptions in Lake County. *Id.* at 596697 n.75.

a.    The district court nonetheless refused to allocate *any* responsibility to the non-defendant pharmacies on the ground that they were not necessarily liable in tort for their own dispensing conduct. *See* R. 4611 at 596697.    Absent evidence that "the other pharmacies also failed to take adequate measures to investigate," the court reasoned, the defendants could not "establish responsibility." *Id.* at 596698.    That was error.    As the Restatement explains, a party can be responsible for contributing to a harm *for apportionment purposes* even if its contributing behavior was "innocent"— that is, not a basis for liability—and even if it is not a defendant to the action. Restatement (Second) of Torts § 433A & cmts. a, c; *id.* § 840E.    The court thus conflated liability with causation:    although apportionment requires that a party helped cause the injury, whether that party is legally liable is irrelevant.

b.    As a result of that erroneous legal ruling, the court did not consider whether the factual record establishes a "reasonable basis" for apportioning harms to pharmacies other than the three defendants.    It does. There is extensive undisputed evidence that the other pharmacies in the pharmacy sector contributed to the nuisance.    Apportioning shares would be a

112

straightforward matter of using the Counties' own analysis of red-flagged prescriptions.

The contribution of non-defendant pharmacies was undisputed. The non-defendant and settling pharmacies dispensed millions of pills, including 76.6% and 49.2% of the red-flagged prescriptions in Trumbull County and Lake County, respectively. The Counties' witnesses testified that non-defendant independent pharmacies were far less compliant than the defendant pharmacies with Ohio law and regulations, R. 4106 (Trial Tr.) at 549761:18-23, 549762:4-11; R. 4111 (Trial Tr.) at 550566:21-550567:14, and that some independent pharmacies had "dispensed greater volumes of [opioids], filled more opioid prescriptions for cash, and dispensed a much higher percentage of high-dose opioid prescriptions" than the defendants, R. 4611 at 596706 n.85. Indeed, the defendant pharmacies were at the low end in average strength per opioid prescription, ranking 25th, 26th, and 28th out of the 33 pharmacies in the Counties. R. 4169-20 (Defs.' Ex.) at 555729. Yet the district court placed the collective responsibility of all pharmacies solely on these three defendants.

The record also provides a straightforward means of determining the other pharmacies' share of the harms: Dr. Chandra's calculation of market share based on each pharmacy's share of red-flagged prescriptions. *See*

R. 4593-3 (Defs.' Ex, Lake County) at 591800; R. 4593-4 (Defs.' Ex., Trumbull County) at 591801; R. 4460 (Remedies Trial Tr.) at 582272:1-582273:13, 582276:7-8, 582152:9-11, 582292:19-582294:2. That analysis establishes that the settling and non-defendant pharmacies collectively accounted for 76.6% of the red-flagged prescriptions in Trumbull County, and 49.2% of the red-flagged prescriptions in Lake County. The district court therefore should have apportioned those shares to the other pharmacies.

*    *    *

The monetary award should be vacated because it ignores the contributions of prescribing doctors and non-defendant pharmacies to the nuisance. On remand, the district court should be directed to allocate an appropriate share to prescribing doctors, and to allocate the remaining amount apportioned to the pharmacy sector to account for the non-defendant pharmacies as described above.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment and its subsequent appointment order. In the alternative, this Court should vacate the judgment and the appointment order and remand the case, either for a new trial on liability, or to enter a new abatement order.

114

Respectfully submitted,

/s/ Noel J. Francisco

NOEL J. FRANCISCO
JOHN M. MAJORAS
ANTHONY J. DICK
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

TINA TABACCHI
TARA FUMERTON
NICOLE HENNING
JONES DAY
77 West Wacker
Chicago, IL 60601
(312) 269-4335

JAMES SAYWELL
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-1190

*Counsel for Walmart Inc.*

/s/ Jeffrey B. Wall

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

KASPAR STOFFELMAYR
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
(312) 494-4400

*Counsel for Walgreens
Appellants*

/s/ Donald B. Verrilli, Jr.

DONALD B. VERRILLI, JR.
GINGER D. ANDERS
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 220-1100
donald.verrilli@mto.com

ERIC R. DELINSKY
ALEXANDRA W. MILLER
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 100
Washington, DC 20036
(202) 778-1800

*Counsel for CVS Appellants*

DECEMBER 1, 2022

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(a) and this Court's November 17, 2022 Order because it contains 23,951 words.

This Brief also complies with the requirements of Federal Rules of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

/s/ Jeffrey B. Wall
JEFFREY B. WALL

DECEMBER 1, 2022

# CERTIFICATE OF SERVICE

I hereby certify that, on this 1st day of December, 2022, I electronically filed the foregoing Brief with the Clerk of Court using the CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

/s/ Jeffrey B. Wall
JEFFREY B. WALL

DECEMBER 1, 2022

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g)(1), appellants hereby designate the following filings in the district court's record as relevant to the disposition of this appeal:

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 71 | Transcript of MDL Status Conference | 01/12/2018 | 459-479 |
| 1025 | Report and Recommendation Regarding Track One Motions to Dismiss | 10/05/2018 | 24807-24909 |
| 1203 | Opinion and Order Adopting and Rejecting Magistrate Judge's Report and Recommendation | 12/19/2018 | 29020-29058 |
| 2565 | Opinion and Order Denying Track One Motions for Summary Judgment | 09/03/2019 | 412892-412914 |
| 3261 | Order Removing Dispensing Claims from Track 1B and Directing Plaintiffs' Executive Committee to Identify Cases for Track Three Bellwether Trial | 04/16/2020 | 492713-492714 |
| 3282 | Order Designating Trumbull County and Lake County Cases as Track Three Cases | 04/30/2020 | 492977-492978 |
| 3314 | Order Granting Track Three Plaintiffs' Motion for Leave to Amend Complaints | 06/02/2020 | 494848-494849 |
| 3315 | Order granting Track Three Plaintiffs' Motion to Bifurcate Bellwether Claims, Join Bellwether Cases for Trial, and to Stay Remaining Claims | 06/02/2020 | 494850-494853 |
| 3326 | Supplemental Amended Complaint of Trumbull County, Ohio | 06/05/2020 | 494941-495152 |

| 3327 | Supplemental Amended Complaint of Lake County, Ohio | 06/05/2020 | 495153-495359 |
|---|---|---|---|
| 3340-1 | Brief in Support of Motion to Dismiss Second Amended Complaints | 06/16/2020 | 495633-495672 |
| 3366 | Memorandum of Law in Opposition to Defendants' Motion to Dismiss Second Amended Complaints | 07/02/2020 | 496389-496435 |
| 3403 | Opinion and Order Denying Defendants' Motion to Dismiss Second Amended Complaints | 08/06/2020 | 497728-497760 |
| 3499 | Order Denying Defendants' Motion for Reconsideration or Certification | 09/22/2020 | 502741-502749 |
| 3561 | Order and Opinion Granting Plaintiffs' Motion to Strike Pharmacy Defendants' Third-Party Complaints | 11/18/2020 | 507070-507072 |
| 3991 | Transcript of Jury Trial Volume 1 | 10/04/2021 | 540196-540374 |
| 4000 | Transcript of Jury Trial Volume 3 | 10/06/2021 | 540897-541189 |
| 4005 | Transcript of Jury Trial Volume 4 | 10/07/2021 | 541222-541566 |
| 4008 | Transcript of Jury Trial Volume 5 | 10/08/2021 | 541569-541789 |
| 4023 | Transcript of Jury Trial Volume 7 | 10/13/2021 | 542760-543064 |
| 4032 | Transcript of Jury Trial Volume 9 | 10/15/2021 | 544680-544887 |
| 4057 | Transcript of Jury Trial Volume 12 | 10/20/2021 | 546180-546496 |
| 4064 | Transcript of Jury Trial Volume 13 | 10/21/2021 | 546550-546842 |
| 4065 | Transcript of Jury Trial Volume 14 | 10/22/2021 | 546843-547027 |
| 4068 | Defendants' Motion for Declaration of Mistrial | 10/24/2021 | 547054-547061 |
| 4069 | Opposition to Motion for Declaration of Mistrial | 10/24/2021 | 547062-54073 |
| 4075-1 | Plaintiffs' Proposed Jury Instructions | 10/25/2021 | 547229-547231 |
| 4078 | Transcript of Jury Trial Volume 15 | 10/25/2021 | 547243-547490 |
| 4093 | Transcript of Jury Trial Volume 17 | 10/27/2021 | 548051-548207 |
| 4098 | Defendants' Joint Motion for Judgment as a Matter of Law Under Rule 50(a) | 10/29/2021 | 548847-548900 |

| 4106 | Transcript of Jury Trial Volume 18 | 11/01/2021 | 549703-549979 |
| 4111 | Transcript of Jury Trial Volume 21 | 11/02/2021 | 550544-550825 |
| 4131 | Plaintiffs' Omnibus Opposition to Defendants' Motion for Judgment as a Matter of Law Under Rule 50(a) | 11/08/2021 | 552936-553021 |
| 4146-1 | Defendants' Proposed Jury Instructions | 11/12/2021 | 554068-554104 |
| 4146-2 | Defendants' Objections to Court's Jury Instructions | 11/12/2021 | 554105-554144 |
| 4153 | Transcript of Jury Trial Volume 28 | 11/15/2021 | 554615-554909 |
| 4169-20 | Defendants' Exhibit - Median Total MME per Prescription by Pharmacy | 11/22/2021 | 555729 |
| 4176 | Verdict Form | 11/23/2021 | 556137-556144 |
| 4202 | Defendants' Joint Motion for Judgment as a Matter of Law Under Rule 50(b) | 12/21/2021 | 557733-557788 |
| 4204 | Defendants' Joint Motion for New Trial Under Rule 59 | 12/21/2021 | 557810-557859 |
| 4206-1 | Final Jury Instructions | 12/21/2021 | 557893-557929 |
| 4219-1 | Expert Witness Report of Dr. G Caleb Alexander and Appendices A-D, F | 12/29/2021 | 568358-568603 |
| 4241 | Plaintiffs' Omnibus Opposition to Defendants' Motions for Judgment as a Matter of Law Under Rule 50(b) and Memorandum of Law in Support | 01/20/2022 | 571133-571262 |
| 4295 | Opinion and Order Denying Defendants' Rule 50(b) Motions for Judgment as a Matter of Law | 03/07/2022 | 572075-572137 |
| 4296 | Opinion and Order Denying Defendants' Motion for New Trial | 03/07/2022 | 572138-572210 |
| 4342 | Joint Reply Brief Regarding Select Legal Issues for Remedies Phase | 03/30/2022 | 575663-575695 |
| 4420 | Transcript of Final Pretrial Proceedings | 05/04/2022 | 579316-579358 |

| 4438 | Transcript of Abatement Bench Trial Volume 1 | 05/10/2022 | 579478-579702 |
|---|---|---|---|
| 4446 | Transcript of Abatement Bench Trial Volume 2 | 05/11/2022 | 580120-580403 |
| 4447 | Transcript of Abatement Bench Trial Volume 3 | 05/12/2022 | 580404-580631 |
| 4460 | Transcript of Abatement Bench Trial Volume 5 | 05/17/2022 | 582058-582329 |
| 4464 | Transcript of Abatement Bench Trial Volume 6 | 05/18/2022 | 582333-582367 |
| 4511 | Defendants' Joint Abatement Phase Closing Submission | 06/13/2022 | 586648-586716 |
| 4512 | CVS Abatement Phase Post-Trial Brief | 06/13/2022 | 586737-586778 |
| 4546 | Track Three Defendants' Motion for Reconsideration | 06/21/2022 | 587394-587397 |
| 4592-5 | Appendix E of Dr. Caleb Alexander's Expert Report Lake County Redress Model | 07/22/2022 | 591491-591510 |
| 4592-6 | Appendix E of Dr. Caleb Alexander's Expert Report Trumbull County Redress Model | 07/22/2022 | 591511-591530 |
| 4592-9 | Redacted Expert Report of Dr. John Burke and Dr. Harvey Rosen | 07/22/2022 | 591603-591778 |
| 4593-3 | Defendants' Exhibit - Shares of Prescription Opioids Dispensed by Various Pharmacies, Lake County, 2008-2018 | 07/22/2022 | 591800 |
| 4593-4 | Defendants' Exhibit - Shares of Prescription Opioids Dispensed by Various Pharmacies, Trumbull County, 2008-2018 | 07/22/2022 | 591801 |
| 4593-6 | Defendants' Exhibit - Trumbull County OUD Treatment Costs | 07/22/2022 | 591817 |
| 4593-7 | Defendants' Exhibit - Lake County OUD Treatment Costs | 07/22/2022 | 591818 |
| 4611 | Abatement Order | 08/17/2022 | 596638-596713 |
| 4611-1 | Injunction Order | 08/17/2022 | 598396-598411 |

| 4614 | Judgment Order | 08/22/2022 | 598413-598415 |
|------|----------------|------------|---------------|
| 4619 | Notice of Appeal filed by Walgreens Appellants | 09/07/2022 | 598436-598438 |
| 4620 | Notice of Appeal filed by CVS Appellants | 09/07/2022 | 598439-598440 |
| 4621 | Notice of Appeal filed by Walmart Inc. | 09/07/2022 | 598441-598443 |
| 4652 | Order of Appointment of Administrator | 09/30/2022 | 599848-599855 |
| 4659 | Amended Notice of Appeal filed by Walmart Inc. | 10/05/2022 | 601199-601201 |
| 4660 | Amended Notice of Appeal filed by CVS Appellants | 10/05/2022 | 601202-601204 |
| 4663 | Amended Notice of Appeal filed by Walgreens Appellants | 10/05/2022 | 601210-601212 |

**STATUTORY AND REGULATORY ADDENDUM**

## STATUTORY AND REGULATORY ADDENDUM
## TABLE OF CONTENTS

**Page**

A.    Ohio Revised Code § 2307.71 ............................................................1a

B.    21 C.F.R. § 1301.71.......................................................................5a

C.    21 C.F.R. § 1306.04.......................................................................8a

A.  Ohio Revised Code § 2307.71 provides:

**Product liability definitions**

(A)  As used in sections 2307.71 to 2307.80 of the Revised Code:

(1)  "Claimant" means either of the following:

(a) A person who asserts a product liability claim or on whose behalf such a claim is asserted;

(b) If a product liability claim is asserted on behalf of the surviving spouse, children, parents, or other next of kin of a decedent or on behalf of the estate of a decedent, whether as a claim in a wrongful death action under Chapter 2125. of the Revised Code or as a survivorship claim, whichever of the following is appropriate:

(i) The decedent, if the reference is to the person who allegedly sustained harm or economic loss for which, or in connection with which, compensatory damages or punitive or exemplary damages are sought to be recovered;

(ii) The personal representative of the decedent or the estate of the decedent, if the reference is to the person who is asserting or has asserted the product liability claim.

(2) "Economic loss" means direct, incidental, or consequential pecuniary loss, including, but not limited to, damage to the product in question, and nonphysical damage to property other than that product.  Harm is not "economic loss."

(3) "Environment" means only navigable waters, surface water, ground water, drinking water supplies, land surface, subsurface strata, and air.

(4) "Ethical drug" means a prescription drug that is prescribed or dispensed by a physician or any other person who is legally authorized to prescribe or dispense a prescription drug.

(5) "Ethical medical device" means a medical device that is prescribed, dispensed, or implanted by a physician or any other person who is legally authorized to prescribe, dispense, or implant a medical device and that is

regulated under the "Federal Food, Drug, and Cosmetic Act," 52 Stat. 1040, 21 U.S.C. 301-392, as amended.

(6) "Foreseeable risk" means a risk of harm that satisfies both of the following:

    (a) It is associated with an intended or reasonably foreseeable use, modification, or alteration of a product in question.

    (b) It is a risk that the manufacturer in question should recognize while exercising both of the following:

        (i) The attention, perception, memory, knowledge, and intelligence that a reasonable manufacturer should possess;

        (ii) Any superior attention, perception, memory, knowledge, or intelligence that the manufacturer in question possesses.

(7) "Harm" means death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question. Economic loss is not "harm."

(8) "Hazardous or toxic substances" include, but are not limited to, hazardous waste as defined in section 3734.01 of the Revised Code, hazardous waste as specified in the rules of the director of environmental protection pursuant to division (A) of section 3734.12 of the Revised Code, hazardous substances as defined in section 3716.01 of the Revised Code, and hazardous substances, pollutants, and contaminants as defined in or by regulations adopted pursuant to the "Comprehensive Environmental Response, Compensation, and Liability Act of 1980," 94 Stat. 2767, 42 U.S.C. 9601, as amended.

(9) "Manufacturer" means a person engaged in a business to design, formulate, produce, create, make, construct, assemble, or rebuild a product or a component of a product.

(10) "Person" has the same meaning as in division (C) of section 1.59 of the Revised Code and also includes governmental entities.

(11) "Physician" means a person who is licensed to practice medicine and surgery or osteopathic medicine and surgery by the state medical board.

(12)(a) "Product" means, subject to division (A)(12)(b) of this section, any object, substance, mixture, or raw material that constitutes tangible personal property and that satisfies all of the following:

(i) It is capable of delivery itself, or as an assembled whole in a mixed or combined state, or as a component or ingredient.

(ii) It is produced, manufactured, or supplied for introduction into trade or commerce.

(iii) It is intended for sale or lease to persons for commercial or personal use.

(b) "Product" does not include human tissue, blood, or organs.

(13) "Product liability claim" means a claim or cause of action that is asserted in a civil action pursuant to sections 2307.71 to 2307.80 of the Revised Code and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:

(a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

(b) Any warning or instruction, or lack of warning or instruction, associated with that product;

(c) Any failure of that product to conform to any relevant representation or warranty.

"Product liability claim" also includes any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public.

(14) "Representation" means an express representation of a material fact concerning the character, quality, or safety of a product.

(15)(a) "Supplier" means, subject to division (A)(15)(b) of this section, either of the following:

(i) A person that, in the course of a business conducted for the purpose, sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce;

(ii) A person that, in the course of a business conducted for the purpose, installs, repairs, or maintains any aspect of a product that allegedly causes harm.

(b) "Supplier" does not include any of the following:

(i) A manufacturer;

(ii) A seller of real property;

(iii) A provider of professional services who, incidental to a professional transaction the essence of which is the furnishing of judgment, skill, or services, sells or uses a product;

(iv) Any person who acts only in a financial capacity with respect to the sale of a product, or who leases a product under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor.

(16) "Unavoidably unsafe" means that, in the state of technical, scientific, and medical knowledge at the time a product in question left the control of its manufacturer, an aspect of that product was incapable of being made safe.

(B) Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability claims or causes of action.

B. 21 C.F.R. § 1301.71 provides:

**Security requirements generally.**

(a) All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances. In order to determine whether a registrant has provided effective controls against diversion, the Administrator shall use the security requirements set forth in §§ 1301.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. Materials and construction which will provide a structural equivalent to the physical security controls set forth in §§ 1301.72, 1301.73 and 1301.75 may be used in lieu of the materials and construction described in those sections.

(b) Substantial compliance with the standards set forth in §§ 1301.72-1301.76 may be deemed sufficient by the Administrator after evaluation of the overall security system and needs of the applicant or registrant. In evaluating the overall security system of a registrant or applicant, the Administrator may consider any of the following factors as he may deem relevant to the need for strict compliance with security requirements:

(1) The type of activity conducted (e.g., processing of bulk chemicals, preparing dosage forms, packaging, labeling, cooperative buying, etc.);

(2) The type and form of controlled substances handled (e.g., bulk liquids or dosage units, usable powders or nonusable powders);

(3) The quantity of controlled substances handled;

(4) The location of the premises and the relationship such location bears on security needs;

(5) The type of building construction comprising the facility and the general characteristics of the building or buildings;

(6) The type of vault, safe, and secure enclosures or other storage system (e.g., automatic storage and retrieval system) used;

(7) The type of closures on vaults, safes, and secure enclosures;

(8) The adequacy of key control systems and/or combination lock control systems;

(9) The adequacy of electric detection and alarm systems, if any including use of supervised transmittal lines and standby power sources;

(10) The extent of unsupervised public access to the facility, including the presence and characteristics of perimeter fencing, if any;

(11) The adequacy of supervision over employees having access to manufacturing and storage areas;

(12) The procedures for handling business guests, visitors, maintenance personnel, and nonemployee service personnel;

(13) The availability of local police protection or of the registrant's or applicant's security personnel;

(14) The adequacy of the registrant's or applicant's system for monitoring the receipt, manufacture, distribution, and disposition of controlled substances in its operations; and

(15) The applicability of the security requirements contained in all Federal, State, and local laws and regulations governing the management of waste.

(c) When physical security controls become inadequate as a result of a controlled substance being transferred to a different schedule, or as a result of a noncontrolled substance being listed on any schedule, or as a result of a significant increase in the quantity of controlled substances in the possession of the registrant during normal business operations, the physical security controls shall be expanded and extended accordingly. A registrant may adjust physical security controls within the requirements set forth in §§ 1301.72-1301.76 when the need for such controls decreases as a result of a controlled substance being transferred to a different schedule, or a result of a controlled substance being removed from control, or as a result of a significant decrease in the quantity of controlled substances in the possession of the registrant during normal business operations.

(d) Any registrant or applicant desiring to determine whether a proposed security system substantially complies with, or is the structural equivalent of,

the requirements set forth in §§ 1301.72-1301.76 may submit any plans, blueprints, sketches or other materials regarding the proposed security system either to the Special Agent in Charge in the region in which the system will be used, or to the Regulatory Section, Drug Enforcement Administration. See the Table of DEA Mailing Addresses in § 1321.01 of this chapter for the current mailing address.

(e) Physical security controls of locations registered under the Harrison Narcotic Act or the Narcotics Manufacturing Act of 1960 on April 30, 1971, shall be deemed to comply substantially with the standards set forth in §§ 1301.72, 1301.73 and 1301.75. Any new facilities or work or storage areas constructed or utilized for controlled substances, which facilities or work or storage areas have not been previously approved by the Administration, shall not necessarily be deemed to comply substantially with the standards set forth in §§ 1301.72, 1301.73 and 1301.75, notwithstanding that such facilities or work or storage areas have physical security controls similar to those previously approved by the Administration.

(f) A collector shall not employ, as an agent or employee who has access to or influence over controlled substances acquired by collection, any person who has been convicted of any felony offense relating to controlled substances or who, at any time, had an application for registration with DEA denied, had a DEA registration revoked or suspended, or has surrendered a DEA registration for cause. For purposes of this subsection, "for cause" means in lieu of, or as a consequence of, any Federal or State administrative, civil, or criminal action resulting from an investigation of the individual's handling of controlled substances.

C.  21 C.F.R. § 1306.04 provides:

**Purpose of issue of prescription.**

(a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

(b) A prescription may not be issued in order for an individual practitioner to obtain controlled substances for supplying the individual practitioner for the purpose of general dispensing to patients.

(c) A prescription may not be issued for "detoxification treatment" or "maintenance treatment," unless the prescription is for a Schedule III, IV, or V narcotic drug approved by the Food and Drug Administration specifically for use in maintenance or detoxification treatment and the practitioner is in compliance with requirements in § 1301.28 of this chapter.

(d) A prescription may be issued by a qualifying practitioner, as defined in section 303(g)(2)G)(iii) of the Act (21 U.S.C. 823(g)(2)(G)(iii)), in accordance with § 1306.05 for a Schedule III, IV, or V controlled substance for the purpose of maintenance or detoxification treatment for the purposes of administration in accordance with section 309A of the Act (21 U.S.C. 829a) and § 1306.07(f). Such prescription issued by a qualifying practitioner shall not be used to supply any practitioner with a stock of controlled substances for the purpose of general dispensing to patients.