Nos. 22-3750, 22-3751, 22-3753, 22-3841, 22-3843, 22-3844

————————

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

————————

IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

————————

TRUMBULL COUNTY, OH, *et al.*,
*Plaintiffs-Appellees*,

v.

PURDUE PHARMA L.P., *et al.*,
*Defendants*,

WALGREENS BOOTS ALLIANCE, INC., *et al.* (22-3750/3841),
CVS PHARMACY, INC., *et al.* (22-3751/3843),
WALMART, INC. (22-3753/3844),
*Defendants-Appellants*.

————————

On Appeal from the United States District Court for the
Northern District of Ohio, No. 1:17-md-2804 (Hon. Dan A. Polster)

————————

**CONSOLIDATED BRIEF FOR PLAINTIFFS-APPELLEES
TRUMBULL COUNTY AND LAKE COUNTY, OHIO**

————————

W. MARK LANIER
M. MICHELLE CARRERAS
LANIER LAW FIRM
10940 W. Sam Houston Pkwy. N.
Suite 100
Houston, TX 77064
(713) 659-5200

DAVID C. FREDERICK
MINSUK HAN
ARIELA M. MIGDAL
TRAVIS G. EDWARDS
KATHLEEN W. HICKEY*
DAREN ZHANG
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

* Admitted only in Massachusetts;
supervised by members of the firm

February 14, 2023

*Counsel for Plaintiffs-Appellees Trumbull County and Lake County, Ohio*
*(additional counsel listed on inside cover)*

PETER H. WEINBERGER
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East
Suite 1700
Cleveland, OH 44114
(216) 696-3232

FRANK L. GALLUCCI
PLEVIN & GALLUCCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113
(216) 861-0804

HUNTER J. SHKOLNIK
SALVATORE C. BADALA
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007

*Counsel for Plaintiffs-Appellees Trumbull County and Lake County, Ohio*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................xix

INTRODUCTION ..............................................................................1

STATEMENT OF THE ISSUES..........................................................3

STATEMENT OF THE CASE..............................................................4

I.    REGULATORY FRAMEWORK FOR OPIOIDS ........................4

      A.    Prescription Opioids Are Highly Dangerous Drugs ...........4

      B.    Congress And DEA Strictly Regulate Opioids .................5

      C.    Dispensers Have Special Duties To Prevent Diversion ........6

II.   FACTUAL BACKGROUND........................................................10

      A.    The Pharmacies Knew The Dangers Of Opioid Diversion.................11

      B.    Appellants Did Not Implement Adequate Measures To
            Control Diversion ...................................................12

            1.    Appellants did not require resolution of red flags
                  before dispensing suspicious prescriptions and
                  ignored information necessary to identify red flags .................12

            2.    Appellants' dispensing practices led to government
                  enforcement actions ...............................................16

            3.    Appellants kept key information from pharmacists.................18

            4.    Appellants did not enforce anti-diversion policies ...................19

            5.    Appellants discouraged compliance .........................................21

C.   Appellants Filled Suspicious Prescriptions Without Proper Inquiry......................................................24

D.   Appellants Dispensed Opioid Prescriptions From "Pill Mill" Doctors.............................................................26

E.   Opioid Oversupply And Diversion Created A Health And Safety Crisis In The Counties.............................28

III.  PROCEDURAL HISTORY ........................................................32

A.   A Jury Found Appellants Liable For Public Nuisance Following A Six-Week Trial...............................32

B.   The District Court Ordered The Equitable Remedy Of Abatement ...........................................................33

SUMMARY OF ARGUMENT .........................................................37

STANDARD OF REVIEW ...............................................................39

ARGUMENT .......................................................................................40

I.   THE JURY PROPERLY FOUND APPELLANTS LIABLE FOR PUBLIC NUISANCE UNDER OHIO LAW .......................40

A.   The Jury Properly Found Conduct Supporting Nuisance Liability .............................................................41

1.   Appellants violated the CSA and its Ohio analogue ...............41

a.   Appellants lacked effective controls and procedures to guard against diversion ............................42

b.   Appellants dispensed suspicious prescriptions without first resolving red flags...................................44

2.   The evidence supported a finding of culpable intentional conduct...................................47

B.   Appellants Misconstrue The CSA And Ohio Law..............................49

1. Appellants' interpretation of the duty to maintain effective controls is contrary to law ........................... 50

    a. Section 1301.71 requires pharmacies to control diversion, not just theft ....................... 50

    b. DEA has long required dispensers to guard against diversion .............................. 52

2. Appellants cannot avoid their corresponding responsibility by importing the standard for civil or criminal penalties ........................ 54

3. The corresponding responsibility falls on pharmacies ................................. 58

4. The CSA does not preempt state nuisance law ........................ 60

5. Ohio law does not preclude nuisance liability for culpable intentional conduct ....................... 64

6. The jury verdict was correct and does not require reversal ................................ 67

II. THE OHIO PRODUCT LIABILITY ACT DOES NOT BAR APPELLEES' CLAIMS ................................. 69

   A. OPLA Abrogates Product Liability Claims Seeking Damages ............................... 69

    1. OPLA's definition of "product liability claim" requires a claim for compensatory damages ........................... 70

    2. OPLA governs only damages recovery .................... 73

    3. Legislative history confirms that OPLA does not govern claims for equitable relief ............................ 75

   B. Appellants Incorrectly Read OPLA To Abrogate Claims For Equitable Abatement ................................. 77

   C. Appellants Misread OPLA's Legislative History .............................. 79

III.     THE JURY FOUND PROXIMATE CAUSE UNDER THE
         CORRECT LEGAL STANDARD ..................................................82

         A.     The District Court Properly Defined And Applied
                Proximate Cause ....................................................................83

         B.     The District Court Correctly Rejected Appellants'
                Misleading Instruction ...........................................................84

         C.     Liability Was Not Too Remote ...............................................85

                1.     Appellants' attempts to distinguish *Beretta* fail ......86

                2.     Third parties did not break the causal chain .............88

                3.     The Counties are the appropriate entity to seek
                       relief for harm to the public .....................................89

IV.      THE DISTRICT COURT ORDERED AN APPROPRIATE
         REMEDY ..................................................................................90

         A.     Remedying The Public Nuisance Requires Abating The
                Harmful Conditions Appellants Created ...............................90

         B.     Abating A Nuisance May Require Creation Of A
                Monetary Fund To Pay For Remediation Into The Future .................92

         C.     The Court's Order Is Reasonably Calculated To Remedy
                The Unprecedented Public Nuisance .....................................93

         D.     Appellants Offer No Persuasive Arguments Why The
                Court Abused Its Discretion ...................................................95

                1.     The abatement order addresses the nuisance the
                       jury found ...............................................................95

                2.     Ordering Appellants to pay into an abatement fund
                       does not render the remedy compensatory ...............96

                3.     The abatement remedy is sufficiently tailored to
                       address the nuisance Appellants caused ...................98

        4.      Appellants rely on outlier cases and ignore most opioid decisions recognizing abatement as an appropriate remedy ................................................................101

        5.      The abatement cost was not impermissibly speculative................................................................102

        6.      The district court's apportionment does not warrant reversal.......................................................104

V.    THE DISTRICT COURT CORRECTLY DECLINED TO DECLARE A MISTRIAL ...........................................................108

    A.    The Court Investigated And Addressed A Single Juror's Misconduct .......................................................................109

    B.    The Incident Of Juror Misconduct Did Not Prejudice Defendants, And The Court Cured Any Potential Prejudice With A Limiting Instruction .............................110

    C.    The Court Should Reject Appellants' Argument For A Mistrial Notwithstanding Curative Instructions...............................112

CONCLUSION ...................................................................................115

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM: Designation of Relevant District Court Documents

# TABLE OF AUTHORITIES

Page(s)

**CASES**

**Federal**

*Aluminum Co. of Am. v. Loveday*, 273 F.2d 499 (6th Cir. 1959) .........................113

*Am. Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513 (1933) ...........................................72

*Anchor v. O'Toole*, 94 F.3d 1014 (6th Cir. 1996) ..................................................39

*Arizona v. United States*, 567 U.S. 387 (2012).......................................................62

*Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566 (6th Cir. 2014) .................................39

*Bevan & Assocs., LPA v. Yost*, 929 F.3d 366 (6th Cir. 2019) ................................70

*Beverly Hills Fire Litig., In re*, 695 F.2d 207 (6th Cir. 1982) ..............................113

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)................................................92, 97

*Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341 (2001) ......................................63

*Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840
(6th Cir. 1999) ...................................................................................91, 103

*Cherokee Nation v. McKesson Corp.*:

529 F. Supp. 3d 1225 (E.D. Okla. 2021)....................................................102

2021 WL 1200093 (E.D. Okla. Mar. 29, 2021) .........................45, 56, 61, 62

*Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837
(1984).............................................................................................................42

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979).....................................................42

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*:

    491 F. Supp. 3d 610 (N.D. Cal. 2020)..................................52, 60, 61, 62, 64

    --- F. Supp. 3d ---, 2022 WL 3224463 (N.D. Cal. Aug. 10, 2022) ..............81

*City of Chicago v. Purdue Pharma L.P.*, 2021 WL 1208971
    (N.D. Ill. Mar 31, 2021)...........................................................................60, 63

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474
    (6th Cir. 2017) ................................................................................................88

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496
    (6th Cir. 2010) ................................................................................................87

*City of Huntington v. AmerisourceBergen Drug Corp.*,
    ---F. Supp. 3d ---, 2022 WL 2399876 (S.D. W. Va. July 4, 2022) ............101

*Cronin v. Washington Nat'l Ins. Co.*, 980 F.2d 663 (11th Cir. 1993) ....................68

*Dassault Systèmes, SA v. Childress*, 828 F. App'x 229 (6th Cir. 2020)...............113

*Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) .............................................76

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000)......................................61, 62

*Gonzales v. Raich*, 545 U.S. 1 (2005).................................................................6, 61

*Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970)................................69

*Hamm v. Jabe*, 706 F.2d 765 (6th Cir. 1983) ................................................110, 114

*Hardwick v. 3M Co.*, 2019 WL 4757134 (S.D. Ohio Sept. 30, 2019)....................74

*Heartland Pharmacy, Inc. v. Rosen*, 2021 WL 650350
    (S.D. Fla. Feb. 18, 2021) ........................................................................45, 56

*Helvering v. Morgan's, Inc.*, 293 U.S. 121 (1934)...........................................71, 78

*Holmes v. City of Massillon*, 78 F.3d 1041 (6th Cir. 1996)...........111, 112, 114, 115

*Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992)............................................85

*Huffman v. Electrolux N. Am., Inc.*, 961 F. Supp. 2d 875 (N.D. Ohio 2013) ...................................................76

*Hughes v. Borg*, 898 F.2d 695 (9th Cir. 1990) ...................................................112

*Ivey v. Wilson*, 832 F.2d 950 (6th Cir. 1987) ...................................................4, 39

*Keet v. Serv. Mach. Co.*, 472 F.2d 138 (6th Cir. 1972) ...................................................68, 69

*Lorillard v. Pons*, 434 U.S. 575 (1978) ...................................................76

*Martin v. Weaver*, 666 F.2d 1013 (6th Cir. 1981) ...................................................68

*Medicine Shoppe-Jonesborough v. DEA*, 300 F. App'x 409 (6th Cir. 2008) ...................................................8, 45, 56

*Meyers v. Wal-Mart Stores, E., Inc.*, 257 F.3d 625 (6th Cir. 2001) ...................................................39

*Milliken v. Bradley*, 433 U.S. 267 (1977) ...................................................92

*Moody v. United States*, 958 F.3d 485 (6th Cir. 2020) ...................................................95

*Mount Lemmon Fire Dist. v. Guido*, 139 S. Ct. 22 (2018) ...................................................78

*Mugler v. Kansas*, 123 U.S. 623 (1887) ...................................................91

*Nat'l Prescription Opiate Litig., In re*, 452 F. Supp. 3d 745 (N.D. Ohio 2020) ...................................................81

*Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746 (6th Cir. 2021) ...................................................113

*Nichols v. United States*, 260 F.3d 637 (6th Cir. 2001) ...................................................42

*Paulus v. Citicorp N. Am., Inc.*, 2014 WL 4557603 (S.D. Ohio Sept. 12, 2014) ...................................................47

*Qiusha Ma v. Bon Appétit Mgmt. Co.*, 785 F. App'x 293 (6th Cir. 2019) ...................................................80

*Richardson v. Marsh*, 481 U.S. 200 (1987) ...................................................115

*Rimer v. Rockwell Int'l Corp.*, 739 F.2d 1125 (6th Cir. 1984) ...................................................68

*Ruan v. United States*, 142 S. Ct. 2370 (2022) ........................................................58

*Scrap Metal Antitrust Litig.*, *In re*, 527 F.3d 517 (6th Cir. 2008) ...........................40

*Stiles v. Lawrie*, 211 F.2d 188 (6th Cir. 1954) .......................................................113

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971) ...........91, 93, 96

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) ...................................102

*United States v. Apex Oil Co.*, 579 F.3d 734 (7th Cir. 2009) ................................103

*United States v. Bogart*, 576 F.3d 565 (6th Cir. 2009) ............................................39

*United States v. Copeland*, 51 F.3d 611 (6th Cir. 1995) ..................................39, 110

*United States v. Henry*, 983 F.3d 214 (6th Cir. 2020) ..............................................71

*United States v. Lartigue*, 23 F.3d 409 (Table), 1994 WL 151337
    (6th Cir. 1994) ..................................................................................111, 112

*United States v. Moore*, 423 U.S. 122 (1975) ...........................................................53

*United States v. Morris*, 203 F.3d 423 (6th Cir. 2000) .............................................39

*United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993) .................................112, 114

*United States v. Richmond*, 884 F.2d 581 (Table),
    1989 WL 103334 (6th Cir. 1989) ......................................................... 110-11

*United States v. Rugiero*, 20 F.3d 1387 (6th Cir. 1994) ........................................111

*United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004) .........................................110

*United States v. Wheaton*, 517 F.3d 350 (6th Cir. 2008) ......................111, 112, 114

*Williams v. Eau Claire Pub. Schs.*, 397 F.3d 441 (6th Cir. 2005) .....................39, 85

## State

*Adams v. Young*, 4 N.E. 599 (Ohio 1886)..........................................................83, 89

*Alabama v. Purdue Pharma L.P.*, No. 03-CV-2019-901174.00
    (Ala. Cir. Ct. Nov. 13, 2019) ...........................................................80

*Alaska v. McKesson Corp.*, No. 3AN-18-10023CI
    (Alaska Super. Ct. Aug. 28, 2019) .................................................80

*Arkansas v. Purdue Pharma L.P.*, 2019 WL 1590064
    (Ark. Cir. Ct. Apr. 5, 2019) ............................................................81

*Bemis v. Upham*, 30 Mass. 169 (1832) .....................................................99

*Berk v. Matthews*, 559 N.E.2d 1301 (Ohio 1990)....................................40

*Brown v. Scioto Cnty. Comm'rs*, 622 N.E.2d 1153
    (Ohio Ct. App. 1993) ......................................................................66

*Carrel v. Allied Prods. Corp.*, 677 N.E.2d 795 (Ohio 1997) ...................75

*City of Boston v. Purdue Pharma L.P.*, 2020 WL 416406
    (Mass. Super. Ct. Jan. 3, 2020) ......................................................81

*City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136
    (Ohio 2002)............................................................... 40, 65, 66, 67, 80-81,
                                                                                    85, 86, 87, 90

*City of Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL
    1183332 (Ohio Ct. App. Mar. 21, 2013) .......................................89

*City of Hamilton v. Dilley*, 165 N.E. 713 (Ohio 1929)............................95

*City of Mingo Junction v. Sheline*, 196 N.E. 897 (Ohio 1935)...........65, 66

*City of N. Olmsted v. Police & Firemen's Disability & Pension
    Fund Bd. of Trs.*, 483 N.E.2d 162 (Ohio Ct. App. 1984)...............74

*City of Seven Hills v. City of Cleveland*, 439 N.E.2d 895
    (Ohio Ct. App. 1980) ......................................................................93

*City of Surprise v. Allergan PLC*, Nos. CV2019-003439 et al.
(Ariz. Super. Ct. Oct. 28, 2020)............................................................ 80-81

*City of Toledo v. Gorney*, 1988 WL 128304 (Ohio Ct. App. Dec. 2, 1988)............91

*City of Toledo v. Sherwin-Williams Co.*, 2007 WL 4965044
(Ohio Ct. Com. Pl. Dec. 12, 2007) ..................................................82

*City of Wauseon v. Plassman*, 1996 WL 354881 (Ohio Ct. App. 1996)..............103

*Cnty. of Delaware v. Purdue Pharma L.P.*, No. CV-2017-008095
(Pa. Ct. Com. Pl. Oct. 25, 2019, Dec. 4, 2019, and Mar. 13,
2020) ................................................................................81

*Diller v. Diller*, 182 N.E.3d 370 (Ohio Ct. App. 2021)..........................72

*Florida v. Purdue Pharma L.P.*, No. 2018-CA-001438
(Fla. Cir. Ct. Mar. 30, 2022)........................................................81

*Gedeon v. E. Ohio Gas Co.*, 190 N.E. 924 (Ohio 1934)................................ 88-89

*Hartman, In re*, 443 N.E.2d 516 (Ohio 1983) ......................................72

*Huffman v. Hair Surgeon, Inc.*, 482 N.E.2d 1248 (Ohio 1985) ...........................108

*Jennings Buick, Inc. v. City of Cincinnati*, 384 N.E.2d 303
(Ohio 1978)..........................................................................40

*Kentucky ex. rel. Beshear v. Walgreens Boots All., Inc.*,
No. 18-CI-00846 (Ky. Cir. Ct. July 18, 2019) .......................................81

*Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46 (Ohio Ct. App. 2007) ......40, 47, 58

*LaPuma v. Collinwood Concrete*, 661 N.E.2d 714 (Ohio 1996).....................74, 76

*Longbottom v. Mercy Hosp. Clermont*, 998 N.E.2d 419
(Ohio 2013)..........................................................................97

*Lorain Cnty. Bd. of Health v. Diewald*, 2006 WL 825517
(Ohio Ct. App. Mar. 31, 2006) ......................................................91

*Mansfield v. Balliet*, 63 N.E. 86 (Ohio 1902) ....................................47

*Martin v. Lambert*, 8 N.E.3d 1024 (Ohio Ct. App. 2014) ........................................80

*Matthews v. State*, 25 Ohio St. 536 (1874) ..................................................91, 93, 99

*McCarthy v. Kasperak*, 444 N.E.2d 472 (Ohio Ct. App. 1981) .............................68

*Mettling v. White*, 1927 WL 3124 (Ohio Ct. App. Oct. 31, 1927) ........79, 91, 93, 99

*Metzger v. Pa., O. & D. R.R. Co.*, 66 N.E.2d 203 (Ohio 1946).........................40, 47

*Michigan ex. rel. Nessel v. Cardinal Health, Inc.*, No. 19-016896-
    NZ (Mich. Cir. Ct. Mar. 24, 2021), *rev'g on recons.*
    (Mich. Cir. Ct. Nov. 17, 2020) ...................................................................81

*Minnesota v. Purdue Pharma L.P.*, 2019 WL 11729023
    (Minn. Dist. Ct. Jan. 4, 2019) .....................................................................81

*Mississippi v. Cardinal Health, Inc.*, No. 25CII:18-cv-00692
    (Miss. Cir. Ct. Apr. 5, 2021)........................................................................81

*Missouri ex rel. Schmitt v. Purdue Pharma L.P.*,
    No. 1722-CC10626 (Mo. Cir. Ct. Apr. 6, 2020) ...........................................81

*Mouse v. Cent. Sav. & Tr. Co.*, 167 N.E. 868 (Ohio 1929) ...................................88

*Mudrich v. Standard Oil Co.*, 90 N.E.2d 859 (Ohio 1950) ...................................88

*NACCO Indus., Inc. v. Tracy*, 681 N.E.2d 900 (Ohio 1997)...................................72

*Nevada v. McKesson Corp.*, No. A-19-796755-B
    (Nev. Dist. Ct. Jan. 8, 2020) ........................................................................81

*New Hampshire v. Purdue Pharma Inc.*, 2018 WL 4566129
    (N.H. Super. Ct. Sept. 18, 2018).......................................................81, 90, 102

*New Mexico ex rel. Balderas v. Purdue Pharma L.P.*,
    2022 WL 6822694 (N.M. Dist. Ct. June 15, 2022)........................................81

*Nithiananthan v. Toirac*, 2015 WL 1619097
    (Ohio Ct. App. Apr. 13, 2015)......................................................................97

*Opioid Litig.*, *In re*:

    2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018) ................................81, 102

    2018 WL 4827862 (N.Y. Sup. Ct. July 17, 2018).........................................90

*Pang v. Minch*, 559 N.E.2d 1313 (Ohio 1990) ....................................104, 105, 106

*People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499
    (Ct. App. 2017) ..................................................................................92, 93, 97

*Police & Firemen's Disability & Pension Fund v. City of Akron*,
    778 N.E.2d 68 (Ohio Ct. App. 2002) ............................................................74

*Rhode Island v. Purdue Pharma L.P.*, 2019 WL 3991963
    (R.I. Super. Ct. Aug. 16, 2019), *nuisance decision aff'd on*
    *summary judgment*, 2022 WL 577874 (R.I. Super. Ct. Feb.
    18, 2022) ......................................................................................................81

*Ross v. Nutt*, 203 N.E.2d 118 (Ohio 1964) ..............................................................83

*Royal Indem. Co. v. Becker*, 173 N.E. 194 (Ohio 1930) .......................................105

*Sheldon v. Cole*, 3 Ohio Dec. 473, 1895 WL 597
    (Ohio Ct. Com. Pl. 1895)..............................................................................99

*Sites v. Haverstick*, 23 Ohio St. 626 (1873)............................................................68

*South Carolina ex rel. Wilson v. Purdue Pharma L.P.*,
    No. 2017-CP-40-04872 (S.C. Ct. Com. Pl. Apr. 12, 2018).........................81

*State v. Carroll*, 2015 WL 5782286 (Ohio Ct. App. Oct. 2, 2015) ........................78

*State ex rel. AmerisourceBergen Drug Corp. v. Moats*,
    859 S.E.2d 374 (W. Va. 2021) ...................................................................101

*State ex rel. Bunch v. Indus. Comm'n of Ohio*, 406 N.E.2d 815
    (Ohio 1980)...................................................................................................80

*State ex rel. Dewine v. Purdue Pharma L.P.*, 2018 WL 4080052
    (Ohio Ct. Com. Pl. Aug. 22, 2018).................................................76, 77, 90

*State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719
(Okla. 2021) ............................................................................101

*State ex rel. Morris v. Sullivan*, 90 N.E. 146 (Ohio 1909) .....................................79

*State ex rel. Prade v. Ninth Dist. Ct. of Appeals*, 87 N.E.3d 1239
(Ohio 2017).................................................................................70

*State ex rel. Schoener v. Hamilton Cnty. Bd. of Comm'rs*,
619 N.E.2d 2 (Ohio Ct. App. 1992) .............................................66

*Strother v. Hutchinson*, 423 N.E.2d 467 (Ohio 1981) ............................................88

*Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187 (Ohio 1998).....................................107

*Taylor v. City of Cincinnati*, 55 N.E.2d 724 (Ohio 1944) .......................................40

*Tennessee ex rel. Slatery v. AmerisourceBergen Drug Corp.*,
No. 1-345-19 (Tenn. Cir. Ct. July 14, 2020) .................................81

*Tex. Opioid Litig. (Cnty. of Dallas), In re*, No. 2018-77098
(Tex. Dist. Ct. June 6, 2019)..........................................................81

*Uland v. S.E. Johnson Cos.*, 1998 WL 123086
(Ohio Ct. App. Mar. 13, 1998) ................................................41, 47

*Vermont v. Cardinal Health, Inc.*, No. 279-3-19 Cncv
(Vt. Super. Ct. May 12, 2020) .......................................................81

*Wagner v. Roche Labs.*, 709 N.E.2d 162 (Ohio 1999) ............................................68

*Washington v. Purdue Pharma L.P.*, 2018 WL 7892618
(Wash. Super. Ct. May 14, 2018).................................................81

*Z.N., In re*, 29 N.E.3d 1016 (Ohio Ct. App. 2015) ...........................................77, 78

# STATUTES, REGULATIONS, AND RULES

Controlled Substances Act, Pub. L. No. 91-513, tit. II, 84 Stat. 1236, 1242 (1970), codified as amended at 21 U.S.C. § 801 *et seq.* ..................................................................................*passim*

§ 801(1) ...................................................................................62

§ 801(2) ...........................................................................5, 6, 53

§ 802(10) ...................................................................................7

§ 812(b)(2) .................................................................................5

§ 821 .......................................................................................42

§ 822(a)(1) .................................................................................5

§ 822(a)(2) .................................................................................5

§ 822(c)(1) ...............................................................................59

§ 822(c)(3) .................................................................................7

§ 823 .........................................................................................5

§ 823(b)(1) .................................................................................6

§ 824(d)(2) ...........................................................................6, 51

§ 829(a) ...............................................................................7, 44

§ 903 .................................................................................60, 63

18 U.S.C. § 922 .............................................................................65

Ohio Product Liability Act, Ohio Rev. Code Ann. § 2307.71 *et seq.* .............*passim*

§ 2307.71(A)(13) ...........................................69, 70, 71, 75, 77, 78

§ 2307.71(B) ........................................................................69, 75

§ 2307.72 ........................................................69

§ 2307.72(A)-(B) ...........................................73

§ 2307.72(D) .............................................74, 79

Ohio Rev. Code Ann. § 4729.35 ...........................79

21 C.F.R.:

§ 1301.71 ....................................................6, 51

§ 1301.71(a) ................... 6, 41, 42, 43, 44, 50, 51, 52

§ 1301.71(b) .....................................................51

§§ 1301.72-.76 ...........................................50, 51

§ 1306.04(a) .................. 7, 42, 44, 52, 54, 57, 58, 59, 65

§ 1306.06 ....................................7, 8, 42, 46, 55

§ 1308.11 ..........................................................5

§ 1308.12 ..........................................................5

27 C.F.R. pt. 178 ..............................................65

Ohio Admin. Code:

Rule 4729-5-20 (2011) ......................................8

Rule 4729:5-1-01(A)(1) .....................................8

Rule 4729:5-3-14(A) ................................8, 41, 42

Rule 4729:5-5-08 .............................................42

Rule 4729:5-5-08(A) .........................................8

Rule 4729:5-5-15(A) ....................................8, 42

**ADMINISTRATIVE DECISIONS**

*Bob's Pharmacy & Diabetic Supplies*, 74 Fed. Reg. 19,599
(DEA Apr. 29, 2009) ...................................................................54

*E. Main St. Pharmacy*, 75 Fed. Reg. 66,149 (DEA Oct. 27, 2010).........................9

*George Pharmacy, Inc.*, 87 Fed. Reg. 21,145 (DEA Apr. 11, 2022) .................8, 46

*Heavenly Care Pharmacy*, 85 Fed. Reg. 53,402 (DEA Aug. 28, 2020) ................46

*Holiday CVS, L.L.C.*, 77 Fed. Reg. 62,316 (DEA Oct. 12, 2012) ............7, 8, 45, 54

*Masters Pharms., Inc.*, 80 Fed. Reg. 55,418 (DEA Sept. 15, 2015) ........................8

*Medic-Aid Pharmacy*, 55 Fed. Reg. 30,043 (DEA July 24, 1990)...............8, 13, 54

*Ralph J. Bertolino Pharmacy*, 55 Fed. Reg. 4729
(DEA Feb. 9, 1990) ......................................................8, 13, 45, 56

*Suntree Pharmacy & Suntree Med. Equip., LLC*,
85 Fed. Reg. 73,753 (DEA Nov. 19, 2020)....................................................9

*Top RX Pharmacy*, 78 Fed. Reg. 26,069 (DEA May 3, 2013) .....................8, 45, 59

*Trinity Pharmacy II*, 83 Fed. Reg. 7304 (DEA Feb. 20, 2018)..............................45


**LEGISLATIVE MATERIALS**

2004 Ohio Laws File 144 (S.B. 80) (Am. Sub. S.B. 80), § 3(D) ............................75

2006 Ohio Laws File 198 (Am. Sub. S.B. 117), § 3................................. 75, 79-80


**OTHER AUTHORITIES**

Br. for Appellees, *Holiday CVS, L.L.C. v. Holder*, No. 12-5072,
2012 WL 2052422 (D.C. Cir. June 4, 2012) .................................................52

1 CV Ohio Jury Instructions 405.01 (2022) ..........................................................83

1 CV Ohio Jury Instructions 405.03 (2022) ...........................................84

1 CV Ohio Jury Instructions 621.09 (2022) ...........................................67

1 Dan B. Dobbs, *Law of Remedies* (2d ed. 1993)..............................97, 98

Order Setting Trial Dates for Abatement Phase, *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-cv-07591, ECF No. 1589 (N.D. Cal. Oct. 11, 2022) ....................................102

Resp. in Opp. to Partial Mot. To Dismiss, *United States v. Walmart Inc.*, No. 20-cv-01744, ECF No. 93 (D. Del. Jan. 17, 2023)......................55

Restatement (Second) of Torts (1965).............................47, 104, 106, 107

Restatement (Second) of Torts (1979).................... 40, 47, 67, 80, 91, 105

Restatement (Third) of Torts: Liab. for Econ. Harm (2020) ......................80, 81, 82

2 Story, Eq. Jur.......................................................................91

*Webster's II New College Dictionary* (1999) ..........................................44

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs-Appellees respectfully request oral argument because this case involves important legal issues related to the interpretation of the Controlled Substances Act and its implementing regulations, as well as the district court's exercise of its discretion to issue equitable relief designed to abate a public nuisance found by the jury.

**INTRODUCTION**

This case concerns the egregious dispensing practices of three national chain pharmacies in two Ohio counties. Those pharmacies long knew that prescription opioids were pharmacologically equivalent to heroin, yet they flouted federal and state requirements in flooding the counties with an unconscionable number of pain pills—approximately 110 million opioid pills between 2006 and 2019—representing 250 pills for every man, woman, and child residing in the counties. The public harms those wrongful acts caused will be felt for decades unless strong abatement remedies are undertaken.

Plaintiffs-Appellees Lake and Trumbull Counties, Ohio ("Counties" or "Appellees") proved that Defendants-Appellants CVS, Walgreens, and Walmart ("Pharmacies" or "Appellants") bore substantial responsibility for the devastating opioid epidemic in the Counties. As the entities that dispense highly addictive and widely abused opioids to consumers at their drugstores, the Pharmacies are subject to strict regulatory duties to prevent diversion of the drugs. Instead of complying with their duties to look into suspicious prescriptions and resolve any red flags, Appellants unreasonably filled prescriptions for massive amounts of opioids.

The foreseeable result was a public health and safety crisis in the Counties. As of 2019, approximately 13,000 county residents suffered from opioid addiction, also called opioid use disorder. Once addicted, a person requires many years of

treatment and faces risks of devastating relapses.  In the last two decades, increasing numbers of residents have died from opioid overdoses every year.  And overdose deaths represent only one facet of the crisis.  For every death, tens of patients need hospital care, and numerous first responders must answer the call of opioid-related emergencies.  For every parent with opioid use disorder, a child will suffer.  Many need foster care.  Babies born sick from opioid exposure during pregnancy face extreme challenges from birth.  That invidious cycle endangers neighborhoods, raises crime rates, and overburdens law enforcement.

An Ohio jury found Appellants liable for causing a public nuisance in the Counties.  During the six-week trial, the Counties presented overwhelming evidence of the Pharmacies' misconduct and the harms they caused.  A subsequent bench trial adduced evidence of the appropriate remedies.  The court established a fund for measures to abate the public health crisis, such as providing treatment to residents suffering from opioid use disorder and distributing drugs that save lives by reversing opioid overdoses.

On appeal, Appellants do not dispute the facts underlying the jury's verdict.  Instead, they offer unpersuasive, technical legal arguments that are inconsistent with Ohio and federal statutes and regulations and the long-standing law-enforcement framework for dangerous drugs.  The district court properly exercised

its discretion to order an appropriate remedy for the public nuisance found by the jury. That judgment should be affirmed.

## STATEMENT OF THE ISSUES

1.      Whether the jury properly found unlawful or intentional conduct as the basis for a public-nuisance claim under Ohio law.

2.      Whether the district court correctly held that the Ohio Product Liability Act did not abrogate Appellees' claims seeking only equitable relief.

3.      Whether the jury found proximate cause under the correct standard.

4.      Whether the district court acted within its discretion in ordering the creation of an abatement fund to be funded by Appellants and appointing a neutral administrator to review and approve abatement measures to implement over the course of 15 years to abate the public nuisance found by the jury.

5.      Whether the district court acted within its discretion in declining to declare a mistrial after learning of juror misconduct and curing any potential prejudice with a limiting instruction.

# STATEMENT OF THE CASE[1]

## I.  REGULATORY FRAMEWORK FOR OPIOIDS

### A.  Prescription Opioids Are Highly Dangerous Drugs

Opioids are a class of drugs made from the poppy plant.  R.4000 (Tr.) at 540950.  Prescription opioids have a molecular structure nearly identical to heroin and bind to the same receptors in the brain.  Using opioids can relieve pain, but they change the brain's chemistry and cause euphoria and respiratory depression.  R.4000 (Tr.) at 540986-540987; R.4005 (Tr.) at 541494-541495, 541503.

Opioids are highly addictive.  Patients quickly develop tolerance and require progressively higher doses to obtain the same effects.  R.4000 (Tr.) at 540960, 540967-540982.  Taking opioids even for a short period of time can lead to physical dependency, addiction, and serious withdrawal symptoms.  *Id.* at 540976-540977; R.4090 (Tr.) at 547876-547877.  Stronger doses and longer durations of use increase the risk of addiction and the severity and length of withdrawal symptoms.  R.4000 (Tr.) at 540959-540962, 540976-540978, 541000-541004; R.4005 (Tr.) at 541505.

---

[1] Because this case concerns an appeal from a jury verdict, the Court reviews facts under a deferential standard in the light most favorable to supporting the verdict.  *See Ivey v. Wilson*, 832 F.2d 950, 953 (6th Cir. 1987) (per curiam).

## B. Congress And DEA Strictly Regulate Opioids

Prescription opioids are "controlled substances" under Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (the "Controlled Substances Act" or "CSA"). Most are "Schedule II" drugs, the second most strictly controlled group of narcotics. Like Schedule I drugs (*e.g.*, heroin, ecstasy, LSD), 21 C.F.R. § 1308.11, Schedule II drugs have "a high potential for abuse" that can lead to "severe psychological or physical dependence." 21 U.S.C. § 812(b)(2). But, unlike Schedule I drugs, Schedule II drugs have "a currently accepted medical use in treatment." *Id.* They include prescription opioids like oxycodone, hydrocodone, and fentanyl, and non-opioids like cocaine and methamphetamine. 21 C.F.R. § 1308.12.

Congress recognized that the "illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2). To guard against these harms, Congress established a "closed delivery system" in which any entity that "manufactures[,] distributes," or "dispenses" controlled substances must register with the Attorney General. *Id.* §§ 822(a)(1), (2), 823. This closed, tripartite system governs three levels of regulated entities, known as "registrants": (i) "manufacturers" that produce and deliver controlled substances to (ii) wholesale "distributors" that deliver the drugs

to (iii) "dispensers" (*e.g.*, pharmacies) that deliver the drugs to patients. *Id.* § 801 *et seq.*; 21 C.F.R. § 1301 *et seq.*

The purpose of this system is to prevent the improper use and diversion of controlled substances "into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 801(2), 823(b)(1); *see also Gonzales v. Raich*, 545 U.S. 1, 12-13 (2005) ("The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances."). Congress directed DEA to consider whether registrants "maintain effective controls against diversion" in determining whether to grant or continue registration. 21 U.S.C. § 824(d)(2). To effectuate that requirement, DEA regulations require all registrants to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). A registrant's "failure . . . to maintain effective controls against diversion" may lead DEA to suspend its registration. 21 U.S.C. § 824(d)(2); *see also* R.4132 (Tr.) at 553156 (Ashley, former DEA Acting Assistant Administrator) (Section 1301.71 requires pharmacies to "develop and implement systems to provide the necessary tools for their pharmacists to comply with the CSA regulations.").

### C. Dispensers Have Special Duties To Prevent Diversion

Unlike manufacturers and distributors, which deliver controlled substances to other registrants, dispensers "deliver a controlled substance to an ultimate

6

user"—a non-registrant. 21 U.S.C. § 802(10); *see id.* § 822(c)(3) (exempting "[a]n ultimate user" from registration requirement). Pharmacies are thus the "last line of defense" in preventing diversion. R.4132 (Tr.) at 553159 (Ashley); R.4023 (Tr.) at 542814, 542974-542975 (Rannazzisi, former Head of DEA Office of Diversion Control); R.4029-22 (Ex.) at 544473; *see also* R.3995 (Tr.) at 540614; R.4078 (Tr.) at 547428-547429; R.4090 (Tr.) at 547881. This unique position comes with the responsibility to prevent diversion at the point of sale.

The CSA prohibits dispensers from delivering controlled substances to patients "without the written prescription of a practitioner." 21 U.S.C. § 829(a). A "prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice." 21 C.F.R. § 1306.06. Prescriptions "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *Id.* § 1306.04(a). While prescribers bear "responsibility for the proper prescribing and dispensing of controlled substances," pharmacists have "a corresponding responsibility" to "dispense only lawful prescriptions," *id.*, a duty that "extends to the pharmacy itself." *Holiday CVS, L.L.C.*, 77 Fed. Reg. 62,316, 62,341 (DEA

Oct. 12, 2012); *Top RX Pharmacy*, 78 Fed. Reg. 26,069, 26,082 (DEA May 3, 2013); *Masters Pharms., Inc.*, 80 Fed. Reg. 55,418, 55,477 (DEA Sept. 15, 2015).[2]

This "corresponding responsibility" prohibits pharmacies from filling a prescription that they "'know[] or ha[ve] reason to know' . . . is invalid." *Holiday CVS*, 77 Fed. Reg. at 62,341 (citation omitted); *see Medic-Aid Pharmacy*, 55 Fed. Reg. 30,043, 30,044 (DEA July 24, 1990); *accord Medicine Shoppe-Jonesborough v. DEA*, 300 F. App'x 409, 412 (6th Cir. 2008) (same). "[A] pharmacist or pharmacy may not dispense a prescription in the face of a red flag (*i.e.*, a circumstance that does or should raise a reasonable suspicion as to the validity of a prescription) unless he or it takes steps to resolve the red flag and ensure that the prescription is valid." *Top RX Pharmacy*, 78 Fed. Reg. at 26,082; *see also Holiday CVS*, 77 Fed. Reg. at 62,341; *Ralph J. Bertolino Pharmacy*, 55 Fed. Reg. 4729, 4730 (DEA Feb. 9, 1990). "[T]he usual course of the professional practice of pharmacy" prohibits dispensing controlled substances "without addressing or resolving red flags of drug abuse and diversion." *George Pharmacy, Inc.*, 87 Fed. Reg. 21,145, 21,152 (DEA Apr. 11, 2022) (citing 21 C.F.R. § 1306.06).

_____

[2] Ohio's Controlled Substances Act mirrors the federal scheme and requires pharmacists to "review the patient profile for the purpose of identifying . . . [a]buse/misuse" "[p]rior to dispensing any prescription." Ohio Admin. Code 4729:5-5-08(A); *see generally id.* 4729:5-3-14(A), 4729:5-5-15(A), 4729:5-1-01(A)(1); *see also* Ohio Admin. Code 4729-5-20 (2011).

Red flags include prescriptions presented by customers who are "doctor shopping"—*i.e.*, getting "multiple prescriptions for opioids from different doctors," R.4005 (Tr.) at 541485; who are "pharmacy shopping"—*i.e.*, "going from pharmacy-to-pharmacy getting prescriptions filled for opioids just to increase the number of opioids that they have," *id.* at 541487-541488; and who are buying a dangerous "drug cocktail" that combines opioids, anti-anxiety drugs like Xanax, and muscle relaxants like Soma. *See id.* at 541488, 541492-541497. Red flags also include prescriptions for excessive amounts of opioids in dosage or days of supply, *id.* at 541504-541513; opioid prescriptions paid for in cash, *id.* at 541513-541514; and patients traveling long distances to obtain a prescription or to fill a prescription, R.4017 (Tr.) 542485-542486 (Rannazzisi).

Other red flags arise when one doctor issues high numbers of prescriptions. *See E. Main St. Pharmacy*, 75 Fed. Reg. 66,149, 66,158 (DEA Oct. 27, 2010). They also can be evident from the duration and pattern of the prescriptions; early fills/refills; other pharmacies' refusals to fill the prescriptions; irregular dosing instructions; and multiple customers presenting prescriptions written by the same prescriber for the same drugs in the same quantities. *See Suntree Pharmacy & Suntree Med. Equip., LLC*, 85 Fed. Reg. 73,753, 73,770 (DEA Nov. 19, 2020) (summarizing DEA decisions listing red flags supporting "a finding that the pharmacists who filled them violated" their "corresponding responsibility" because

they had "actual knowledge of, or willful blindness to, the prescriptions' illegitimacy").

## II. FACTUAL BACKGROUND

Appellants operate and maintain DEA registrations[3] for 33 pharmacies across the Counties' approximately 440,000 residents combined. R.4036-3 (Ex.) at 604829-604831; R.4046-14 (Ex.) at 545605-545607; R.4046-16 (Ex.) at 545611-545613. From 2006 to 2019, these pharmacies dispensed nearly 1.7 million opioid prescriptions, or approximately 110 million opioid pills (also known as "dosage units"), into the Counties. R.4032 (Tr.) at 544783-544784. Throughout that time, Appellants knew they had an obligation to prevent diversion. But they subverted that obligation through nationwide policies and practices, even after DEA told them their legal violations were leading to opioid diversion and causing a public health crisis.

---

[3] Appellant Walgreen Co. holds the DEA registration of its drugstores. R.3493 (Answer) at 502031 (¶ 38); R.3494 (Answer) at 502180 (¶ 37). Appellant Walmart, Inc. holds the DEA registration of its drugstores through its subsidiary dismissed from the case pursuant to a stipulation under which Walmart, Inc. agreed not to "dispute liability . . . on the ground that the dismissed Walmart entities . . . are not named defendants." R.3487 (Stipulation) at 501379; R.3490 (Answer) at 501626-501627, 501635 (¶¶ 47-52, 91-92); R.3491 (Answer) at 501787-501788, 501796-501797 (¶¶ 48-53, 92-93). Appellant CVS Pharmacy, Inc. holds the DEA registration of its drugstores through its subsidiary Appellant Ohio CVS Stores, L.L.C. R.3488 (Answer) at 501388, 501413 (¶¶ 25-26, 206); R.3489 (Answer) at 501505, 501530 (¶¶ 26-27, 204).

Appellants ran their pharmacies through national policies and controlled compliance at the corporate level. R.4023 (Tr.) at 542972; R.4041 (Tr.) at 545168; R.4050 (Tr.) at 545759, 545762-545763; R.4078 (Tr.) at 547421; R.4115 (Tr.) at 551199; R.4128-9 (Ex.) at 552474. They required pharmacists to use centralized computer systems when dispensing prescriptions. R.4057 (Tr.) at 546397; R.4109 (Tr.) at 550297-550298; R.4115 (Tr.) at 551215-551216. Appellants' policies acknowledged their legal obligations to maintain effective controls against diversion and to exercise their corresponding responsibility. R.4094-38 (Ex.) at 548741; R.4128-10 (Ex.) at 552479; R.4128-55 (Ex.) at 553506. But their practices told a different story.

## A. The Pharmacies Knew The Dangers Of Opioid Diversion

By the late 1990s, prescription opioid abuse had become a nationwide epidemic. R.4000 (Tr.) at 541072; R.4023 (Tr.) at 542939; R.4065 (Tr.) at 546890-546891. Appellants have long known the devastating harms resulting from opioid diversion, as well as the importance of complying with their legal obligations to prevent diversion. R.4026 (Tr.) at 543323; R.4094-15 (Ex.) at 548309-548310; R.4113-9 (Ex.) at 551022-551027; R.4128-54 (Ex.) at 553484-553494; R.4128-19 (Ex.) at 552519-552522; *see also* R.4008 (Tr.) at 541607.

In 2006, CVS understood that prescription opioids could be "abused or misused" and that "[a]nytime an opioid is used for something it's not intended to

be used for could be a risk to the public."  R.4078 (Tr.) at 547278, 547427.  In

2010, Walgreens's leadership knew that prescription drug abuse was "a serious

social and health problem in the United States" and discussed "the problems with

opiates."  R.4050 (Tr.) at 545818, 545837; R.4057 (Tr.) at 546437; R.4026 (Tr.) at

543188; R.4036-1 (Ex.) at 544914-544930.  In 2011, Walmart was aware that

opioids were part of a nationwide substance abuse epidemic.  R.4041 (Tr.) at

545219-545221.  In 2013, Walmart told pharmacists that "the abuse of controlled

substances in the U.S. has increased significantly and at a concerning rate over the

past ten years."  R.4109 (Tr.) at 550326-550328.  In 2015, a CVS official warned

of the "tremendous growth of the misuse of prescription drugs" and expressed

doubt that the company was "doing everything [it] could to reduce the growth of

this tragic problem in the United States."  R.4115 (Tr.) at 551308-551309; *see also*

R.4104-39 (Ex.) at 553728.

**B.  Appellants Did Not Implement Adequate Measures To Control Diversion**

Even though Appellants knew about the opioid crisis and understood their

duty to prevent diversion, they failed to institute and enforce sufficient controls.

**1.  Appellants did not require resolution of red flags before dispensing suspicious prescriptions and ignored information necessary to identify red flags**

For years, Appellants lacked basic controls for preventing diversion of

prescription opioids.  According to the trial testimony of the former Head of

DEA's Office of Diversion Control, Joseph Rannazzisi, since at least 1990 DEA has instructed that pharmacists must identify and resolve suspicions of diversion before dispensing prescription opioids. R.4017 (Tr.) at 542484-542485; *see also* *Ralph J. Bertolino*, 55 Fed. Reg. at 4730; *Medic-Aid Pharmacy*, 55 Fed. Reg. at 30,044. Appellees' expert Carmen Catizone, former Executive Director of the National Association of Boards of Pharmacy, testified that dispensing red-flagged prescriptions without resolving red flags is likely to lead to diversion. R.4005 (Tr.) at 541528. Yet, as of 2010, Walgreens, for example, had no "procedures to identify the common signs associated with diversion" and conducted no "periodic training" for employees dispensing controlled substances. R.4094-15 (Ex.) at 548307, 548311. Walgreens instructed pharmacists to process suspicious prescriptions "as normal" if the prescriber confirmed it, even though a Walgreens compliance official admitted that "blindly rely[ing] on the prescriber" cannot confirm a prescription's validity. R.4050 (Tr.) at 545768-545769; R.4057 (Tr.) at 546333-546334; R.4094-38 (Ex.) at 548742. And even after it modified its policies to require additional checks for certain opioids, Walgreens specifically excluded highly abused opioids—including hydrocodone—from that requirement. R.4036-8 (Ex.) at 545026; R.4050 (Tr.) at 545872; R.4057 (Tr.) at 546266-546267; R.4023 (Tr.) at 542806.

Documenting resolution of red flags—in other words, explaining which red flags a pharmacist identified as to a particular prescription and whether and how the pharmacist resolved those red flags and dispelled suspicion—is "critical" and "necessary" to prevent diversion.  R.4005 (Tr.) at 541416-541418, 541459 (Catizone).  Such documentation would indicate that the pharmacist dispensed (or refused to dispense) the prescription after proper inquiry and assist pharmacists with conducting due diligence into future suspicious prescriptions.  R.4005 (Tr.) at 541414-541422, 541459-541460 (Catizone); R.4017 (Tr.) at 542488-542493 (Rannazzisi) (documenting red-flag resolution is an "imperative" "requirement[]" [of] practicing pharmacy"); R.4111 (Tr.) at 550633-550634 (Edwards, Ohio Board of Pharmacy Agent).

Walgreens did not say anything to pharmacists about documenting how they resolved red flags for suspicious prescriptions until 2006.  R.4094-36 (Ex.) at 548737-548738.  For years after that, Walgreens told pharmacists that it was sufficient merely to document the prescriber's confirmation that the prescription was "valid[]."  R.4094-37 (Ex.) at 548739.  CVS's policies did not mention red flags or instruct pharmacists to document their resolution until late 2010.  R.4115 (Tr.) at 551334; R.4128-49 (Ex.) at 552886-552901.  Walmart's early polices did not require pharmacists to conclusively resolve red flags before dispensing opioids.  R.4128-9 (Ex.) at 552475-552476.  Even after revising policies to require record-

keeping, Appellants for years directed pharmacists to document how red flags were resolved on hard-copy prescriptions to be stored in file cabinets, not in centralized computer systems that other pharmacists could access. *Id.*; R.4132 (Tr.) at 553254-553255, 553264; R.4057 (Tr.) at 546269-546282; R.4090 (Tr.) at 547755-547756.

Appellants systematically ignored a well-known resource for preventing diversion: the prescription drug monitoring program ("PDMP"), an electronic database that tracks controlled-substance prescribing and dispensing for each patient. R.4008 (Tr.) at 541635-541636 (Catizone). Ohio made its PDMP available to pharmacists in 2007. R.4111 (Tr.) at 550635-550636. The database listed "all of the prescriptions [a patient has] received for a controlled drug" and "every pharmacy, every doctor that [a] patient has gone to for controlled substances." R.4005 (Tr.) at 541489; R.4000 (Tr.) at 541013. Checking the PDMP is the only way to identify certain red flags (such as "pharmacy shopping"). R.4005 (Tr.) at 541489-541490.

Despite their acknowledgement that the PDMP is an "effective" and "important" tool to prevent diversion, R.4023 (Tr.) at 543016-543017; R.3995 (Tr.) at 540644; R.4041 (Tr.) at 545195, Appellants did not instruct pharmacists to check PDMPs for years. R.4094-38 (Ex.) at 548741-548742; R.4090 (Tr.) at 547770; R.4128-15 (Ex.) at 552508-552509. On the contrary, Appellants

discouraged pharmacists from consulting them. As one Walmart compliance official testified, Walmart denied Ohio pharmacists' requests for access to Ohio's PDMP for several years. R.4109 (Tr.) at 550427-550432 (Hiland); R.4128-25 (Ex.) at 552534-552535. CVS instructed its Ohio pharmacists *not* to access the PDMP except under certain narrow circumstances. R.4090 (Tr.) at 547771, 547776 (Travassos, CVS compliance official); R.4128-43 (Ex.) at 552786; R.4104-11 (Ex.) at 549367.

### 2. Appellants' dispensing practices led to government enforcement actions

Due to their failures to prevent the diversion of opioids, Appellants faced a wave of DEA enforcement actions.

In 2006 and 2009, DEA alleged that several Walmart pharmacies violated the CSA in dispensing controlled substances. R.4029-19 (Ex.) at 544438 (2011 settlement agreement); R.4109 (Tr.) at 550403-550406, 550487 (Hiland, Walmart compliance official) (Walmart entered into "four settlements" with DEA); R.4055-21 (Ex.) at 555476 (2007 settlement agreement). In 2011 and 2013, Walgreens entered into two settlement agreements with DEA to resolve claims that certain pharmacies violated the CSA when dispensing controlled substances. R.4094-11 (Ex.) at 548287 (2011 settlement agreement); R.4029-35 (Ex.) at 555152 (2013 settlement agreement). From 2012 to 2019, DEA initiated at least six enforcement actions against CVS for CSA violations. R.4115 (Tr.) at 551331-551333. In one,

DEA revoked the registration of two CVS pharmacies in Florida. R.3999-17 (Ex.) at 555080-555081 (2015 settlement agreement); R.4000 (Tr.) at 541067; R.4029-31 (Ex.) at 555175-555182; R.3995 (Tr.) at 540632-540633.

In their settlement agreements, CVS and Walgreens admitted violating the CSA. R.4029-35 (Ex.) at 555152 (Walgreens 2013 agreement "acknowledg[ing] that certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations"); R.3999-17 (Ex.) (CVS 2015 agreement acknowledging same); R.3999-16 (Ex.) at 555073 (CVS 2016 agreement admitting CVS sometimes did not "conduct[] 'corresponding responsibility'").

Appellants' pharmacies in the Counties followed the same dispensing policies and practices that triggered the DEA enforcement actions. *See supra* Part II. When Appellants settled with DEA, they agreed to improve anti-diversion controls nationwide. They pledged to adopt policies to "detect and prevent diversion of controlled substances" as the CSA and its regulations required, including "procedures to identify the common signs associated with the diversion of" controlled substances. *E.g.*, R.4094-11 (Ex.) at 548287 (Walgreens 2011 agreement); R.4029-35 (Ex.) at 555156 (Walgreens 2013 agreement); R.4029-19 (Ex.) at 544439 (Walmart 2011 agreement); R.4115 (Tr.) at 551203 (Harrington,

17

senior CVS official) (CVS "develop[ed] new [anti-diversion] programs in response to" DEA enforcement action).

### 3. Appellants kept key information from pharmacists

Appellants promised to improve their practices, but the changes were largely cosmetic. They started monitoring their dispensing data related to diversion of controlled substances but did not provide this information to pharmacists. In fact, Walgreens *denied* pharmacists access to information in its possession critical to diversion control, such as store-specific dispensing statistics, information on doctors' prescribing patterns, and reports identifying common red flags. R.4023 (Tr.) at 543019; R.4026 (Tr.) at 543184; R.4133 (Tr.) at 553598-553599; R.4064 (Tr.) at 546629-546631; R.4057 (Tr.) at 546411-546413. CVS kept from pharmacists the company's controlled-substance dispensing data, investigations of problematic prescribers, and reports "detect[ing] outlier patterns" of prescribing behavior. R.4115 (Tr.) at 551227-551234; R.3995 (Tr.) at 540553-540554; R.4132 (Tr.) at 553108-553109; R.4078 (Tr.) at 547449-547450. CVS had tools that would alert pharmacists to red flags and assist them with documentation but chose *not* to provide them to all pharmacists. R.4090 (Tr.) at 547753-547769. Walmart kept store dispensing data from its pharmacists. R.4132 (Tr.) at 553204, 553253-553255; R.4128-31 (Ex.) at 552582; R.4055-18 (Ex.) at 546171.

Appellants did not track whether pharmacists complied with their corresponding responsibility and refused to fill suspicious prescriptions with unresolved red flags. Walgreens did not direct pharmacists to keep a copy of the refused prescription or record their refusals to fill prescriptions in an accessible location. R.4057 (Tr.) at 546481-546482; R.4133 (Tr.) at 553683-553685. Walmart required pharmacists to report to corporate leadership any decision not to fill a prescription but did not provide that information to pharmacists prior to 2015, and even after 2015, Walmart did not make the information easily accessible to pharmacists for several more years. R.4078 (Tr.) at 547362; R.4109 (Tr.) at 550464-550468, 550481-550484 (when jury asked how other Walmart pharmacists/pharmacies would know "the patient had a refusal to fill," Walmart admitted that "there wasn't a clear transfer of information"). If a CVS pharmacist refused to fill a suspicious prescription, they would give it "back to the patient" without making any record of it. R.4115 (Tr.) at 551378-551379; R.4090 (Tr.) at 547759-547760.

### 4. Appellants did not enforce anti-diversion policies

Appellants did not even enforce the deficient policies they had on the books. In a 2015 Walgreens audit, more than 40% of pharmacies failed to comply with the "policies/procedures put in place per the" DEA settlement agreement. R.4036-9 (Ex.) at 545036-545037; R.4057 (Tr.) at 546239-546241 (Polster, Walgreens

compliance official).  Nearly half of the audited stores did not refuse a single prescription that year.  R.4036-9 (Ex.) at 545037-545039; R.4057 (Tr.) at 546237-546241; R.4026 (Tr.) at 543276-543277.  Another 2014 audit showed Walgreens was "not training people properly, not giving them the tools" to stop diversion.  R.4057 (Tr.) at 546460-546461; R.4094-25 (Ex.) at 548388-548391.  Even by the time of trial, a Walgreens pharmacist testified that it was "not common practice" at her Lake County pharmacy to document red-flag resolution.  R.4133 (Tr.) at 553564, 553624-553626, 553632.

At trial, a CVS compliance official admitted it is "common" for pharmacists not to document resolution of red flags, despite policies requiring it.  R.4115 (Tr.) at 551281-551282.  CVS devoted few resources to enforce its policies, at one time employing only three people to oversee "all aspects" of controlled substance dispensing for all 7,600 CVS stores.  R.4078 (Tr.) at 547421-547424.

In 2011, Walmart finally hired a single compliance manager to lead "compliance with federal and state regulatory requirements" related to controlled substances.  R.4041 (Tr.) at 545168.  That person testified he did not consider it his job to "enforce that [the policies] were followed."  R.4078 (Tr.) at 547318.  A Walmart regional director notified him in 2013 that "inspectors collectively feel Walmart is [s]tarting to become a 'funnel' with [controlled substances including opioids] due to more liberal policies on dispensing pain meds" than competitors.

R.4055-16 (Ex.) at 546162; R.4041 (Tr.) at 545256-545259. But he made no recommendations or changes in response. R.4055-16 (Ex.) at 546162; R.4041 (Tr.) at 545256-545259; *see* R.4094-34 (Ex.) at 548450-548453. And in 2012, Walmart recognized "the risk of our pharmacies becoming the pharmacy of choice for pill mills" after learning of "lines forming for scripts" hours before a pharmacy opened and "very high" numbers of opioid prescriptions dispensed at a store. R.4109 (Tr.) at 550455.

### 5. Appellants discouraged compliance

Appellants did not just fail to stop diversion; they used the information to make it *harder* for pharmacists to fulfill their anti-diversion duties. R.4005 (Tr.) at 541405-541407, 541474-541480; R.4132 (Tr.) at 553163. Walgreens "identif[ied] pharmacists [who were] dispensing a *low* rate of controlled substances" and encouraged them to "feel more comfortable in filling" controlled substance prescriptions. R.4094-17 (Ex.) at 548322-548323 (emphasis added); R.4050 (Tr.) at 545874-545878, 545884-545885. Walgreens trained pharmacy supervisors "to be concerned with profit, customer service, and resolving customer complaints," not with enforcing compliance with dispensing policies. R.4094-13 (Ex.) at 555297. It tracked customer wait times as a "success metric" and ordered pharmacies to "[d]ecrease wait times" to "less than 15 minutes at all times of the day" to "improve pharmacy sales." R.4050 (Tr.) at 545760-545762, 545794;

R.4036-10 (Ex.) at 545044-545045, 545066-545068 (Walgreens market "Action Plan"); R.4026 (Tr.) at 543281-543288. CVS rewarded pharmacists for filling prescriptions quickly, "in 15 minutes or less." R.4029-27 (Ex.) at 555127-555128, 555144 (CVS "Performance Reporting" policy); R.4008 (Tr.) at 541600-541604.

Appellants tied pharmacists' bonuses to the overall volume of prescriptions they dispensed. Before 2014, Walgreens included controlled-substance prescriptions in calculating the overall volume and told pharmacists that "[t]he best evidence of a well-run pharmacy is the increase in prescriptions and pharmacy sales[.]" R.4094-14 (Ex.) at 548304; R.4094-18 (Ex.) at 548325; R.4050 (Tr.) at 545783-545786, 545796-545799. Until 2013, CVS did the same, incentivizing pharmacists to "maximize store profit" by filling as many prescriptions as possible, including opioid prescriptions. R.4029-21 (Ex.) at 544458-544460 (CVS "Pharmacist Incentive Plan"); R.4115 (Tr.) at 551283. Until 2012, Walmart did the same. R.4029-28 (Ex.) at 544512-544522 (Walmart "Incentive Plan"); R.4008 (Tr.) at 541593-541597.

Even after Appellants stopped including opioid volume in calculating pharmacists' bonuses directly, the volume of other prescriptions dispensed still affected compensation. R.4005 (Tr.) at 541477-541479 (Catizone) (explaining that, when pharmacists spent more time resolving red flags on opioid prescriptions, they had less time to dispense other prescriptions); R.4008 (Tr.) at 541596-541597

(Catizone); *see* R.4115 (Tr.) at 551283-551284; R.4094-25 (Ex.) at 548394-548395.  In addition, pharmacists' refusal to fill opioid prescriptions influenced metrics like customer satisfaction that negatively affected compensation.  R.4008 (Tr.) at 541591-541599; R.4005 (Tr.) at 541479-541480 (Catizone); R.4050 (Tr.) at 545893-545897.

Appellants' decision to understaff pharmacies and cut labor costs compounded these problems.  Walgreens pharmacies filled up to 500 prescriptions a day.  R.4050 (Tr.) at 545798.  Yet even "very busy location[s]" staffed only one pharmacist in the store at any given time.  R.4133 (Tr.) at 553687-553688.

Pharmacists expressed fear that taking time to resolve red flags or refusing to fill prescriptions would negatively affect their pay or even get them fired.  DEA received "complaints from pharmacists that they don't have time to check all these prescriptions for good faith" and instructed Appellants not to "pressur[e] their pharmacists to fill fast or not provid[e] adequate labor."  R.4046-6 (Ex.) at 545510-545512; R.4050 (Tr.) at 545826.  Ohio's Board of Pharmacy expressed similar concerns.  R.4026 (Tr.) at 543289-543290.

In 2018, one Walgreens pharmacist internally complained when managers reprimanded him for refusing to fill a suspicious prescription.  R.4094-13 (Ex.) at 555296-555300; R.4050 (Tr.) at 545887-545891, 545893-545897.  He pointed out the "clear conflict of interest" that exists when pharmacists are evaluated by

profit-maximizing store managers and urged Walgreens to address its "institutional" problem "with the system."  R.4094-13 (Ex.) at 555297-555300; R.4050 (Tr.) at 545893-545897.  But Walgreens's witnesses reported no resulting policy changes.  R.4064 (Tr.) at 546605-546606, 546614.

In 2018, CVS pharmacists told the company that documenting red flags took "too much time to fill out" especially in "higher volume" stores, which negatively affected compensation metrics.  R.4104-4 (Ex.) at 549317-549322; R.4090 (Tr.) at 547756-547758.  One pharmacist "coach[ed]" his colleague to decrease "wait times" for opioid prescriptions to "make sure we did not go off track from the CVS mission statement."  R.4169-35 (Ex.) at 557019 (pharmacist performance evaluation); R.4132 (Tr.) at 553089-553090.  Walmart pharmacists also felt pressured to fill suspicious prescriptions.  R.4041 (Tr.) at 545327.

## C. Appellants Filled Suspicious Prescriptions Without Proper Inquiry

Expert testimony at trial proved that, almost every time a suspicious opioid prescription was presented at Appellants' drugstores in the Counties, Appellants dispensed it without resolving red flags.  Catizone and Dr. Craig McCann, a data analyst and economist, analyzed the opioid prescriptions Appellants dispensed in the Counties.  R.4005 (Tr.) at 541378-541386 (Catizone); R.4026 (Tr.) at 543329-543334 (McCann).  First, they determined how many of the prescriptions Appellants dispensed had red flags.  R.4005 (Tr.) at 541481-541498, 541503-

541515 (Catizone); R.4008 (Tr.) at 541620-541626, 541691 (Catizone). This analysis revealed that between 16% and 22% of the dispensed prescriptions had red flags. R.4032 (Tr.) at 544715-544718, 544723-544731 (McCann) (finding red flags in 141,651 of 701,467 prescriptions CVS dispensed, 175,609 of 806,193 prescriptions Walgreens dispensed, and 37,379 of 229,006 prescriptions Walmart dispensed).

As Catizone explained, even one diverted opioid "prescription is important because any one prescription could harm or kill a patient." R.4008 (Tr.) at 541679; *see also* R.4017 (Tr.) at 542468 ("[I]f one person breaks down in that system, you have diversion. And depending on how quickly it could be discovered, you can have a lot of diversion, a great amount of diversion.") (Rannazzisi); R.4111 (Tr.) at 550688 ("[E]ven a small percentage of the doctors, if they're bad, and if the pharmacists do not exercise corresponding responsibility, can cause a lot of harm to individuals in a community[.]") (Edwards, Ohio Board of Pharmacy Agent).

Based on Catizone's detailed analysis of a sample set of red-flag prescriptions each Appellant dispensed, he and McCann determined how many red-flag prescriptions Appellants dispensed without resolving the red flags. R.4005 (Tr.) at 541397-541399, 541473-541474, 541532 (Catizone); R.4008 (Tr.) at 541621-541622, 541691 (Catizone). That analysis revealed that Appellants dispensed red-flag prescriptions without proper inquiry 87% to 93% of the time.

R.4008 (Tr.) at 541626-541647, 541648-541666, 541678-541679, 541717, 541719 (Catizone); R.4026 (Tr.) at 543397-543400 (McCann).

### D. Appellants Dispensed Opioid Prescriptions From "Pill Mill" Doctors

With corporate pressure to sell as many opioids as possible and such lax enforcement of anti-diversion policies, it is unsurprising that Appellants sold opioids prescribed by some of the most notorious rogue prescribers in and around the Counties.

CVS knew that a Lake County store was filling prescriptions from one Dr. David Demangone, whose prescriptions had "red flags of a 'pill mill' such as high quantity, same dose and directions for numerous patients, accepting cash only payment." R.4104-6 (Ex.) at 549329. Other stores had stopped filling his prescriptions. CVS told its Lake County store that "[f]illing these scripts are completely up to you in your professional judgment." *Id.*; R.4078 (Tr.) at 547474-547476. CVS eventually learned Demangone saw 65 to 70 patients *each day*, prescribed "very high pill volumes," most of his patients gravitated toward oxycodone, two of his patients had overdosed, and high volumes of his patients would come into the pharmacy at once. R.4104-31 (Ex.) at 549695-549696; R.4078 (Tr.) at 547477-547479. Nonetheless, CVS stores continued to fill his prescriptions. R.4104-31 (Ex.) at 549696.

CVS also did not stop pharmacists from dispensing prescriptions written by Dr. Frank Veres, despite his reputation as the Trumbull County doctor for "[e]verybody in town who is hooked on pain and anxiety meds" and "the man to see" "if you want to become a full blown drug addict." R.3999-11 (Ex.) at 554915. Two Trumbull County CVS stores raised the alarm, but CVS just told them to continue exercising their corresponding responsibility. R.4104-16 (Ex.) at 549414; R.4078 (Tr.) at 547453-547456. Veres and another doctor prescribed 70-80% of the hydrocodone dispensed in one of those stores. *Id.* Some of his patients even had overdosed. R.4128-50 (Ex.) at 552903. But CVS remained "comfortable" with his practices and simply "monitor[ed] his CS dispensing." *Id.* at 552903-552904. Eventually CVS stopped filling Veres's prescriptions. R.4115 (Tr.) at 551348-551349.

Walgreens also filled prescriptions for Demangone and Veres. R.4026 (Tr.) at 543226-543228; R.4133 (Tr.) at 553583, 553597-553598; R.4036-7 (Ex.) at 545013. In fact, Walgreens told one pharmacist he *could not refuse* to fill Veres's prescriptions as a blanket rule. R.4064 (Tr.) at 546640-546641. One former Walgreens district manager who oversaw its Trumbull County pharmacies acknowledged at trial that Walgreens filled opioid prescriptions written by Veres for 25 years despite knowing "for a long time" that he had "been a problem." R.4026 (Tr.) at 543226-543228, 543234. Walgreens filled more than 15,000 of

Veres's prescriptions and more than 13,000 of Demangone's prescriptions in the Counties.  R.4111 (Tr.) at 550812-550813, 550815.

Walmart filled many red-flagged opioid and cocktail prescriptions by Dr. Trevor Levin, who was known to be a high prescriber.  R.4132 (Tr.) at 553241-553251, 553274-553275.  For years, Walmart prohibited pharmacists from refusing all prescriptions from known pill-mill doctors as a blanket rule.  R.4128-8 (Ex.) at 552473; R.4078 (Tr.) at 547326.  When pharmacists raised concerns about another rogue prescriber in Ohio, Walmart responded that "no blanket refusals are allowed."  R.4094-33 (Ex.) at 548448-548449; R.4078 (Tr.) at 547378-547379.

By mid-2015, Walmart amended its official policy to allow pharmacists to refuse prescriptions from problematic prescribers.  R.4109 (Tr.) at 550357, 550463.  Yet, for almost two more years, when pharmacists raised concerns about problematic prescribers, Walmart *continued to instruct them that they could not refuse to fill these doctors' prescriptions as a blanket rule*, even though Walmart's policy allowed it.  R.4078 (Tr.) at 547354-547355, 547358-547360, 547362-547370.

### E.    Opioid Oversupply And Diversion Created A Health And Safety Crisis In The Counties

Fueled by Appellants' non-enforcement of policies and a willingness to fill prescriptions written by known pill-mill doctors, the oversupply and diversion of opioids created an unprecedented epidemic of addiction and overdoses.  R.4000

(Tr.) at 541082-541083, 541108-541111, 541121; R.4005 (Tr.) at 541524, 541528; R.4065 (Tr.) at 546881-546918.  Opioid use disorder is defined as chronic use of opioids causing clinically significant distress or impairment and is "synonymous" with "opioid addiction."  R.4000 (Tr.) at 541001.  Addicted individuals can require lifelong treatment.  *Id.* at 540964.

Ohio is one of the hardest-hit states in the country, with the Counties among the hardest-hit Ohio communities.  R.4118 (Tr.) at 551579; R.4104-19 (Ex.) at 549434.  Rates of opioid use disorder there have been "[w]orse . . . than . . . the national average" and "worse . . . than in Ohio."  R.4065 (Tr.) at 546916-546918.  In the two decades since 1999, the Counties experienced "an exponential increase in prescription opioid overdose as well as many other nonfatal consequences."  *Id.* at 546888, 546910-546911.  In 2019, about 13,500 residents of the Counties suffered from opioid use disorder.  R.4090 (Tr.) at 547879-547880.

As explained by Appellees' expert witnesses, Dr. Keyes (an epidemiologist from Columbia University) and Dr. Lembke (a physician from Stanford University specializing in addiction medicine), most opioid use disorder and overdose deaths are attributable to prescription opioids.  R.4065 (Tr.) at 546862, 546911, 546926-546927; R.4000 (Tr.) at 540932-540935, 540941, 541074 ("oversupply . . . is the major contributor to people getting addicted to that substance," "which led to people getting addicted and dying").

Keyes "link[ed] . . . the availability of prescription opioids" to "overdose death rates [being] so much higher in these two counties than the national average." R.4090 (Tr.) at 547795. Even a small increase in the volume of opioids dispensed in a community significantly aggravates opioid-related mortality rates. R.4118 (Tr.) at 551566-551567 ("[A] one-pill increase in per capita pill volume [is] associated with a .2 percent increase in opioid-related deaths per 100,000 in the population."). From 1999 to 2011, when Appellants dispensed millions of prescription opioids, overdose deaths from prescription opioids in Ohio increased 440%. R.4111 (Tr.) at 550623-550624. For each overdose death, "there were 10 treatment admissions for abuse, . . . 32 emergency department visits for misuse or abuse[,] . . . [and] 130 people who abuse or are dependent" on prescription opioids. *Id.* at 550624; R.4128-33 (Ex.) at 552627.

Increased prescription opioid addiction and abuse has led to increased abuse of other illicit drugs such as heroin and fentanyl in the Counties. R.4000 (Tr.) at 541090-541095, 541118-541120; R.4065 (Tr.) at 546896, 546903-546904 ("[T]here's a really strong association between increased use of prescription opioids and subsequent experiences of addiction and transition to heroin use."); R.4090 (Tr.) at 547910. Nearly "80 percent of heroin users today started out with a prescription opioid." R.4005 (Tr.) at 541306-541307; *see* R.4064 (Tr.) at 546720-546722. After developing a tolerance to prescription opioids, users seek

out cheaper and more potent alternatives when the costs or difficulties of obtaining prescription opioids increases.  R.4000 (Tr.) at 541090-541091.  In fact, prescription opioid use is the strongest risk factor for future heroin use.  R.4065 (Tr.) at 546900; R.4090 (Tr.) at 547885-547886.

The epidemic has devastated families.  R.4000 (Tr.) at 541098-541116.  In-utero exposure to opioids significantly increased the number of babies born in the Counties with neonatal abstinence syndrome—dependence on opioids.  This "painful condition" causes "developmental delays" that require special services and ongoing care.  R.4064 (Tr.) at 546718-546719; R.4065 (Tr.) at 546919-546921, 546924-546926.  Parental opioid use significantly increases placements in foster care, kinship care, and residential treatment facilities.  R.4090 (Tr.) at 547969; R.4093 (Tr.) at 548085.

The epidemic has exhausted the Counties' public health and safety infrastructure.  First responders in the Counties are "day in and day out" responding to overdoses.  R.4065 (Tr.) at 546919, 546921; R.4090 (Tr.) at 547970-547971.  The epidemic has increased crime rates, taxing law enforcement and the court system, overcrowding jails and treatment facilities, undermining the employability of the workforce, and devastating neighborhoods.  R.4050 (Tr.) at 545660-545661, 545682-545684, 545725-545726; R.4090 (Tr.) at 547960-547963, 547998; R.4093 (Tr.) at 548094-548098.

## III. PROCEDURAL HISTORY

### A. A Jury Found Appellants Liable For Public Nuisance Following A Six-Week Trial

Appellees brought public-nuisance actions against CVS, Walmart, and Walgreens for their roles in causing the opioid epidemic. *See* R.3282 (Order Regarding Track Three) at 492977-492978; R.3326-3327 (Amended Complaints) at 494941-495359. Those cases became part of the nationwide opioid multidistrict litigation (MDL) proceeding in the Northern District of Ohio. The MDL court consolidated thousands of cases and selected this case for a bellwether trial. The MDL court, which presided over the trial, bifurcated it into a jury trial on liability, followed by a bench trial to determine the appropriate equitable remedy.

The six-week trial featured 34 witnesses. The jury heard testimony from 13 current and former CVS, Walgreens, and Walmart employees, including corporate executives, managers, and line pharmacists. Epidemiologists, doctors, statisticians, and economists offered expert testimony. County health officials testified to the effects of opioid oversupply and diversion. The jury also heard testimony from FDA and DEA officials and Ohio Board of Pharmacy agents.

Three weeks into the trial, a juror improperly shared information with other jurors about the availability of free opioid overdose treatment in the Counties. R.4065 (Tr.) at 546962, 546965-546968. The court investigated the misconduct and dismissed the juror. *Id*. at 546969-546970. The court then provided a curative

instruction and confirmed that each juror could follow that instruction. R.4078 (Tr.) at 547247, 547258-547271.

The jury returned a verdict for Appellees. It found that (1) "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels, is a public nuisance" and (2) Appellant Pharmacies "engaged in intentional and/or illegal conduct which was a substantial factor in producing the public nuisance that [the jury] found exists." R.4176 (Verdict) at 556138-556140, 556142-556144. The court denied Appellants' post-trial motions. *See* R.4295 (Rule 50(b) Order) at 572075-572137; R.4296 (Rule 59 Order) at 572138-572210.

## B. The District Court Ordered The Equitable Remedy Of Abatement

Following the verdict, the district court ordered the parties to propose remedies to abate the nuisance. R.4220 (Jan. 4, 2022 Order) at 570402. Appellees submitted a proposal incorporating the expert report of Dr. Caleb Alexander, a doctor and professor of epidemiology at the Johns Hopkins Bloomberg School of Public Health. R.4232 (Pls.' Abatement Plans) at 570849; R.4446 (Tr.) at 580222, 580335 (Alexander). The report set out four categories of measures necessary to abate the opioid crisis in Lake and Trumbull Counties: prevention, treatment, recovery, and measures addressing the needs of special populations. R.4446 (Tr.) at 580226-580227 (Alexander).

Preventive measures reduce opioid oversupply. *See id.* at 580230. Treatment includes treating individuals affected by the epidemic of opioid use disorder with proven medications and distributing naloxone, a drug that reverses overdose. *See id.* at 580226-580227, 580248. Recovery remediates public safety conditions and opioids' effects on the criminal justice system. *See id.* at 580250-580253. Special measures address populations with distinct needs, including children and pregnant women affected by opioid addiction. *See id.* at 580227. Economists Harvey Rosen and John Burke opined that these measures over the course of 15 years would cost $1,433,261,070 to implement in Lake County and $1,833,702,580 in Trumbull County. R.4592-9 (Ex.) at 591604, 591606. Treatment accounts for nearly 70% of the estimated total costs. *See id.*

Appellants objected to Appellees' proposed remedy and did not submit an alternative proposal to the court. R.4315 (Defs.' Objs. to Pls.' Abatement Plan) at 574273-574276. The district court then ordered Appellants to "submit an abatement plan that complies with the Court's original order" and "list specific elements to be addressed for abatement, as well as the cost for each." R.4319 (Mar. 21, 2022 Order) at 574286-574287. In response, Appellants submitted a three-paragraph "plan" arguing that the only appropriate "element of Plaintiffs' abatement plan . . . is the drug disposal element." R.4337 (Defs.' Am. Objs. to

Pls.' Abatement Plan) at 575464. Appellants proposed that any drug disposal programs the court ordered be limited to one year. *Id.*

In May 2022, the district court held a five-day bench trial on the abatement remedy. Appellees' experts testified to the harms to public health and safety in the Counties resulting from Appellants' conduct, the measures necessary to abate those harms, and the estimated costs to implement those measures. R.4438 (Tr.) at 579521-579555, 579567-579569, 579671-579676 (Keyes); R.4446 (Tr.) at 580126-580170 (Young); *id.* at 580219-580400 (Alexander); R.4447 (Tr.) at 580407-580513 (Alexander), 580518-580620 (Burke). Appellants offered testimony from an accountant and health economists criticizing Appellees' calculations and opining on how the abatement award should be apportioned. R.4455 (Tr.) at 580652-580802 (Bialecki), 580804-580942 (Kessler); R.4460 (Tr.) at 582062-582217 (Kessler), 582220-582327 (Chandra).

On August 17, 2022, the district court entered an abatement plan and injunctive relief order. R.4611 (Order) at 596640-596641. Beginning with Appellees' proposed abatement plan, the court excluded the costs of programs it determined were not reasonably calculated to abate the nuisance and a portion of costs it determined was not attributable harms from prescription opioids. *Id.* at 596640. The court ordered Appellants to fund one-third of the remaining total, taking into account the fact that opioid manufacturers, distributors, and dispensers

together form the tripartite closed-delivery system of prescription opioids. *Id.* at 596641. The court held Appellants jointly and severally liable for funding $306.2 million to abate the public nuisance in Lake County and $344.4 million in Trumbull County.

The district court ordered Appellants to pay into a fund annually for 15 years and appointed Special Master David Cohen to administer the fund. R.4611 (Order) at 596641, 596707; R.4652 (Order) at 599848-599855. The court authorized the administrator to determine whether specific programs are reasonably calculated to abate the nuisance. R.4611 (Order) at 596707-596708. The court required Appellants to fund the first two years immediately, with any funds remaining at the end of a given year rolling over to the next or being refunded. *Id.* at 596641, 596680, 596707-596708. The district court retained jurisdiction over the parties' compliance with the order. *Id.* at 596641, 596708. The court also enjoined Appellants to correct their dispensing practices. *Id.* at 596708-596713; R.4611-1 (Inj. Order) at 596714-596716; *cf.* R.4893 (Am. Inj. Order) at 609039-609053. The court entered final judgment on August 22, 2022. R.4614 (Judgment) at 598413-598415.

# SUMMARY OF ARGUMENT

I.    The district court correctly interpreted the CSA and DEA regulations to impose a duty on Appellants to maintain effective controls against diversion, not merely when storing controlled substances, but also when dispensing them. The regulations require pharmacies to employ measures to determine whether prescriptions are valid by identifying and resolving red flags. This Court should reject Appellants' invitation to overrule DEA's long-standing interpretation and to decimate the anti-diversion duties of dispensers, the only DEA registrants that distribute controlled substances to members of the public.

Appellants violated these duties and engaged in culpable intentional conduct, both of which formed a proper basis for a finding of public-nuisance liability. The CSA does not preempt Appellees' state-law public-nuisance claim, nor does Ohio law preempt nuisance liability based on culpable intentional conduct.

II.   Ohio's Product Liability Act does not abrogate Appellees' public-nuisance claims. Appellees seek only equitable relief. To fall within the scope of the Act, a claim must seek compensatory, punitive, or exemplary damages—none of which Appellees seek.

III.  The district court properly instructed the jury that proximate cause is satisfied if the circumstances constituting the nuisance are the natural and

foreseeable result of Appellants' conduct. That instruction tracks Ohio's model jury instructions. The court properly refused to give Appellants' proposed instruction because it was incomplete and misleading. The chain of causation in this case is not too remote as a matter of law.

**IV.** The district court issued an appropriate equitable remedy to abate the public nuisance found by the jury. The court established a fund with flexibility to adapt to changes in the epidemic and developments in treatment. The court reasonably calculated the costs, subject to rollover or refunds of unused amounts, based on evidence presented by both parties. The court did not abuse its discretion in holding Appellants jointly and severally liable for funding one-third of the total estimated abatement costs, considering that dispensers, together with manufacturers and distributors, make up a tripartite closed-delivery system for the supply of prescription opioids.

**V.** The district court did not abuse its discretion in declining to declare a mistrial after learning of a single incident in which a juror shared outside information with other jurors. Appellants did not suffer actual prejudice, and the district court cured any potential prejudice by dismissing the juror and giving a limiting instruction.

## STANDARD OF REVIEW

This Court upholds a jury verdict unless it is contrary to the "clear weight of the evidence." *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 581 (6th Cir. 2014). The test "ask[s] whether a reasonable juror could reach the challenged verdict." *Id.* The Court does not "reweigh the evidence," *id.*, and it "view[s] the evidence in the light most favorable to the prevailing party," *Ivey v. Wilson*, 832 F.2d 950, 953 (6th Cir. 1987) (per curiam). Unless the Court is "left with the definite and firm conviction that a mistake resulting in plain injustice has been committed, or [that] the verdict is contrary to all reason, [the Court] must affirm the jury's verdict." *Meyers v. Wal-Mart Stores, E., Inc.*, 257 F.3d 625, 632 (6th Cir. 2001). Questions of statutory interpretation are reviewed de novo. *See United States v. Morris*, 203 F.3d 423, 424 (6th Cir. 2000) (per curiam).

This Court reviews the district court's refusal to give requested jury instructions and the decision to deny a mistrial for abuse of discretion. *See Williams v. Eau Claire Pub. Schs.*, 397 F.3d 441, 445 (6th Cir. 2005); *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir. 1995) ("The trial judge is in the best position to determine the nature of the alleged jury misconduct[.]").

This Court reviews the district court's grant of equitable relief and apportionment for abuse of discretion. *See Anchor v. O'Toole*, 94 F.3d 1014, 1025 (6th Cir. 1996); *United States v. Bogart*, 576 F.3d 565, 575 (6th Cir. 2009). An

appellate court "will not substitute [its] own judgment for that of the district court." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008); *see also Berk v. Matthews*, 559 N.E.2d 1301, 1308 (Ohio 1990) (same).

## ARGUMENT

## I.    THE JURY PROPERLY FOUND APPELLANTS LIABLE FOR PUBLIC NUISANCE UNDER OHIO LAW

A public nuisance is "an unreasonable interference with a right common to the general public." *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002) (quoting Restatement (Second) of Torts § 821B(1) (1979) ("Restatement (Second)"); *see also Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46, 52 (Ohio Ct. App. 2007) ("A public nuisance . . . arises . . . when a public right has been affected."). It includes a "significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience." Restatement (Second) § 821B(2)(a).

Public nuisances can be classified as absolute (nuisance per se) or qualified (mirroring a negligent tort). *Taylor v. City of Cincinnati*, 55 N.E.2d 724, 732 (Ohio 1944). Absolute public nuisance can be based on unlawful conduct, such as violating a statute or regulation. *Jennings Buick, Inc. v. City of Cincinnati*, 384 N.E.2d 303, 307 (Ohio 1978) (quoting *Metzger v. Pa., O. & D. R.R. Co.*, 66 N.E.2d 203, 203 (Ohio 1946) (paragraph one of the syllabus)). "[T]he violation of a specific legal requirement established for the protection of others imposes absolute

liability . . . regardless of the degree of care used." *Uland v. S.E. Johnson Cos.*, 1998 WL 123086, at \*5 (Ohio Ct. App. Mar. 13, 1998).

Liability for absolute public nuisance also can be based on "a culpable and intentional act resulting in harm[]," regardless of whether the act is unlawful, if the "harm resulting from the culpable act is substantially certain to occur." *Id.*

## A. The Jury Properly Found Conduct Supporting Nuisance Liability

The jury determined that Appellants engaged in "intentional and/or illegal conduct" causing a public nuisance in Lake and Trumbull Counties. R.4176 (Verdict) at 556139-556140, 556143-556144. The record amply supports this finding. Appellees proved both that Appellants engaged in unlawful conduct by violating the CSA and its Ohio analogue and that Appellants committed culpable and intentional acts resulting in harm that was substantially certain to occur.

### 1. Appellants violated the CSA and its Ohio analogue

Ample evidence demonstrated that Appellants (i) failed to provide "effective controls and procedures" to guard against diversion in violation of 21 C.F.R. § 1301.71(a) and Ohio Administrative Code 4729:5-3-14(A) and (ii) dispensed suspicious prescriptions without resolving warning signs of diversion in violation

of 21 C.F.R. §§ 1306.04(a), 1306.06, and Ohio Administrative Code 4729:5-5-15(A) and 4729:5-5-08.[4]

### a. Appellants lacked effective controls and procedures to guard against diversion

Appellants violated 21 C.F.R. § 1301.71(a) and Ohio Administrative Code 4729:5-3-14(A) by dispensing massive quantities of opioids into the Counties without "effective controls and procedures to guard against theft and diversion." R.4000 (Tr.) at 541078-541079; R.4005 (Tr.) at 541467-541470, 541472-541475, 541522-541524. Appellants lacked even basic controls and procedures to prevent diversion. Before DEA took enforcement action against them, Appellants also did not require pharmacists to document if or how they resolved red flags. *See supra* Statement Part II.B.1. Appellants did not tell pharmacists to check the PDMP for years after Ohio created it. *See id.*

After DEA alleged that Appellants failed to comply with their CSA duties, causing diversion, Appellants promised to enhance their controlled-substance

---

[4] Section 821 of the CSA authorizes DEA to promulgate rules and regulations "relating to the registration and control" of the dispensing of controlled substances. 21 U.S.C. § 821. As regulations promulgated pursuant to Congressional authority, the CSA regulatory duties carry the full force and effect of law. *See Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-844 (1984); *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979); *Nichols v. United States*, 260 F.3d 637, 648 (6th Cir. 2001). Therefore, the CSA regulatory duties impose legal obligations on registrants, and failure to comply with these duties constitute "unlawful" conduct.

procedures "to detect and prevent diversion." *See supra* Statement Part II.B.2. But in reality, Appellants continued their deficient practices. They kept their pharmacists from seeing the chain-wide dispensing and prescribing data Appellants collected, and did not use that data to prevent diversion. *See supra* Statement Part II.B.3.

The evidence demonstrated that Appellants violated their legal duties. Appellants did not track pharmacists' refusals to fill prescriptions, which caused a major gap in their controls to prevent diversion. *See id.* Appellants did not require pharmacists to document these refusals in any standardized location that other pharmacists could access, despite using chain-wide computer dispensing systems. *See id.* Thus, when a pharmacist declined to fill an illegitimate prescription, the customer could bring that prescription to another location from the same chain, or a different pharmacist at the same location, and try again to get it filled. *See id.* Without telling pharmacists which prescriptions their peers had refused to fill or why, Appellants could not effectively guard against diversion as required by 21 C.F.R. § 1301.71(a).

And Appellants failed to implement or enforce their own anti-diversion policies. *See supra* Statement Part II.B.4. Appellants devoted limited resources and personnel to enforcing them, and Appellants' witnesses acknowledged that pharmacists regularly failed to follow them. *See id.* Therefore, Appellants failed

to provide "effective" controls against diversion as required by 21 C.F.R.

§ 1301.71(a).

### b. Appellants dispensed suspicious prescriptions without first resolving red flags

Appellants violated their duty to identify and resolve "red flags" before dispensing opioids. Section 1306.04(a) imposes a "corresponding responsibility" on pharmacists to ensure proper prescribing and dispensing of controlled substances. It sets out doctors' "responsibility for the proper prescribing and dispensing of controlled substances" and the pharmacist's "corresponding responsibility" for the same. *Cf. Webster's II New College Dictionary* 253 (1999) (defining "corresponding" as "conforming, as in degree or kind," "[a]nalogous," and "equivalent").

The corresponding responsibility includes a duty to determine whether the customer presents an "effective" prescription. *See* 21 U.S.C. § 829(a) (barring pharmacists from dispensing a controlled substance "without [a] written prescription"). Section 1306.04(a) defines an "effective" prescription: one "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

More than two decades of DEA practice confirm that the corresponding responsibility prohibits pharmacies from dispensing suspicious prescriptions if "a red flag was or should have been recognized," and "the question created by the red

flag was not resolved conclusively." *Holiday CVS, L.L.C.*, 77 Fed. Reg. 62,316, 62,341 (DEA Oct. 12, 2012); *see also*, *e.g.*, *Ralph J. Bertolino Pharmacy*, 55 Fed. Reg. 4729, 4730 (DEA Feb. 9, 1990); *Top RX Pharmacy*, 78 Fed. Reg. 26,069, 26,082 (DEA May 3, 2013); R.4017 (Tr.) at 542476-542479, 542488-542493 (Rannazzisi) ("If [the pharmacist] can't resolve the red flags, [he] cannot dispense the medication."); R.4132 (Tr.) at 553160 (Ashley); R.4005 (Tr.) at 541460, 541517-541518 (Catizone).

This Court ratified DEA's approach, holding that, "'[w]hen [pharmacists'] suspicions are aroused as reasonable professionals,' they must at least verify the prescription's propriety, and if not satisfied by the answer they must 'refuse to dispense.'" *Medicine Shoppe-Jonesborough v. DEA*, 300 F. App'x 409, 412 (6th Cir. 2008) (quoting *Ralph J. Bertolino*, 55 Fed. Reg. at 4730). Other courts agree that "*pharmacies*, not merely pharmacists, have obligations to 'resolve red flags' before dispensing controlled substances concerning suspicious prescriptions." *Cherokee Nation v. McKesson Corp.*, 2021 WL 1200093, at *6 (E.D. Okla. Mar. 29, 2021); *see also Heartland Pharmacy, Inc. v. Rosen*, 2021 WL 650350, at *4 (S.D. Fla. Feb. 18, 2021) ("[P]art 1306.04(a) 'requires pharmacists to identify and resolve suspicions that a prescription is illegitimate.'") (quoting *Trinity Pharmacy II*, 83 Fed. Reg. 7304, 7331 (DEA Feb. 20, 2018)).

The duty to identify and resolve red flags also is embedded in 21 C.F.R. § 1306.06, which requires a pharmacist to act "in the usual course of his professional practice" when dispensing controlled substances.[5]  DEA has long interpreted 21 C.F.R. § 1306.06 to prohibit "dispens[ing] prescriptions for controlled substances without resolving red flags."  *Heavenly Care Pharmacy*, 85 Fed. Reg. 53,402, 53,417 (DEA Aug. 28, 2020); *see also George Pharmacy, Inc.*, 87 Fed. Reg. 21,145, 21,152 (DEA Apr. 11, 2022); R.4008 (Tr.) at 541686 (Catizone).

Appellants did not do any of this.  Between 16% and 22% of the opioid prescriptions they dispensed in the Counties bore red-flag signs that "activities are occurring outside the usual and customary scope of pharmacy practice . . . [and] are more likely to include abuse, diversion, and fraudulent acts."  R.4005 (Tr.) at 541514 (Catizone).  Appellants consistently filled those opioids prescriptions without first resolving red flags.  *See supra* Statement Part II.C.  Between 2006 and 2020, Appellants dispensed highly dangerous opioids into the Counties without resolving red flags 87% to 93% of the time.  R.4026 (Tr.) at 543397-543400.

---

[5] *See* R.4241 (Pls.' Opp. to Defs.' Rule 50(b) Mot.) at 571164 & n.17 (§ 1306.06 requires a pharmacy's "careful evaluation of prescriptions"); R.4075 (Pls.' Proposed Jury Instructions) at 547225 (§ 1306.06 requires dispensers to "check for and conclusively resolve red flags"); R.4075-1 (Ex. A) at 547230; R.4008 (Tr.) at 541686, 541707-541708 (Catizone).

## 2. The evidence supported a finding of culpable intentional conduct

An absolute public nuisance may be based on a "culpable and intentional act resulting in harm," regardless of whether the act was unlawful. *Kramer*, 882 N.E.2d at 52-53 (citing *Metzger*, 66 N.E.2d at 203). An "intentional act" is when the defendant intended to act and knew, or was substantially certain, that the circumstances resulting from that act would interfere with public health or safety. *See Paulus v. Citicorp N. Am., Inc.*, 2014 WL 4557603, at *14 (S.D. Ohio Sept. 12, 2014); Restatement (Second) § 825 (1979). For example, an intentional act resulting in harm could be the "polluting of a stream without lawful authority by casting sewage therein." *Uland*, 1998 WL 123086, at *5 (citing *Mansfield v. Balliet*, 63 N.E. 86 (Ohio 1902)). If the defendant learns that circumstances resulting from the conduct interfere with public health, and continues that conduct, then the subsequent conduct is intentional. *See Paulus*, 2014 WL 4557603, at *14; Restatement (Second) § 825 cmt. d; *id.* § 8A cmt. b (1965).

Appellants engaged in culpable intentional conduct that unreasonably interfered with public health and safety in the Counties. They do not dispute that they intentionally dispensed high volumes of opioids. Appellants knew—because DEA told them—of the dangers associated with prescription opioids, the devastating harms to public health resulting from diversion, and the ineffectiveness of their procedures to prevent diversion. Yet they continued dispensing high

volumes of prescription opioids into the Counties without effective policies to guard against diversion. Worse, Appellants' policies *discouraged* pharmacists from guarding against diversion and fulfilling their corresponding responsibility.

*First*, Appellants knew for decades that prescription opioids have a high potential for abuse and diversion. *See supra* Statement Part II.A. They have long understood that diversion presents a serious and growing threat to public health. *See id.* DEA enforcement actions put them on notice. From 2007 to 2019, DEA initiated and settled at least two enforcement actions against Walgreens, six against CVS, and four against Walmart. *See id.* When settling those actions, Walgreens and CVS admitted they violated the CSA. *See id.* Still, Appellants continued dispensing high volumes without adequate controls to prevent diversion. *See supra* Statement Part II.B-C.

*Second*, Appellants intentionally implemented policies that discouraged pharmacists from resolving red flags before dispensing suspicious prescriptions. Because Appellants understood the risk of diversion, Appellants knew or were substantially certain that diversion would result from these policies.

Appellants incentivized pharmacists to dispense high volumes of prescriptions as quickly as possible and discouraged pharmacists from properly resolving red flags. *See supra* Statement Part II.B.5. For years, Appellants encouraged store profitability by tying pharmacist compensation to the volume of

prescriptions (including opioid prescriptions) they dispensed.  *See id*.  DEA settlements eventually forced Appellants to stop directly factoring opioid prescriptions into bonus calculations, but even then, the volume of other prescriptions dispensed continued to affect compensation.  *See id*.  Appellants continued to evaluate pharmacists using metrics like customer satisfaction that could be negatively affected by refusals to fill suspicious prescriptions.  *See id*.  CVS and Walgreens encouraged pharmacists to fill prescriptions within 15 minutes.  *See id*.  Store managers reprimanded pharmacists for refusing to fill suspicious prescriptions with unresolved red flags.  *See id.*  Compounded by inadequate staffing, some busy locations filled hundreds of prescriptions per day with only one pharmacist staffed at a time.  *See id*.

Consequently, pharmacists expressed fear that taking the time to resolve red flags or refusing to fill prescriptions would negatively affect their pay or even get them fired.  *See id.*  Other pharmacists reported that they did not have time to both speak with the customer and document red flags.  *See id.*

### B.  Appellants Misconstrue The CSA And Ohio Law

Instead of contesting this tsunami of evidence, Appellants dispute their legal duties and the wording of the jury verdict.  Multiple courts have rejected similar efforts to refashion the CSA to eviscerate pharmacies' anti-diversion duties.  Likewise, courts have uniformly rejected arguments that the CSA preempts

state-law nuisance claims based on culpable intentional conduct, and the Ohio Supreme Court has rejected the argument that highly regulated entities cannot engage in such conduct.  This Court should do the same.

### 1. Appellants' interpretation of the duty to maintain effective controls is contrary to law

Appellants argue (at 54-56) that 21 C.F.R. § 1301.71(a) requires pharmacies to maintain only physical security controls to guard against theft, but not other forms of diversion, such as invalid prescriptions.  They base this argument on §§ 1301.72-.76, which describe physical security requirements that pharmacies must follow.  Appellants' argument contradicts the plain text of the statute and DEA regulation as well as well-established agency and court precedent.

### a. Section 1301.71 requires pharmacies to control diversion, not just theft

The first sentence of § 1301.71(a) pronounces the fundamental duty of all DEA registrants:  "All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances."  *See* R.4153 (Tr.) at 554648 (jury instruction) ("[E]ntities that are authorized to dispense controlled substances are required to provide effective controls and procedures to guard against theft and diversion.").  A registrant's failure to "maintain effective controls against diversion" is a basis for suspending its

registration.  21 U.S.C. § 824(d)(2).  That duty covers all types of diversion,
including dispensing without a valid prescription.

Appellants argue (at 55-56) that § 1301.71 "expressly defines the precise
'controls and procedures' required" in the second and third sentences of
§ 1301.71(a) and (b), which "impose no duties on pharmacies relating to
dispensing controlled substances."  But nothing in § 1301.71's text indicates that
providing physical security controls is sufficient to comply with the duty to
provide "effective controls and procedures to guard against theft and diversion."
The provision refers to the "security requirements" set forth in §§ 1301.72-.76 as
"standards for the physical security controls" and "*necessary* to prevent
diversion"—not "effective controls and procedures to guard against theft and
diversion."  (Emphasis added.)  Physical security is necessary but not *sufficient* to
guard against all forms of diversion—such as attempts to buy controlled substances
through illegitimate prescriptions.

Section 1301.71(b) concerns whether DEA can excuse full compliance with
the security requirements set forth in §§ 1301.72-.76 based on consideration of
enumerated factors.  It does not limit § 1301.71(a)'s duty to provide effective
controls and procedures against all forms of diversion.  Appellants' reading also
leads to an absurd outcome:  a dispenser would be required to have effective

controls when storing dangerous drugs, but not when dispensing them to the public.

### b. DEA has long required dispensers to guard against diversion

Established DEA practice confirms pharmacies' duty to prevent diversion, not just theft. *See* Br. for Appellees at 5, *Holiday CVS, L.L.C. v. Holder*, No. 12-5072, 2012 WL 2052422 (D.C. Cir. June 4, 2012) ("*Holiday CVS* Appellee Br."); *see also* R.4017 (Tr.) at 542467-542468 (Rannazzisi) (pharmacies "must prevent or . . . have practices in place to prevent diversion"); R.4132 (Tr.) at 553153-553154 (Ashley) (diversion includes not only theft, but "use[] by patients or individuals in ways not consistent with a legitimate medical use").

In *Holiday CVS*, DEA found that CVS pharmacies "systematically disregarded warning[] signs of diversion" and dispensed controlled substances "where [they] knew or should have known that the prescriptions were not issued in the usual course of professional practice or for . . . legitimate medical purposes." *Holiday CVS* Appellee Br. 9. In defending its revocation of pharmacies' registration before the D.C. Circuit, DEA invoked the duty to "provide effective controls and procedures" under § 1301.71(a), together with § 1306.04(a)'s "corresponding responsibility." *Id.* at 5.[6]

---

[6] Federal courts concur. *See City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 669-70 (N.D. Cal. 2020) (Section 1301.71(a)

Appellants' interpretation undermines the CSA's purpose. "Congress was particularly concerned with the diversion of drugs" and "was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic." *United States v. Moore*, 423 U.S. 122, 135 (1975); *see also* 21 U.S.C. § 801(2) (recognizing that the "improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people"); *see also* R.4132 (Tr.) at 553154 (Ashley) (the purpose of the CSA was "to minimize the risk of misuse and diversion of drugs"); R.4017 (Tr.) at 542466 (Rannazzisi). Pharmacies are "the last line of defense" in preventing diversion. *See supra* Statement Part I.C; R.4000 (Tr.) at 541004-541007 (Lembke) (pharmacies hold a "unique and pivotal position in the opioid supply chain").

Appellants' interpretation is further belied by evidence that they long understood their obligations under the CSA to prevent diversion. *See*, *e.g.*, R.4036-9 (Ex.) at 545035 ("Walgreens agreed . . . to maintain a compliance program to detect and prevent diversion of controlled substances as required under the [CSA] and applicable DEA regulations."); R.4029-19 (Ex.) at 544439 (Walmart agreeing to same); R.4128-55 (Ex.) at 553506 (2010 CVS policy

---

imposes a "dut[y] on [a pharmacy] in its capacity as a dispenser to implement systems designed to prevent diversion," including "*all* efforts to divert controlled substances," not just theft.) (emphasis added).

recognizing the "regulatory imperative to prevent drug diversion"); R.4128-18 (Ex.) at 552513 (2013 Walmart "Considerations for Dispensing Controlled Substance Prescriptions" stating that "diversion refers not only to outright theft and forged or fraudulent prescriptions, but also to prescriptions that are not written for a legitimate medical purpose").

This Court should reject Appellants' invitation to overrule DEA's long-standing interpretation of the CSA and its regulation of dispensers. No court has done so.

> **2.    Appellants cannot avoid their corresponding responsibility by importing the standard for civil or criminal penalties**

Section 1306.04(a)'s text does not specify a state of mind to prove a violation of the corresponding responsibility. "Settled [DEA] precedent has interpreted this corresponding responsibility as prohibiting the filling of a prescription where the pharmacist or pharmacy 'knows or has reason to know' that the prescription is invalid." *Holiday CVS*, 77 Fed. Reg. at 62,341 (quoting *Bob's Pharmacy & Diabetic Supplies*, 74 Fed. Reg. 19,599, 19,601 (DEA Apr. 29, 2009)); *see also id.* (corresponding responsibility prohibits pharmacies from dispensing suspicious prescriptions if "a red flag was *or should have been* recognized," and "the question created by the red flag was not resolved conclusively") (emphasis added); *Medic-Aid Pharmacy*, 55 Fed. Reg. 30,043, 30,044 (DEA July 24, 1990).

The district court's instruction is consistent with DEA's established interpretation.  The court instructed:  "A violation of the corresponding responsibility occurs when a person knowingly fills or allows to be filled an illegitimate prescription.  In this context, knowingly includes when a person acts with deliberate ignorance or willful blindness to information in their possession."  R.4153 (Tr.) at 554648-554649 (jury instruction).

The district court's instruction likewise accords with the position taken by the U.S. Department of Justice in its ongoing lawsuit against Walmart for "exacerbat[ing] the opioid epidemic by systematically violating the" CSA.  In that action, DOJ reiterated that the CSA and regulations require pharmacies to act "in the course of professional practice" and "follow professional standards" when dispensing controlled substances.  Resp. in Opp. to Partial Mot. To Dismiss at 1, 21-24, *United States v. Walmart Inc.*, No. 20-cv-01744, ECF No. 93 (D. Del. Jan. 17, 2023) (discussing obligations imposed by 21 C.F.R. § 1306.06).  These standards "require three fundamental steps when presented with controlled-substance prescriptions—identifying red flags, resolving those red flags, and documenting their resolution." *Id.* at 21.  Pharmacists violate their legal obligations anytime they "fail[] to take those basic steps." *Id.*

The district court's approach further accords with this Court's holding that pharmacists must "at least verify" a prescription's "propriety" when a pharmacist's

55

"suspicions are aroused as reasonable professionals." *Medicine Shoppe*, 300

F. App'x at 412 (quoting *Ralph J. Bertolino*, 55 Fed. Reg. at 4730). "[I]f not

satisfied by the answer they must 'refuse to dispense.'" *Id.*; *see also Cherokee*

*Nation*, 2021 WL 1200093, at *6 ("*[P]harmacies*, not merely pharmacists, have

obligations to 'resolve red flags' before dispensing controlled substances

concerning suspicious prescriptions."); *Heartland Pharmacy*, 2021 WL 650350, at

*4 (pharmacists must "identify and resolve suspicions that a prescription is

illegitimate"). That obligation prevents pharmacies from filling a prescription that

a pharmacist suspects may be invalid if the pharmacist cannot conclusively dispel

the suspicion.

Appellants' proposed standard conflicts with these requirements. They

contend (at 52) that pharmacists may fill any prescription "unless they *know* the

[prescribing] doctor was acting outside his professional role." This standard would

render the corresponding responsibility meaningless, except on the rare occasion

that a pharmacist already has actual knowledge of a prescription's illegitimacy.

Appellants' interpretation gives pharmacies permission to ignore even

obvious and egregious red flags, gutting decades of DEA guidance. It contradicts

this Court's statement that the corresponding responsibility requires "pharmacists

[to] use common sense and professional judgment" to detect possible diversion.

*Medicine Shoppe*, 300 F. App'x at 412. Appellants' interpretation also contradicts

their own previously understood responsibilities as set out in their internal guidance and policies.[7]

Moreover, Appellants' position is inconsistent with the regulation's text and structure. They argue incorrectly that the third sentence of § 1306.04(a) limits their "corresponding responsibility" when it provides that "the person knowingly filling" an illegitimate prescription "shall be subject to the penalties" under the CSA. Appellants misread the regulation. The quoted sentence requires "knowing[]" dispensation of an illegitimate prescription for imposition of civil and criminal penalties provided for under the CSA, such as fines and imprisonment. It does not define the regulatory duty of "corresponding responsibility." A pharmacist may violate that duty by filling suspicious prescriptions without proper

---

[7] *See, e.g.*, R.4128-10 (Ex.) at 552479 (2017 Walmart "Practice Compliance [on] Corresponding Responsibility" stating that "[t]he pharmacist must use professional judgment to resolve all red flags prior to dispensing a controlled substance prescription. . . . If the pharmacist cannot resolve every red flag, then the pharmacist should refuse to fill the prescription and document the refusal[.]"); R.4036-8 (Ex.) at 545016-545020 (2018 Walgreens controlled-substance dispensing policy, describing corresponding responsibility and requiring all pharmacists to evaluate elements "that should alert a pharmacist to questionable circumstances," such as unusual dosages, follow up for additional information, and use "professional judgment" prior to dispensing); R.4128-46 (Ex.) at 552875 (2015 CVS presentation titled "Corresponding Responsibility" stating that a pharmacist's "role" is to "[e]valuate each prescription individually and identify Red Flags" and "[r]efuse prescriptions the pharmacist is not comfortable filling or cannot resolve outstanding red flags").

inquiry, even if the pharmacist lacked the actual knowledge of invalidity required for the imposition of a civil or criminal penalty.

For the same reasons, Appellants' invocation of *Ruan v. United States*, 142 S. Ct. 2370, 2379 (2022), is misguided. They assert (at 52-53) that pharmacists may rely on prescriptions unless they have actual knowledge the doctor was acting outside her professional role. But *Ruan* merely clarified the requisite *mens rea* for a criminal conviction of a doctor under the CSA, which does not apply in a civil public-nuisance context of a pharmacy's duties. *Ruan* held that a criminal conviction under the CSA requires proof that a defendant "knowingly or intentionally"—the most stringent *mens rea* requirements in criminal law—acted in an unauthorized manner. 142 S. Ct. at 2379. This *mens rea* provision applies only to the imposition of civil or criminal penalties and does not define the "corresponding responsibility." *See supra* Statement Part I.C.

*Ruan*'s holding does nothing to undermine civil liability for public nuisance, which does not require criminal intent. *See supra* Part I.A. Under Ohio law, Appellants can be held to account for creating a nuisance if their conduct was simply unlawful. *See Kramer*, 882 N.E.2d at 52-53.

### 3. The corresponding responsibility falls on pharmacies

Appellants argue (at 51) that § 1306.04(a) places the corresponding responsibility on individual pharmacists, not pharmacies. They offer no support

for their contention below that § 1306.04(a) imposes no pharmacy- or corporate-level duty, *see*, *e.g.*, R.4295 (Rule 50(b) Order) at 572114. The CSA regulates the conduct of pharmacist employees through the pharmacy registrants. *See* 21 U.S.C. § 822(c)(1) (exempting "[a]n agent or employee" of a registered dispenser from the DEA registration requirement); *see also Top RX Pharmacy*, 78 Fed. Reg. at 26,082 (summarizing agency rulings that the "corresponding responsibility to ensure the dispensing of valid prescriptions extends to the pharmacy itself") (footnote omitted); R.4005 (Tr.) at 541399-541402, 541433-541449, 541454, 541518-541522 (Catizone); R.4017 (Tr.) at 542479-542481 (Rannazzisi); R.4132 (Tr.) at 553156, 553159 (Ashley).

Appellants maintain the DEA registrations of their pharmacies. They owe a duty to ensure their respective agents and employees comply with the corresponding responsibility under § 1306.04(a), as they acknowledged in their settlement agreements. *See*, *e.g.*, R.3999-7 (Ex.) at 540870 ("CVS acknowledges that it has a corresponding responsibility to dispense only those prescriptions that have been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice . . . ."); R.4094-11 (Ex.) at 548288 ("Walgreens shall not knowingly fill an invalid prescription or a prescription that it reasonably believes was issued for other than a legitimate medical purpose[.]").

#### 4. The CSA does not preempt state nuisance law

Confronted with overwhelming evidence that their culpable intentional conduct caused the opioid epidemic in the Counties, *see supra* Part I.A.2, Appellants argue (at 63-69) that the CSA preempts nuisance liability predicated on such conduct. Every court to consider similar preemption arguments based on the CSA has rejected them in the context of governmental opioid claims. The CSA expressly preserves state law:

> No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

21 U.S.C. § 903.

"No such conflict exists" here. *San Francisco*, 491 F. Supp. 3d at 662. State-law nuisance claims reinforce, and do not conflict with, the CSA's objective of safe dispensing of controlled substances and preventing their "improper use." 21 U.S.C. § 801(2); *see San Francisco*, 491 F. Supp. 3d at 662 (rejecting CSA preemption argument in opioids case against pharmacies); *City of Chicago v. Purdue Pharma L.P.*, 2021 WL 1208971, at *11 (N.D. Ill. Mar 31, 2021) (rejecting CSA preemption arguments in opioids case and holding that, "[w]hile the duties imposed under the CSA may overlap with certain state-law duties underlying"

state-law claims, "the latter are independent of the former"); *Cherokee Nation*, 2021 WL 1200093, at *7 (rejecting "obstacle preemption" argument based on CSA in opioid case). "[T]he state law claims are entirely consistent with the CSA's goals of 'foster[ing] the beneficial use of those medications,' and ensuring 'no interference with the dispensing' of lawfully prescribed opioids." *San Francisco*, 491 F. Supp. 3d at 663 (quoting *Gonzalez v. Raich*, 545 U.S. 1, 4 (2005) (characterizing goals of the CSA)). Appellants cite no authority holding that the CSA preempts state nuisance actions for opioid dispensing or distributing.

Appellants' contrary argument mischaracterizes Appellees' claims as seeking "the fewer opioids dispensed, the better." Br. 67-68 (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000)). Rather, the Counties proved that Appellants engaged in culpable intentional conduct by dispensing excessive volumes of opioids without adequate policies and systems to prevent diversion and by discouraging pharmacists from taking the time to resolve red flags before dispensing suspicious prescriptions, despite knowing that doing so would lead to more diversion. *See supra* Part I.A.2. Imposing liability based on such conduct does not conflict with anything in the CSA.

Appellants' reliance on *Geier* is misplaced. There, the federal agency expressly permitted a range of safety restraints, and the Court held that, in those circumstances, state law could not establish a different standard requiring airbags.

529 U.S. at 875, 881.  Appellants point to no analogous DEA statement giving pharmacies free rein to engage in the conduct at issue here, nor could they.  They cite 21 U.S.C. § 801(1), which recognizes that many regulated drugs have "a useful and legitimate medical purpose and are necessary to maintain the health and general welfare."  Nothing about Appellees' claims conflicts with that provision; by definition, Schedule II drugs have a legitimate medical purpose, but those who dispense these drugs are required to guard against their diversion.  *See supra* Statement Part I.B.

Governmental state-law opioids claims primarily "seek to hold Defendants accountable for allegedly breaching their duties to maintain effective controls." *San Francisco*, 491 F. Supp. 3d at 663.  In this case, the Counties sought liability for Appellants' conduct in intentionally oversupplying opioids and instituting procedures that inhibited their pharmacists from complying with their CSA duties, in addition to violating the CSA's express requirements.  *See supra* Part I.A.  Such liability does not conflict with the CSA.

Lacking any case on point supporting their position, Appellants cite two other Supreme Court preemption decisions (at 64, 69), but neither applies.  *Arizona v. United States*, 567 U.S. 387 (2012), is a field-preemption case.  There, "the Supreme Court held that *any* attempt to regulate in the area of alien registration was preempted." *Cherokee Nation*, 2021 WL 1200093, at *7.  No court has held

that the CSA preempts the entire field of drug dispensing, and the pharmacies do not argue that field preemption applies. Such an argument would fly in the face of § 903's statement that the CSA does not "occupy the field in which" state law "operates," and that the CSA will not preempt state law absent "a positive conflict between" a provision of the CSA and state law. Appellants cite no CSA provision conflicting with Ohio's prohibition on intentionally engaging in nuisance-creating conduct.

Finally, Appellants unpersuasively invoke (at 69) *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), to assert that allowing tort liability would "destroy[] the efficiency of Congress's comprehensive federal regime." In that case, the Supreme Court held that a "fraud-on-the-FDA" state-law claim was preempted because that claim existed "solely by virtue of" federal law requiring certain disclosures to the FDA. *Id*. at 347-48, 352-53. The state-law claims did not "rely[] on traditional state tort law" but rather the federal-disclosure requirements as "a critical element." *Id*. at 353. Accordingly, the state-law claim "inevitably conflict[ed] with the FDA's responsibility to police fraud." *Id.* at 350.

The opposite is true here: Appellees bring a traditional state-law public-nuisance claim that exists independent of the CSA's requirements. *See City of Chicago*, 2021 WL 1208971, at *10 (explaining that "the CSA and its implementing regulations are not critical elements of state-law claims of public

nuisance' . . . because they are not 'essential to [their] existence'") (quoting and

discussing *San Francisco*, 491 F. Supp. 3d at 664).  In addition to imposing

nuisance liability for unlawful conduct, Ohio law imposes a duty not to engage in

culpable intentional conduct that unreasonably interferes with public health and

safety.  "Because the state-law claims were premised on independent duties that

[merely] overlap with duties imposed by the CSA and its implementing

regulations, they were not preempted under *Buckman*."  *Id.* (citation omitted).

### 5.    Ohio law does not preclude nuisance liability for culpable intentional conduct

Appellants argue they cannot be held liable under Ohio law for culpable

intentional conduct.  Br. 60-63.  Even accepting that certain of Appellants'

practices—such as offering bonuses based on dispensing volume and failing to tell

pharmacists to check the PDMP—were not expressly prohibited by the CSA and

its regulations, Appellants are liable to the extent they did these acts intentionally,

knowing that the policies and incentives they promulgated were substantially

certain to produce diversion.  *See supra* Part I.A.

Appellants unpersuasively seek to carve out an exception for entities

regulated under the CSA.  Br. 61-63.  Appellants' conduct is not, as they claim (at

62), "fully authorized by a statute."  No statute or regulation authorizes pharmacies

to establish performance metrics, compensation policies, or other dispensing

policies that interfere with their employees' ability to comply with their corresponding responsibility under the CSA. *See* 21 C.F.R. § 1306.04(a).

The Ohio Supreme Court rejected Appellants' argument in *Beretta*. There, a city brought suit against gun manufacturers for "creat[ing] a nuisance through their ongoing conduct of marketing, distributing, and selling firearms in a manner that facilitated their flow into the illegal market." 768 N.E.2d at 1143. The Ohio Supreme Court allowed the claims to proceed and rejected the defendants' argument that the "nuisance claim [could not] go forward because the distribution of firearms is highly regulated and covers 'legislatively authorized conduct.'" *Id.* The defendants argued, as Appellants do here, that "[w]hat the law sanctions cannot be held to be a public nuisance." *Id.* (quoting *City of Mingo Junction v. Sheline*, 196 N.E. 897, 897 (Ohio 1935)). The court held that, "[e]ven though there exists a comprehensive regulatory scheme involving the manufacturing, sales, and distribution of firearms, the law does not regulate the distribution practices alleged in the complaint." *Id.* (citing 18 U.S.C. § 922; 27 C.F.R. pt. 178).

*Beretta*'s holding controls here. While "there exists a comprehensive regulatory scheme involving the manufacturing, sales, and distribution of" controlled substances, the CSA does not sanction "the [dispensing] practices" proven at trial, such as policies that made it impossible for pharmacists to discharge their duty to dispel suspicions before dispensing opioids. *Id.* As in

65

*Beretta*, public-nuisance law reaches such activity when it is intentional and unreasonably interferes with a public right.

Ignoring *Beretta*, Appellants rely (at 63) on two lower-court opinions that predate *Beretta* to support their argument that regulated entities cannot be held liable for intentional, nuisance-creating conduct. These cases do not support that argument or overcome the later Ohio Supreme Court ruling. In *Brown v. Scioto County Commissioners*, 622 N.E.2d 1153 (Ohio Ct. App. 1993), the court found a genuine issue of fact on whether operating a licensed plant was, itself, a public nuisance. By contrast, Appellees do not claim that Appellants' pharmacy operation is a nuisance on its own, but that their intentional conduct in dispensing opioids without effective controls to prevent diversion and in interfering with their pharmacists' ability to discharge their corresponding responsibility created a public nuisance. Appellants' other lower-court opinion is inapt for the same reason. *See State ex rel. Schoener v. Hamilton Cnty. Bd. of Comm'rs*, 619 N.E.2d 2 (Ohio Ct. App. 1992).

The Ohio Supreme Court clarified this line of cases in *Beretta*. In *Brown*, the court of appeals cited *Mingo* to support the proposition that "conduct which is fully authorized by statute or administrative regulation is not an actionable tort." 622 N.E.2d at 1159. Addressing *Mingo*, the *Beretta* court clarified that the existence of "a comprehensive regulatory scheme" governing an industry does not

preclude a public-nuisance claim involving conduct not regulated by that scheme. 768 N.E.2d at 1143-45.

Appellants also cite (at 63) Restatement (Second) § 821B cmt. f's statement that "'conduct that is fully authorized by statute, ordinance or administrative regulation' cannot support nuisance liability." But the Restatement cautions that "[l]egislation prohibiting some conduct but not other conduct is not ordinarily construed as authorizing the latter." Restatement (Second) § 821B cmt. f. That is the situation here. The CSA's requirements (*e.g.*, the requirement to maintain effective controls against diversion and the prohibition against dispensing invalid prescriptions) do not "authorize" Appellants to institute policies, intentionally, that hinder those goals.

The pattern jury instruction Appellants cite is to the same effect. It states that "[a] defendant's activity pursuant to and in compliance with specific statutory authority or a regulatory scheme cannot constitute an absolute nuisance." 1 CV Ohio Jury Instructions 621.09 (2022). Appellants' position founders on the fact that their own conduct was *not* pursuant to and in compliance with specific statutory authority.

### 6. The jury verdict was correct and does not require reversal

The jury found Appellants "engaged in intentional and/or illegal conduct" that was a substantial factor in producing oversupply and diversion of prescription

opioids in the Counties. R.4176 (Verdict) at 556139-556140, 556143-556144.

Both intentional and illegal conduct are valid bases for nuisance liability, and

Appellees presented sufficient evidence to support liability under both

theories. *See supra* Part I.A.

Even if this Court concludes that one of the two theories was impermissible,

the verdict should stand. Under Ohio's "two-issue rule,"[8] the verdict "which is

supportable on one or more alternate grounds properly submitted to the jury is

invulnerable to attack." *McCarthy v. Kasperak*, 444 N.E.2d 472, 475 (Ohio Ct.

App. 1981) (citing *Sites v. Haverstick*, 23 Ohio St. 626 (1873)). This Court has

applied the two-issue rule to uphold jury verdicts on claims governed by Ohio law,

like the verdict in this case.[9]

---

[8] The rule provides that "error in the charge of the court dealing exclusively with one of two or more complete and independent issues required to be presented to a jury in a civil action will be disregarded, if the charge in respect to another independent issue which will support the verdict of the jury is free from prejudicial error." *Wagner v. Roche Labs.*, 709 N.E.2d 162, 165 (Ohio 1999).

[9] *See, e.g.*, *Rimer v. Rockwell Int'l Corp.*, 739 F.2d 1125, 1130 (6th Cir. 1984); *Keet v. Serv. Mach. Co.*, 472 F.2d 138, 140 (6th Cir. 1972); *cf. Martin v. Weaver*, 666 F.2d 1013, 1022 (6th Cir. 1981) (recognizing that the Ohio two-issue rule applies to state-law claims, citing *Keet*). Similarly, in *Cronin v. Washington National Insurance Co.*, 980 F.2d 663 (11th Cir. 1993), *cited in* Br. 71, the court *affirmed* a jury verdict because the jury could have found liability under a negligent-failure-to-warn theory despite concluding that it was the only one of plaintiff's theories of liability supported by the evidence. *Id.* at 669.

In their brief, Appellants erroneously rely (at 70-71) on federal-law cases, not applicable here. Where "state-created rights are sought to be enforced in the federal courts, this Court has consistently construed a general verdict as the forum state would construe it." *Keet*, 472 F.2d at 140. Appellants cite (at 70) *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6 (1970), a Maryland libel case, but no court has applied *Greenbelt* to require vacating a jury verdict outside the First Amendment context.

## II. THE OHIO PRODUCT LIABILITY ACT DOES NOT BAR APPELLEES' CLAIMS

Appellants' principal appellate argument is that Appellees' public-nuisance claims are abrogated by the Ohio Product Liability Act ("OPLA"). But OPLA does not cover Appellees' public-nuisance claims seeking equitable relief.

### A. OPLA Abrogates Product Liability Claims Seeking Damages

OPLA is "intended to abrogate all common law product liability claims or causes of action." Ohio Rev. Code Ann. § 2307.71(B). It defines a "product liability claim" as one for damages, *id.* § 2307.71(A)(13), and enumerates the types of damages whose recovery is subject to special proof requirements delineated in the statute, *id.* § 2307.72. Therefore, OPLA makes clear Appellees' public-nuisance claims seeking an equitable remedy of abatement neither fall within the definition of "product liability claim" nor seek the remedies OPLA governs.

Where, as here, "the meaning of a statute is unambiguous and definite, it must be applied as written." *Bevan & Assocs., LPA v. Yost*, 929 F.3d 366, 375 (6th Cir. 2019) (quoting *State ex rel. Prade v. Ninth Dist. Ct. of Appeals*, 87 N.E.3d 1239, 1242 (Ohio 2017) (per curiam)). The statute's text and structure, read in light of foundational canons of statutory construction, support this conclusion.

### 1. OPLA's definition of "product liability claim" requires a claim for compensatory damages

OPLA defines a product liability claim as follows:

"Product liability claim" *means* a claim or cause of action that is asserted in a civil action pursuant to sections 2307.71 to 2307.80 of the Revised Code and that *seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property* other than the product in question, that allegedly arose from any of the following:

  (a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

  (b) Any warning or instruction, or lack of warning or instruction, associated with that product;

  (c) Any failure of that product to conform to any relevant representation or warranty.

"Product liability claim" *also includes* any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public.

Ohio Rev. Code Ann. § 2307.71(A)(13) (emphases added).

To fall within the "mean[ing]" of a "[p]roduct liability claim," a claim must "seek[] to recover compensatory damages from a manufacturer or supplier." *Id.*

Such compensatory damages must be for one of the enumerated harms caused by such manufacturer or supplier: "death, physical injury to person, emotional distress, or physical damage to property" from the allegedly defective product. *Id.* The provision's second sentence clarifies that a public-nuisance claim qualifies as a "product liability claim" under OPLA, whether brought pursuant to OPLA or at common law, as long as the claim is for "compensatory damages from a manufacturer or supplier," as set forth in the first sentence. *Id.*

Statutory interpretation must begin with "the specific statutory language as well as the language and design of the statute as a whole." *United States v. Henry*, 983 F.3d 214, 218 (6th Cir. 2020) (citation omitted). The language and design indicate that, to fall within the statutory "mean[ing]" of a "[p]roduct liability claim," any public-nuisance claim or cause of action described in the second sentence must "seek[] to recover compensatory damages." *See Helvering v. Morgan's, Inc.*, 293 U.S. 121, 125 n.1 (1934) ("[W]here 'means' is employed, the term and its definition are to be interchangeable equivalents[.]").

The second sentence, using the word "includes," offers public-nuisance claims as an example or subset of the claims included in the definition. "[T]he verb 'includes' imports a general class, some of whose particular instances are those specified in the definition." *Id.* The word "includes" is illustrative and

71

implies that what follows is "subsumed within the stated category." *In re Hartman*, 443 N.E.2d 516, 517 (Ohio 1983).

Case law confirms this reading. In *Diller v. Diller*, the Ohio Court of Appeals considered the use of "means" and "includes" in a statute and "presume[d] that the General Assembly made a considered and deliberate decision to preface some of the definitions in [the statute] with the word 'means' instead of the word 'includes,' and vice versa." 182 N.E.3d 370, 387 (Ohio Ct. App. 2021). "Means" (the word used in the definitional sentence) and "includes" (the word used in the sentence about public-nuisance claims) have distinct statutory functions. *See Am. Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933) (where a statute varyingly used the words "include" and "mean," it was "evident that these verbs [were] not used synonymously or loosely, but with discrimination and a purpose to give to each a meaning not attributable to the other"). The differing significance of the words "means" and "includes" confirms that the statute offers public-nuisance claims in the second sentence of the definition to illustrate a subset of product liability claims. *See id.*; *NACCO Indus., Inc. v. Tracy*, 681 N.E.2d 900, 902 (Ohio 1997) (the state legislature is "generally presumed to act intentionally and purposely when it includes particular language in one section of a statute but omits it in another").

Appellees sought equitable abatement, not compensatory damages for death, physical injury to person, emotional distress, or physical damage to property. *See* R.3327 (Am. Compl.) at 495357 (¶ 655); *infra* Part IV.D.2. Therefore, Appellees' claims are not "product liability claims" abrogated by OPLA.

## 2. OPLA governs only damages recovery

The plain text of OPLA's operative provisions also makes clear that the statute does not apply to claims for equitable relief. Separate from the statute's definition of a "product liability claim," OPLA's proof provisions govern only recovery of damages, which Appellants do not seek. They state:

> (A) Any recovery of *compensatory damages* based on a product liability claim is subject to sections 2307.71 to 2307.79 of the Revised Code.

> (B) Any recovery of *punitive or exemplary damages* in connection with a product liability claim is subject to sections 2307.71 to 2307.80 of the Revised Code.

Ohio Rev. Code Ann. § 2307.72(A)-(B) (emphases added). These provisions subject product liability claimants to the burden of proof specified in the referenced sections of OPLA, for "any recovery" of three categories of damages. By their terms, they do not cover claims for equitable relief. No provision of OPLA sets forth a required showing to obtain equitable relief or otherwise bars a claim for equitable relief.

"An accepted tenet of statutory interpretation is that a legislature would have included a provision in a law had it intended to do so." *Police & Firemen's Disability & Pension Fund v. City of Akron*, 778 N.E.2d 68, 75 (Ohio Ct. App. 2002) (quoting *City of N. Olmsted v. Police & Firemen's Disability & Pension Fund Bd. of Trs.*, 483 N.E.2d 162, 165 (Ohio Ct. App. 1984)).  If the legislature had intended OPLA to establish a required showing for, or to bar, claims for equitable relief, the legislature would have included such a provision.  Its failure to do so is presumptively intentional.  In its savings clause exempting environmental pollution claims, OPLA refers to equitable remedies such as abatement and injunction, along with "compensatory damages or punitive or exemplary damages."  Ohio Rev. Code Ann. § 2307.72(D).  The Ohio legislature chose not to abrogate claims for equitable relief.

Courts so hold.  In *LaPuma v. Collinwood Concrete*, a plaintiff sued a driveway supplier for negligent installation, seeking replacement costs.  The Ohio Supreme Court held that, "although a cause of action may concern a product, it is not a product liability claim within [OPLA's] purview" because it did not seek "compensatory damages . . . for death, physical injury to person, emotional distress, or physical damage to property."  661 N.E.2d 714, 716 (Ohio 1996); *see also Hardwick v. 3M Co.*, 2019 WL 4757134, at *12-13 (S.D. Ohio Sept. 30, 2019) (holding OPLA did not apply to claim seeking only equitable relief (medical

monitoring and a scientific study) against equipment manufacturer for using toxic chemicals). Therefore, OPLA's operative provisions do not govern claims for equitable relief.

### 3. Legislative history confirms that OPLA does not govern claims for equitable relief

When enacted in 1988, OPLA did not apply to all common-law claims seeking compensatory damages from a manufacturer or supplier—such as common-law negligence claims. *See Carrel v. Allied Prods. Corp.*, 677 N.E.2d 795, 798 (Ohio 1997) (holding that "a common-law cause of action, negligent design, survives the enactment of" OPLA). In 2005, the legislature amended the statute, modifying the required proof for certain claims and noting that the statute, as amended, is "intended to abrogate all common law product liability claims or causes of action." Ohio Rev. Code Ann. § 2307.71(B). The legislature "declare[d] its intent" to "supersede the holding of [*Carrel*]. . . and to abrogate all common law product liability causes of action." 2004 Ohio Laws File 144 (S.B. 80) (Am. Sub. S.B. 80), § 3(D).

In 2007, the legislature further amended OPLA to add the second sentence in § 2307.71(A)(13) referring to public-nuisance claims after the definition of a "product liability claim" under OPLA. The amending legislation made clear that this addition was "not intended to be substantive" and was intended only to clarify the statute. 2006 Ohio Laws File 198 (Am. Sub. S.B. 117), § 3. The added text

thus merely clarified that a public-nuisance theory does not take a claim otherwise meeting the statutory definition of a "product liability claim" outside OPLA.

The 2005 and 2007 amendments did not expand OPLA's scope beyond claims seeking compensatory, punitive, or exemplary damages. Legislatures are "presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change"—such as the Ohio Supreme Court's 1996 ruling in *LaPuma* that OPLA did not apply to a claim not seeking compensatory damages. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)).

Therefore, in amending OPLA in 2005 and 2007 "[i]n reaction to the court's decision in *Carrel*, the General Assembly amended the OPLA to make clear that it had intended for the Act to supersede common-law negligence claims" and "did not similarly amend the remedial portions of the Act to address directly the Court's decision in *LaPuma*." *Huffman v. Electrolux N. Am., Inc.*, 961 F. Supp. 2d 875, 879-80 (N.D. Ohio 2013). The legislature ratified *LaPuma*'s holding that OPLA does not abrogate claims seeking relief other than compensatory damages.

In *State ex rel. Dewine v. Purdue Pharma L.P.*, the state of Ohio's public-nuisance action against opioid companies, the Attorney General argued that OPLA did not abrogate the claim because it did not seek compensatory damages. 2018 WL 4080052, at *1 (Ohio Ct. Com. Pl. Aug. 22, 2018). The court agreed, holding

76

that "plaintiff's common law nuisance claim . . . [was] not abrogated under the OPLA" because "'product liability claim' is statutorily defined as a claim seeking 'compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress or physical damage to property' . . . [and] it does not appear that the plaintiff is seeking these types of damages." *See id.* at \*4.

## B. Appellants Incorrectly Read OPLA To Abrogate Claims For Equitable Abatement

Appellants advance an unsupported reading of "product liability claims" to argue (at 35) that OPLA abrogated claims to abate public nuisances related to products. They argue (at 37) that the phrase "also includes" in the sentence about public-nuisance claims presents a separate, second category of abrogated claims, rather than setting forth a subset of the product liability claims defined in the first sentence of Ohio Rev. Code Ann. § 2307.71(A)(13).

Appellants' interpretation is contrary to cases interpreting a substantively identical phrase—"and includes." In *In re Z.N.*, the Ohio Court of Appeals interpreted a criminal statute defining economic loss using the word "means" as well as the phrase "and includes":

> "Economic loss" *means* any economic detriment suffered by a victim of a delinquent act . . . as a direct and proximate result of the delinquent act . . . *and includes* any loss of income due to lost time at work . . . .

29 N.E.3d 1016, 1019 (Ohio Ct. App. 2015) (emphases added; cleaned up). The court found that "an economic loss is principally defined" by the first clause before the phrase "and includes." *Id.* at 1020. Therefore, determining whether a loss is an economic loss "turns on" whether it satisfied the principal definition in the first clause. *Id.*; *see also State v. Carroll*, 2015 WL 5782286, at *3 (Ohio Ct. App. Oct. 2, 2015) (interpreting similar definition and finding that whether a loss meets the statutory definition "is dependent on" whether it satisfies the "principal[]" part of the definition before the phrase "also includes"). Applying that principle, whether a claim qualifies as a "product liability claim" turns on whether the claim satisfies the definition in the first sentence of § 2307.71(A)(13), which requires that the claim seek compensatory damages from a manufacturer or supplier.

Appellants cite *Mount Lemmon Fire District v. Guido* (at 37-39), but that case is inapposite because it interpreted the phrase "also means" to introduce a new category to a statutory definition. 139 S. Ct. 22, 25 (2018). "The terms 'means' and 'includes' are not necessarily synonymous." *Helvering*, 293 U.S. at 125 n.1; *see also supra* Part II.A.1. *Mount Lemmon* supports Appellees' reading, because the Ohio legislature's use of "also includes," as opposed to "means" (or "also means") shows that the legislature did not intend the second sentence of § 2307.71(A)(13) as an alternate definition of a product liability claim, independent of the first sentence.

Appellants argue (at 42) that Ohio Rev. Code Ann. § 2307.72(D), which states that OPLA does not affect laws relating to liability and relief for contamination or pollution of the environment, precludes equitable relief for other public-nuisance claims. This section clarifies that the statute does not affect environmental claims; it does not reference or address other claims seeking equitable remedies. Likewise, a separate statutory cause of action for public nuisance relating to the sale of controlled substances, *id.* § 4729.35, does not preclude common-law public-nuisance claims concerning controlled substances. A statute is not presumed to displace common-law claims "unless the language employed by it clearly imports such intention." *State ex rel. Morris v. Sullivan*, 90 N.E. 146, 149-50 (Ohio 1909). Section 4729.35 contains no such language.

## C.   Appellants Misread OPLA's Legislative History

Appellants ignore relevant legislative history in arguing (at 46) that the 2007 amendment abrogated all product-based public-nuisance claims, including those for equitable relief. If Appellants were correct, the 2007 amendment would foreclose equitable relief for product-based public-nuisance claims—a substantial change in law and departure from decades of Ohio jurisprudence allowing for equitable relief in public-nuisance cases. *See*, *e.g.*, *Mettling v. White*, 1927 WL 3124 (Ohio Ct. App. Oct. 31, 1927). This result would be at odds with the legislature's express intent that the amendment *not* be substantive. *See* 2006 Ohio

Laws File 198 (Am. Sub. S.B. 117), § 3.  And contrary to Appellants' suggestion (at 47), "[i]t has long been held that the purpose of an amendment" may be to "merely clarify" the law rather than to make a substantive change.  *State ex rel. Bunch v. Indus. Comm'n of Ohio*, 406 N.E.2d 815, 818 (Ohio 1980).

Appellants incorrectly assert (at 41) that the 2007 amendment foreclosed equitable relief to bring Ohio in line with other states and the Restatement (Third) of Torts, which do not recognize product-liability-based public-nuisance claims. But "the Restatement (Third) of Torts is not a reflection of Ohio law."  *Qiusha Ma v. Bon Appétit Mgmt. Co.*, 785 F. App'x 293, 296 (6th Cir. 2019); *see also Martin v. Lambert*, 8 N.E.3d 1024, 1035 n.2 (Ohio Ct. App. 2014) (stating that Ohio "has not adopted any of [the Restatement (Third)] provisions" and "continues to apply the Restatement (Second) of Torts").  Unlike in the outlier cases cited by Appellants (at 45), Ohio follows the Restatement (Second)'s definition recognizing public-nuisance cases involving the sale of products.  *See Beretta*, 768 N.E.2d at 1142.[10]

---

[10] In any case, the Restatement (Third)'s comment that "most courts" have rejected public-nuisance claims based on product sales, Br. 41 (quoting Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (2020) ("Restatement (Third)"), is inaccurate with respect to opioids:  "most courts" to consider the issue have allowed those public-nuisance claims to proceed.  *See Alabama v. Purdue Pharma L.P.*, No. 03-CV-2019-901174.00, slip op. 11-12 (Ala. Cir. Ct. Nov. 13, 2019) (Add.1-25); *Alaska v. McKesson Corp.*, No. 3AN-18-10023CI, slip op. 4-7 (Alaska Super. Ct. Aug. 28, 2019) (Add.26-41); *City of Surprise v. Allergan PLC*, Nos. CV2019-003439 et al., slip op. 34-36 (Ariz. Super.

Moreover, the cited section of the Restatement (Third) addresses public-

nuisance claims by *private parties* and acknowledges that the definition of

---

Ct. Oct. 28, 2020) (Add.42-89); *Arkansas v. Purdue Pharma L.P.*, 2019 WL
1590064, at *3-4 (Ark. Cir. Ct. Apr. 5, 2019); *City & Cnty. of San Francisco v.
Purdue Pharma L.P.*, 2022 WL 3224463, at *50 (N.D. Cal. Aug. 10, 2022);
*Florida v. Purdue Pharma L.P.*, No. 2018-CA-001438, slip op. 3 (Fla. Cir. Ct.
Mar. 30, 2022) (Add.91-95) (denying summary judgment on nuisance); *In re Nat'l
Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 773-75 (N.D. Ohio 2020) (Florida
law); *Kentucky ex. rel. Beshear v. Walgreens Boots All., Inc.*, No. 18-CI-00846,
slip op. 2-4 (Ky. Cir. Ct. July 18, 2019) (Add.96-114); *City of Boston v. Purdue
Pharma L.P.*, 2020 WL 416406, at *8 (Mass. Super. Ct. Jan. 3, 2020); *Michigan
ex. rel. Nessel v. Cardinal Health, Inc.*, No. 19-016896-NZ, slip op. 2 (Mich. Cir.
Ct. Mar. 24, 2021) (Add.115-117), *rev'g on recons.* (Mich. Cir. Ct. Nov. 17,
2020); *Minnesota v. Purdue Pharma L.P.*, 2019 WL 11729023, at *4 (Minn. Dist.
Ct. Jan. 4, 2019); *Mississippi v. Cardinal Health, Inc.*, No. 25CIl:18-cv-00692, slip
op. 2-3 (Miss. Cir. Ct. Apr. 5, 2021) (Add.118-124); *Missouri ex rel. Schmitt v.
Purdue Pharma L.P.*, No. 1722-CC10626, slip op. 6-8 (Mo. Cir. Ct. Apr. 6, 2020)
(Add.125-141); *Nevada v. McKesson Corp.*, No. A-19-796755-B, slip order (Nev.
Dist. Ct. Jan. 8, 2020) (Add.142-149); *New Hampshire v. Purdue Pharma Inc.*,
2018 WL 4566129, at *13 (N.H. Super. Ct. Sept. 18, 2018); *New Mexico ex rel.
Balderas v. Purdue Pharma L.P.*, 2022 WL 6822694, at *1-2 (N.M. Dist. Ct. June
15, 2022) (summary judgment); *In re Opioid Litig.*, 2018 WL 3115102, at *27-28
(N.Y. Sup. Ct. June 18, 2018); *Cnty. of Delaware v. Purdue Pharma L.P.*, No. CV-
2017-008095 (Pa. Ct. Com. Pl. Oct. 25, 2019, Dec. 4, 2019, and Mar. 13, 2020)
(Add.150-184); *Rhode Island v. Purdue Pharma L.P.*, 2019 WL 3991963, at *7-9
(R.I. Super. Ct. Aug. 16, 2019), *nuisance decision aff'd on summary judgment*,
2022 WL 577874 (R.I. Super. Ct. Feb. 18, 2022); *South Carolina ex rel. Wilson
v. Purdue Pharma L.P.*, No. 2017-CP-40-04872 (S.C. Ct. Com. Pl. Apr. 12, 2018)
(Add.185-187); *Tennessee ex rel. Slatery v. AmerisourceBergen Drug Corp.*, No.
1-345-19, slip op. 7-9 (Tenn. Cir. Ct. July 14, 2020) (Add.188-198); *In re Tex.
Opioid Litig. (Cnty. of Dallas)*, No. 2018-77098 (Tex. Dist. Ct. June 6, 2019)
(Add.199); *Vermont v. Cardinal Health, Inc.*, No. 279-3-19 Cncv, slip op. 5-10
(Vt. Super. Ct. May 12, 2020) (Add.200-215); *Washington v. Purdue Pharma L.P.*,
2018 WL 7892618, at *2 (Wash. Super. Ct. May 14, 2018).

nuisance for claims brought by "public officials" is "broader" than in "private suit[s]."  Restatement (Third) § 8; *see id.* § 8 cmt. a.

Appellants' reliance on *City of Toledo v. Sherwin-Williams Co.*, 2007 WL 4965044 (Ohio Ct. Com. Pl. Dec. 12, 2007), is misplaced.  That case dismissed a public-nuisance claim against lead paint manufacturers based on the argument that OPLA "intended to abrogate all common law product liability causes of action including public nuisance claims *based on allegedly defective products*."  *Id.* (emphasis added).  Appellees' claim rests on the pharmacies' sales practices, not a defect in the product.  And unlike Appellees, the plaintiff in *Sherwin-Williams* requested *damages*, bringing it squarely within OPLA's abrogation.

## III.  THE JURY FOUND PROXIMATE CAUSE UNDER THE CORRECT LEGAL STANDARD

The court instructed the jury that "[a] defendant's conduct proximately caused a public nuisance if the circumstances that constitute the nuisance are the natural and foreseeable result of that conduct."  R.4153 (Tr.) at 554649.  That instruction reflected Ohio's model jury instructions.  Appellants do not dispute that the opioid crisis in the Counties was the natural and foreseeable result of their conduct.  Instead, they unpersuasively argue that the district court erred in rejecting their proposed jury instruction, that the chain of causation is too remote, and that Appellees' claims are derivative of injured people in the Counties.

## A.    The District Court Properly Defined And Applied Proximate Cause

Ohio tortfeasors are liable for the consequences that are the natural and foreseeable result of their conduct.  *See Adams v. Young*, 4 N.E. 599, 604 (Ohio 1886) ("[A]n act . . . is the proximate cause of an injury [if it] . . . was the natural and probable consequence of the [act], and . . . it ought to have been foreseen in the light of the attending circumstances."); *Ross v. Nutt*, 203 N.E.2d 118, 120 (Ohio 1964) ("For an act to be the proximate cause of an injury, . . . it must appear that the injury complained of could have been foreseen or reasonably anticipated[.]"). Ohio's model jury instructions incorporate that definition.  *See* 1 CV Ohio Jury Instructions 405.01 (2022) ("'(Proximate) (Direct) cause' is an act or failure to act that in the natural and continuous sequence directly produced the [harm] and without which the [harm] would not have occurred.").

Overwhelming evidence supported the jury's finding that the opioid crisis in the Counties was a natural and foreseeable consequence of Appellants' conduct. Because Appellants neither maintained effective controls against diversion nor resolved red flags before filling prescriptions, Appellants dispensed millions of prescription opioids in the Counties that should not have been dispensed.  *See supra* Statement Part II.C.  Appellants' dispensing practices substantially harmed the Counties.  *See supra* Statement Part II.E.

Appellants not only *could* have foreseen this sequence of events, but they *did* so.  *See supra* Statement Part II.A.  DEA told Appellants that their conduct was causing, and would continue to lead to, oversupply and diversion.  *See supra* Statement Part II.B.2.  Appellants also allowed and encouraged their pharmacists in the Counties to dispense red-flagged opioid prescriptions written by known pill-mill doctors.  *See supra* Statement Part II.D.  Despite knowing their conduct was contributing to the opioid epidemic, Appellants continued to dispense opioids intentionally and unlawfully.

### B.    The District Court Correctly Rejected Appellants' Misleading Instruction

The court correctly rejected Appellants' proffered instruction that "[a] Defendant is not responsible for any injury to another if its conduct is a remote cause and not a proximate or direct cause."  R.4146-1 (Defs.' Proposed Jury Instructions) at 554090.  The instruction did not define "remote cause," R.3793 (Joint Submission re Jury Instructions) at 514643, an omission that rendered it legally improper.  And in any event, Ohio's test for remoteness *is* foreseeability.  The model instruction on which Appellants' proposed instruction is based[11] defines a "remote cause" as one where "the result could not have been reasonably foreseen or anticipated."  *See* 1 CV Ohio Jury Instructions 405.03 (2022) ("A person is not

---

[11] *See* R. 4146-1 (Defs.' Proposed Jury Instructions) at 554090 (citing 1 CV Ohio Jury Instructions 405.03 but omitting definition of "remote cause").

responsible for another's [harm] if his/her negligence is a remote (cause) (condition) (factor) and not a (proximate) (direct) cause. . . . A (cause) (condition) (factor) is remote *when the result could not have been reasonably foreseen or anticipated as being the likely cause of any (injury) (death) (damages).*") (emphasis added).

Appellants' omission of that definition in their proposed instruction rendered it erroneous. "Remote cause" is just another phrase for lack of foreseeability, so the court did not err or abuse its discretion in rejecting Appellants' proposal. *See Williams v. Eau Claire Pub. Schs.*, 397 F.3d 441, 445 (6th Cir. 2005) (holding that the district court did not abuse its discretion by refusing to give plaintiff's "proposed instructions [that] are an incomplete and therefore incorrect statement of the law").

### C.    Liability Was Not Too Remote

Liability here rested on the direct connection between Appellants' conduct and the harm it caused. *Beretta* controls the analysis. The *Beretta* court held on the pleadings that Cincinnati's theory of causation—that (1) the way in which defendants marketed, distributed, and sold firearms (2) "facilitated their flow into the illegal market," (3) which created a public nuisance—was not "too remote for recovery." 768 N.E.2d at 1147-49. Considering the factors discussed in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), the Ohio Supreme

Court held that a causal chain containing multiple steps was "not so remote or indirect as to preclude recovery . . . as a matter of law."  768 N.E.2d at 1148-49.

Causation in this case is nearly identical:  (1) the way in which Appellants dispensed opioid prescriptions (2) caused oversupply and diversion, (3) which unreasonably interfered with public health and safety (the epidemic of opioid use disorder and its manifestations).

### 1.    Appellants' attempts to distinguish *Beretta* fail

Appellants attempt (at 76) to add another link to the causal chain, mischaracterizing the harm as the costs the Counties incurred as a result of Appellants' conduct (*e.g.*, first responders, medical services, law enforcement). Those costs were *evidence* of the harmful condition created by Appellants' conduct—the opioid epidemic.  The jury was entitled to infer from that evidence that Appellants' conduct unreasonably interfered with public health and safety.

*Beretta* forecloses Appellants' effort to impose a more demanding causation standard:  the Ohio Supreme Court concluded that a causal chain connecting handgun manufacturers' conduct to various gun-violence-related costs was *not* too remote.  768 N.E.2d at 1149.  Appellees here seek prospective abatement, not compensatory damages for past harms.  The causal chain therefore is shorter here than the legally sufficient chain the court upheld as "not too remote" in *Beretta*.

Appellants' attempts to overcome *Beretta* are unpersuasive. Their leading case—*City of Cleveland v. Ameriquest Mortgage Securities, Inc.*—involved far more attenuated causal connections. 615 F.3d 496 (6th Cir. 2010). Cleveland alleged that "(1) Wall Street made cash available to subprime lenders, which (2) used the funds to make subprime loans to consumers, then (3) sold the related mortgages back to the same cadre of Wall Street, which (4) packaged them and sold the income they generated to investors in the form of mortgage-backed securities, and (5) used the proceeds to repeat the process." *Id.* at 499. Cleveland further alleged that those actions caused the (6) "financial crisis"; (7) which "led to thousands of foreclosed homes in neighborhoods throughout Cleveland that became 'eyesores, fire hazards, and easy prey for looters and drug dealers in search of a place to conduct their business' "; (8) which "create[d] tangible costs for the city." *Id.*

That chain of causation extended many more links than here, and, critically, the defendants there had *no* direct relation to the harm. As this Court explained, the *Ameriquest* defendants "did not directly make subprime loans to [Cleveland] homeowners" but merely financed "a legal market" for them. *Id.* at 505. Unlike the subprime lenders in *Ameriquest*, Appellants dispensed opioids directly to the Counties' residents, just as handgun manufacturers in *Beretta* marketed and sold firearms in Cincinnati.

Appellants also mistakenly rely on *City of Cincinnati v. Deutsche Bank National Trust Co.*, 863 F.3d 474 (6th Cir. 2017). In that case, Cincinnati "supplie[d] no factual allegations" to support its causation theory. *See id.* at 480 ("The City offers the verdict that it has 'suffered damage as the direct and proximate result of' Wells Fargo's nuisances but supplies no factual allegations to support it."). Here, the jury heard extensive evidence on the causal relationship between Appellants' conduct and the opioid epidemic in the Counties. *See supra* Statement Parts II.B., II.D.

## 2. Third parties did not break the causal chain

Appellants argue (at 78) that "non-pharmacy actors in the opioid supply chain unquestionably contributed to any alleged nuisance." But "the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability." *Strother v. Hutchinson*, 423 N.E.2d 467, 471 (Ohio 1981) (citation omitted). Courts reject the idea that third parties create superseding "steps" in a causal "chain." *See, e.g., Mouse v. Cent. Sav. & Tr. Co.*, 167 N.E. 868, 870 (Ohio 1929) ("It is also a well-established rule of law that a defendant may be held responsible, even if the casualty was not the result of his sole negligence, but was caused by his negligence concurring with that of another, or any other independent intervening cause."); *Mudrich v. Standard Oil Co.*, 90 N.E.2d 859, 863 (Ohio 1950) (same); *Gedeon v. E. Ohio Gas Co.*, 190 N.E. 924, 927 (Ohio

1934); *Adams*, 4 N.E. at 601.  That is particularly true where, as here, trial evidence established that the pharmacies were the last line of defense against diversion.  *See supra* Statement Part I.C.

For similar reasons, Appellants' reliance (at 72) on *City of Cleveland v. JP Morgan Chase Bank, N.A.*, is misplaced.  2013 WL 1183332, at *4 (Ohio Ct. App. Mar. 21, 2013).  That court found that mortgage originators, brokers, and home buyers who failed to repay loans were "intervening factors necessary for the harm suffered by the City to materialize."  *Id.*  Unlike in that case, no culpable party broke the direct link between the pharmacies that sold the opioids and the patients who got addicted to them.  Doctors may have written the prescriptions, but Appellants dispensed them.  Indeed, Appellees proved that Appellants *enabled* "pill mill" doctors to keep prescribing when other stores stopped filling their prescriptions.  *See supra* Statement Part II.D.

### 3. The Counties are the appropriate entity to seek relief for harm to the public

Appellants maintain (at 79) that the jury's verdict on proximate cause cannot stand because the Counties' claims are derivative of those sustained by the victims who succumbed to opioids harms.  But Appellants' argument rests entirely on cases where plaintiffs sought *damages*, which Appellees do not seek.  *See infra* Part IV.D.2.  Appellees seek prospective abatement of the ongoing public nuisance that has harmed the Counties and the public.  Appellants cite no case holding that

89

counties cannot seek abatement of a public nuisance that injures the public health and safety because, in doing so, the counties would be seeking relief derivative of others' claims.

In any event, even where governments seek damages for harms caused by opioids and firearms, courts have recognized that they properly seek relief for their "own harm" and that their claims are not derivative of the harms suffered by individuals. *Beretta*, 768 N.E.2d at 1149 (city sought abatement and damages); *see also Dewine*, 2018 WL 4080052, at *3 (finding sufficient causation given "damages suffered by the state of Ohio"); *New Hampshire*, 2018 WL 4566129, at *11 (finding claims "not necessarily derivative of harm suffered by third parties" where state sought abatement and damages); *In re Opioid Litig.*, 2018 WL 4827862, at *7-9, *13, *17 (N.Y. Sup. Ct. July 17, 2018) (same for counties).

## IV. THE DISTRICT COURT ORDERED AN APPROPRIATE REMEDY

After the jury found a public nuisance, the court ordered an equitable remedy reasonably calculated to abate the nuisance. It established a fund to pay for measures necessary to remediate the harmful condition Appellants caused in the Counties. Appellants offer no persuasive arguments warranting reversal.

### A. Remedying The Public Nuisance Requires Abating The Harmful Conditions Appellants Created

Equitable abatement is a well-established remedy for public nuisance. As Justice Story wrote, with "regard to public nuisances, . . . the jurisdiction of courts

of equity seems to be of a very ancient date." *Mugler v. Kansas*, 123 U.S. 623, 672 (1887) (quoting 2 Story, Eq. Jur. §§ 921, 922). A federal court acting as "a court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999); *see also Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) (emphasizing that "breadth and flexibility are inherent in equitable remedies").

Courts ordering abatement may require a defendant to remediate the condition, because merely stopping harmful activity may be insufficient to redress the public right injured by the nuisance. For example, in *Matthews v. State*, the Ohio Supreme Court affirmed an abatement order requiring defendants convicted of obstructing a public highway to remove the fence they had placed. *See* 25 Ohio St. 536, 541 (1874). The Court characterized "[t]he abatement of the nuisance" as "the removal of a thing injurious to the public." *Id.*[12]

---

[12] *See also Mettling*, 1927 WL 3124, at *1 (ordering landowners who had created a nuisance of "brackish water" to remediate it by filling or draining the lagoons); *City of Toledo v. Gorney*, 1988 WL 128304, at *1 (Ohio Ct. App. Dec. 2, 1988) (affirming abatement instructing junkyard owner to remove automobiles, fencing, weeds, and debris); *Lorain Cnty. Bd. of Health v. Diewald*, 2006 WL 825517, at *1-2 (Ohio Ct. App. Mar. 31, 2006) (requiring property owner to abate conditions by removing junk, debris, and garbage); *accord* Restatement (Second) § 834 cmt. e (1979) (where an activity "resulted in the creation of a physical condition that is of itself harmful after the activity that created it has ceased, a person who carried on the activity that created the condition . . . is subject to the liability for a nuisance, for the continuing harm").

**B.      Abating A Nuisance May Require Creation Of A Monetary Fund To Pay For Remediation Into The Future**

Courts may order defendants to pay into an abatement fund to be administered over time and to fund measures to remediate harmful conditions on a yearly basis.  Such payments are properly characterized as equitable relief, and are not damages.  *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"); *Milliken v. Bradley*, 433 U.S. 267, 289-90 (1977) (holding that requiring a school board to pay for future costs of various educational programs necessary for desegregation is prospective equitable relief).

For example, in a public-nuisance case brought by California concerning lead paint, a court approved a remedy setting up a $1.15 billion fund to abate harmful conditions caused by residential lead paint.  *See People v. ConAgra Grocery Prods. Co*., 227 Cal. Rptr. 3d 499, 514 (Ct. App. 2017).  The fund would pay for lead inspections, education about lead hazards, and remediation of lead in homes for four years.  *Id.* at 525, 568.

The district court approved a similar abatement fund.  Here, Appellants caused an opioid use disorder crisis in the Counties that the funds will be used to abate.  *See infra* Part IV.D.1.  Simply ceasing further oversupply does not remediate the continuing harms of historical oversupply and diversion.  Appellants

are required to abate the harm they caused, completing "the removal of [the] thing injurious to the public." *Matthews*, 25 Ohio St. at 541; *see Mettling*, 1927 WL 3124, at *1. The district court's abatement fund therefore was appropriate.

### C.    The Court's Order Is Reasonably Calculated To Remedy The Unprecedented Public Nuisance

The court properly exercised its discretion in establishing a fund and appointing an administrator to vet specific measures. A fund based on "a reasonable method of prefunding the remediation that is required to abate the public nuisance created by defendants . . . [is] not an abuse of . . . discretion." *ConAgra*, 227 Cal. Rptr. 3d at 570. The order embodies the "breadth and flexibility [that] are inherent in equitable remedies" and is reasonably crafted to abate the public nuisance. *Swann*, 402 U.S. at 15; *see City of Seven Hills v. City of Cleveland*, 439 N.E.2d 895, 902 (Ohio Ct. App. 1980) (equity's "plasticity is such that . . . the perimeter of its authority will expand to fit the size of whatever problem"). The ordered remedy features the flexibility to "tailor the programs and interventions to [the Counties'] specific needs" and "be responsive to . . . future changes in the opioid epidemic itself, . . . improved treatment and intervention modalities, and . . . advancements in addiction science." R.4611 (Order) at 596681.

The court reasonably calculated the appropriate amount of the fund based on evidence of the estimated costs of abating the nuisance. *See supra* Statement Part

III.B.  Treating opioid use disorder is the primary cost—nearly 70% of the total. *See* R.4446 (Tr.) at 580226-580227 (Alexander); R.4592-9 (Ex.) at 591604, 591606 (Rosen & Burke Expert Rep.).  Proposed treatment measures connect individuals to medical care, provide treatment, and distribute naloxone, which reverses overdoses.  R.4446 (Tr.) at 580236-580240, 580244-580248 (Alexander).

The court excluded costs "not reasonably calculated to reduce the actual, unreasonable interferences with public health" and reduced others.  R.4611 (Order) at 596679-596680.  It excluded other costs based on expert testimony regarding the percentage of individuals suffering from opioid use disorder that could be attributed solely to non-prescription opioids.  *Id.* at 596685-596688.  Finally, the district court apportioned one-third of the remaining total costs to Appellants because opioid manufacturers, distributors, and dispensers compose a tripartite closed-delivery system of prescription opioids.  *Id.* at 596694-596695.

The court appointed an administrator to determine whether specific programs are reasonably calculated to abate the nuisance, to approve each year's annual spending, and to administer the fund.  *Id.* at 596707-596708.  The fund must support treatment measures and prevention of opioid abuse and recidivism. *Id.* at 596677.  The district court retained jurisdiction over the fund's implementation.  *Id.* at 596641.  It may hold hearings to evaluate the progress of abatement and adjust funding as needed.  *Id.* at 596708.

The court reasonably ordered abatement to be funded and implemented annually over 15 years. *Id.* at 596640. Many of the harms attributable to oversupply and diversion of opioids do not manifest the day the oversupply happens. R.4446 (Tr.) at 580269-580270. Abating the nuisance requires sustained long-term programs. *Id.* at 580213. "[F]unds that remain at the end of a given year will roll over to the next, and/or will be refunded to Defendants." R.4611 (Order) at 596680.

### D. Appellants Offer No Persuasive Arguments Why The Court Abused Its Discretion

#### 1. The abatement order addresses the nuisance the jury found

Appellants argue (at 94-97) that the abatement order "rewrote" the jury verdict, which only addressed the "oversupply of legal prescription opioids, and diversion of those opioids." R.4176 (Verdict) at 556138, 556142. Appellants' argument contradicts Ohio's definition of nuisance. *See supra* Part I. This Court should reject Appellants' attempt to distort the jury verdict's language.

Under Ohio law, "it is the province of the court to define a nuisance and the province of the jury to determine whether the circumstances of the particular case come within the definition of a nuisance." *City of Hamilton v. Dilley*, 165 N.E. 713, 714 (Ohio 1929). When interpreting the jury's determination, however, the jury verdict does not stand alone—"[it] [comes] with a user's manual: the jury instructions." *Moody v. United States*, 958 F.3d 485, 491 (6th Cir. 2020).

The jury found oversupply and diversion of prescription opioids constituted a public nuisance in the Counties and that Appellants' conduct was a substantial factor in producing that nuisance. *A fortiori*, the jury found Appellants created a harmful condition endangering public health or safety. In instructing the jury, the court emphasized that public nuisance *requires* a finding of harm to public health or safety. *See*, *e.g.*, R. 4153 (Tr.) at 554644-554645. The court's summary of Appellees' case to the jury made the same point. *Id.* at 554643-554644 ("Each plaintiff alleges that each defendant dispensed opioid products in a manner that *endangered public health or safety*, thereby creating a public nuisance.") (emphasis added). And the jury heard ample evidence of the public health and safety crisis in the Counties. *See supra* Statement Part II.E.

Moreover, when reviewing the reasonableness of a court's equitable remedy, "[s]ubstance, not semantics, must govern." *Swann*, 402 U.S. at 31. "[I]n seeking to define the scope of remedial power or the limits on remedial power of courts . . . , words are poor instruments to convey the sense of basic fairness inherent in equity." *Id.* Accepting Appellants' argument to reverse the abatement order would thus defy the "basic fairness inherent in equity." *Id.*

## 2. Ordering Appellants to pay into an abatement fund does not render the remedy compensatory

Appellants mischaracterize the remedy as a lump-sum "monetary award" of "damages." Br. 97-98. But the court did not order a lump-sum payment or award

damages.  Payments over 15 years to the fund do not transform equitable relief into damages.  *See Bowen*, 487 U.S. at 893.

The relief does not compensate the Counties for their injuries.  *See*, *e.g.*, *Longbottom v. Mercy Hosp. Clermont*, 998 N.E.2d 419, 421 (Ohio 2013); *Nithiananthan v. Toirac*, 2015 WL 1619097, at *10 (Ohio Ct. App. Apr. 13, 2015).  The court did not require the Counties to provide an accounting of their past or future costs (*e.g.*, for first responders, medical services, law enforcement).  Rather, the order establishes a fund that will pay for programs necessary to abate the harmful condition created by Appellants' conduct—the epidemic of opioid use disorder (with a primary focus on treating those who suffer from opioid addiction and reducing the number of overdose deaths).  The California Court of Appeal emphasized this distinction in *ConAgra*, holding that "[p]ayment into an abatement fund does not convert the equitable remedy into damages."  227 Cal. Rptr. 3d at 569.

In arguing otherwise, Appellants misread (at 91-92) Dobbs' *Law of Remedies*.  *See* 1 Dan B. Dobbs, *Law of Remedies* § 5.7(3) (2d ed. 1993).  The quoted passage—saying damages "might be based on . . . the cost of eliminating the nuisance effects"—merely explains how damages for *private* nuisance might be measured; it says nothing about public nuisance remedies.  And Appellants

ignore Dobbs where it contradicts their assertions, such as Dobbs' point that injunctions can "compel complete abatement of the offending condition." *Id.*

### 3. The abatement remedy is sufficiently tailored to address the nuisance Appellants caused

Appellants' challenges (at 87-89) to specific abatement measures lack merit. The court did not order particular programs to be funded. Instead, the court established a fund and appointed an administrator to ensure the specific programs funded are reasonably calculated to abate the nuisance. R.4611 (Order) at 596707-596708. The administrator "will work closely with the Counties to ensure funds are spent only on proper abatement interventions focused on treatment and prevention." *Id.* at 596680. Appellants did not object to the appointment of a neutral administrator to oversee the abatement fund. *See* R.4337 (Defs.' Am. Objs. to Pls.' Abatement Plan) at 575471-575472.

Unrebutted expert testimony established that the challenged measures—treatment of addiction and resources for healthcare and law enforcement—are "vital" and "necessary elements" to abate the nuisance. R.4446 (Tr.) at 580227, 580232-580236, 580250-580251, 580289-580290. Implementing the remedy requires sufficient health care workers and medical providers. R.4446 (Tr.) at 580287-580288. Appellants offered no evidence refuting the necessity or efficacy of Appellees' proposed interventions. Their experts declined to propose alternative measures. R.4455 (Tr.) at 580661; *id.* at 580825, 580897; R.4460 (Tr.) at 582241.

Instead, Appellants challenge (at 99-101) certain measures as too remote and argue that the abatement award is not "closely tailored" to the public harm suffered by the Counties. But the conditions these measures address, such as increased abuse in illicit drugs and devastating health effects on children and families, are direct manifestations of the public nuisance Appellants caused. *See supra* Part III; Statement Part II.E. The district court carefully calculated the abatement fund to address the harmful conditions caused by Appellants' conduct and appointed an administrator to ensure that each program funded is reasonably necessary to abate the nuisance.

Appellants challenge (at 90-91) the remedy as "a type of relief that has never been available before." But abatement, which may require defendants to correct or pay to correct harmful conditions, has been a historical remedy for public nuisances for centuries. *See supra* Parts IV.A-B.[13] In fact, Appellants cite (at 92-93 n.9) a case requiring a defendant who created a nuisance by erecting an embankment to correct the harmful condition by "leveling to the ground or removing said embankment." *Sheldon v. Cole*, 3 Ohio Dec. 473, 1895 WL 597, at *7 (Ohio Ct. Com. Pl. 1895); *see also Bemis v. Upham*, 30 Mass. 169, 171 (1832)

---

[13] Appellants' string cite (at 92 n.9) of abatement cases issuing injunctive relief do not contradict Ohio jurisprudence making clear that abatement may also require defendant to *correct* a harmful condition caused by the conduct. *See*, *e.g.*, *Matthews*, 25 Ohio St. at 541; *Mettling*, 1927 WL 3124, at *1.

(requiring defendant to abate the nuisance dam by "hoisting the gates" or "removing the planks from a wasteway"). Simply enjoining defendants from erecting dams was not enough—defendants had to remediate the condition their conduct created. So too here.

Appellants object (at 100) to treating people who first ingest opioids in the future. But treatment for such individuals is reasonably necessary to address the problems Appellants' unlawful dispensing practices caused. Those practices gave rise to widespread diversion and the increased availability of and addiction to prescription opioids. In the wake of their conduct, rates of opioid addiction, overdose, and death continue to rise alarmingly. R.4090 (Tr.) at 547950-547951.

Finally, Appellants challenge (at 100 n.11) the injunctive relief the court ordered requiring Appellants to correct their dispensing practices, noting that opioid dispensing has "plunged over the past five years." But the need for injunctive relief does not depend on the number of opioids dispensed. At all times, Appellants are required to "comply with applicable federal and Ohio state laws" and are prohibited from continuing any of their conduct that led to oversupply and diversion. R.4611-1 (Inj. Order) at 596715; *cf.* R.4893 (Am. Inj. Order) at 609039-609041. Moreover, injunctive relief is appropriate and necessary, especially given Appellants' historical violations of the law. *See supra* Statement Part II.

### 4. Appellants rely on outlier cases and ignore most opioid decisions recognizing abatement as an appropriate remedy

Appellants rely on a handful of cases rejecting an abatement remedy for opioid-related public nuisance and ignore the majority of cases recognizing that such a remedy is appropriate. They cite *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021), but that case is inapplicable because the court did not review an abatement remedy on the merits. There, the Oklahoma Supreme Court declined to extend Oklahoma public-nuisance law to prescription opioids. Its rejection of the state's abatement plan was dicta in the court's liability analysis. *Id.* at 728-29.

Appellants' reliance (at 94) on another outlier decision also fails. *See City of Huntington v. AmerisourceBergen Drug Corp.*, --- F. Supp. 3d ---, 2022 WL 2399876 (S.D. W. Va. July 4, 2022). There, the court erroneously rejected plaintiffs' proposed abatement plan because it determined that no public-nuisance action existed for the opioid crisis under West Virginia law. *Id.* at *55. Indeed, *Huntington* is inconsistent with the only West Virginia Supreme Court of Appeals ruling regarding the ongoing opioid litigation. *See State ex rel. AmerisourceBergen Drug Corp. v. Moats*, 859 S.E.2d 374, 382-86 (W. Va. 2021) (declining to grant writ of prohibition to set aside a decision of the state's Mass Litigation Panel holding that "nothing precludes it from ordering Defendants to pay the costs associated with abating the alleged public nuisance").

In contrast to these decisions, numerous courts have held that an abatement remedy may appropriately address the harms of the opioid crisis. *See In re Opioid Litig.*, 2018 WL 3115102, at *21 ("A public or 'common' nuisance is an offense against the State and is subject to abatement[.]"); *Cherokee Nation v. McKesson Corp.*, 529 F. Supp. 3d 1225, 1234 (E.D. Okla. 2021) ("[A]batement of a public nuisance is a legitimate basis for recovery related to the performance of public services."); *New Hampshire*, 2018 WL 4566129, at *14 (holding that "it is a question of fact" whether the opioid use disorder crisis can be abated by "health care provider and consumer education on appropriate prescribing, honest marketing of the risks and benefits of long-term opioid use, addiction treatment, disposal of unused opioids, and other means"); Order Setting Trial Dates for Abatement Phase, *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-cv-07591, ECF No. 1589 (N.D. Cal. Oct. 11, 2022) (Add.90). Appellants ignore that weight of authority, which this Court should follow.

### 5. The abatement cost was not impermissibly speculative

Appellants cite no case requiring abatement measures to be reasonably certain. Appellants erroneously rely (at 99, 103) on cases involving *damages* and the standards governing the admissibility of medical expert testimony. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 677-78 (6th Cir. 2010) (vacating jury verdict

because medical expert's causation analysis was "inadmissible speculation" that "fell short of what *Daubert* requires").

The requirement of reasonable certainty is inapplicable to the abatement-remedy context and is limited to damage calculations, which lack flexibility and require calculation of a final lump sum. *Cf. Carter-Jones Lumber*, 166 F.3d at 846 ("[f]lexibility rather than rigidity has distinguished" equitable remedies). Appellants erroneously argue (at 102) that the abatement award should have been "characterized as damages." *See supra* Part IV.D.2.

Courts have recognized that attempts to be too specific at early stages of an abatement process may be counter-productive. *See United States v. Apex Oil Co.*, 579 F.3d 734, 739 (7th Cir. 2009) (because the "clean up of the contaminated site is a huge project" that could take 15 years to complete, "[t]o specify the details of the project in the decree would either impose impossible rigidity on the performance of the clean up or, more likely, require constant recourse to the district judge for interpretation or modification of the decree"); *see also City of Wauseon v. Plassman*, 1996 WL 354881, at *4 (Ohio Ct. App. 1996) (affirming abatement order authorizing receiver to "do whatever was necessary to abate the nuisance" and utilizing "the most cost efficient method of cleaning up the property," including demolition).

In any event, Appellants did not proffer abatement calculations. *See* R.4315 at 574273-574276 (Defs.' Objs. to Pls.' Abatement Plan); R.4337 (Defs.' Am. Objs. to Pls.' Abatement Plan) at 575463-575475. Instead, Appellants (at 103) provided cost numbers for treatment of opioid use disorder without any information on how these costs were calculated. R.4593-7 (Ex.) at 591818 (Lake County OUD Treatment Costs). The court reasonably determined that Appellants' unexplained numbers could not serve as a basis for calculating the cost of an abatement plan. R.4455 (Tr.) at 580682-580684.

### 6. The district court's apportionment does not warrant reversal

Appellants argue incorrectly (at 107-14) that the court erred by failing to apportion the harm in this case to the doctors and other pharmacies in the Counties. "Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm," courts should not "make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm." *Pang v. Minch*, 559 N.E.2d 1313, 1323 (Ohio 1990) (emphasis omitted); *see* Restatement (Second) § 433A (1965) (stating that damages for harm "cannot be apportioned among two or more causes" unless "there are distinct harms" or "there is a reasonable basis for determining the contribution of each cause to a single harm").

In some cases, "the harm resulting from a nuisance is not capable of apportionment to the several contributors upon any reasonable or rational basis." Restatement (Second) § 840E cmt. c (1979). For example, when "oil discharged upon the surface of a stream by a number of defendants catches fire and the fire spreads to the plaintiff's barn and destroys it," a defendant "is held liable for the entire harm." *Id.* The epidemic of opioid use disorder is no different.

Here, because of the indivisible harms Appellants created, each may be held responsible for the entire abatement fund. Appellants did not create separate epidemics of opioid use disorder. Thus, the law does not *require* the district court to apportion the fund. Yet the court, acting in equity, nevertheless *reduced* the fund and apportioned some of the harm to manufacturers and distributors. In demanding further apportionment, Appellants "lose sight of the principle that there is no line of separation between the liability of joint tort-feasors." *Royal Indem. Co. v. Becker*, 173 N.E. 194, 196 (Ohio 1930).

Even if apportionment were required, Appellants failed to meet their burden of proving a reasonable basis to apportion the harm resulting from their tortious acts. Once a plaintiff "demonstrate[s] that he has suffered an injury and that the tortious act of each defendant was a substantial cause in producing that injury," the burden is on defendants "to demonstrate that the harm produced by their separate tortious acts is capable of apportionment." *Pang*, 559 N.E.2d at 1324-25; *see*

Restatement (Second) § 433B.  Appellants did not meet their burden to show—either by evidence or by proposing a methodology—that the harm can be reasonably apportioned with doctors.  Their expert merely testified that there are "many causes" of the opioid epidemic and the abatement award must be apportioned among five sectors that "may have played a role."  R.4460 (Tr.) at 582260-582266.  But the criterion for joint and several liability is "the indivisibility of harm, not the indivisibility of causation." *Pang*, 559 N.E.2d at 1323.

Appellant Pharmacies also failed to meet their burden of proving apportionment with other pharmacies.  Appellants assert (at 113-14) that the court could have apportioned the harm based on the market share of each pharmacy's red-flagged prescriptions.  But public-nuisance liability in this case is not premised on the sheer number of red-flagged opioid prescriptions dispensed by a particular pharmacy.  Rather, liability is based on evidence that Appellants—the largest national pharmacy chains in the Counties—engaged in unlawful and intentional conduct that caused a public nuisance.  In particular, Appellants dispensed millions of suspicious opioid prescriptions without effective anti-diversion controls and without resolving red flags, causing oversupply and diversion of highly dangerous and addictive opioids in the Counties. *See supra* Statement Part II.B.  The jury has not rendered a similar finding of liability with respect to other pharmacies.

Market-share liability theory has been used at the causation stage, not the remedy stage, when it is impossible to identify any specific manufacturer whose product caused a plaintiff's injury. *See Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187, 189-93 (Ohio 1998). Appellants fail to identify a single case applying a market-share theory to apportion harm between multiple defendants for a public nuisance, let alone a case that applies this theory to apportion harm to entities whose liability has not been adjudicated. Appellants' reliance (at 112) on Restatement (Second) § 433A cmts. a, c is misplaced. Section 433A cmt. a states that the rules stated in § 433A apply regardless of "whether all or any of such persons are joined as defendants in the particular action" or whether another person's contributing conduct was "innocent." Appellants failed to meet the threshold requirement of proving that pharmacies created "distinct harms" and that there is a "reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) § 433A. Section 433A cmt. c—which discusses "[s]uccessive injuries," where the "harm inflicted may be conveniently severable in point of time"—does not apply because Appellants did not create "successive injuries," and the harm is not severable in point of time.

Even if Appellants met their burden of providing a reasonable basis for apportionment, the court did not abuse its discretion in declining to apportion the award as Appellants requested. Appellants proposed apportioning equally among

five sectors because "all one has to do is to divide the amount by the number of actors." R.4460 (Tr.) at 582260, 582268-582269. The court adopted Appellants' approach in part and reasonably exercised its discretion to apportion among the three categories of actors that it determined to have been "overwhelmingly" responsible—manufacturers, distributors, and dispensers of prescription opioids. R.4611 (Order) at 596694-596695. Appellants' own expert testified that his model of apportionment allowed for the district court to apportion the abatement in three shares instead of five. R.4460 (Tr.) at 582279. The court was likewise within its discretion to reject Appellants' market-share analysis, and make clear that, in any event, Appellants are free to seek contribution from other actors. R.4611 (Order) at 596705-596706. Thus, the apportionment was not "so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will," as to be an abuse of discretion. *Huffman v. Hair Surgeon, Inc.*, 482 N.E.2d 1248, 1252 (Ohio 1985) (citation omitted).

## V.    THE DISTRICT COURT CORRECTLY DECLINED TO DECLARE A MISTRIAL

The juror misconduct highlighted by Appellants (at 81-85) provides no basis for a mistrial. The misconduct was a single incident of a juror improperly sharing information with other jurors. Appellants did not suffer actual prejudice—the requirement for a mistrial—and the court cured any potential prejudice by excusing the juror and giving a limiting instruction.

## A.    The Court Investigated And Addressed A Single Juror's Misconduct

During trial, a juror reported to the court that another juror had distributed copies of a one-page printout about a local health department program ("Project Dawn") that offered free Narcan (naloxone) in the Counties and told other jurors that Narcan was available for free.  R.4065 (Tr.) at 546962, 546965-546968; R.4067-1 (Printout) at 547051.

The court immediately informed the parties' counsel and questioned the juror in their presence.  R.4065 (Tr.) at 546962-546969, 546971-546972.  The juror explained she had understood a witness to suggest "you have to pay for Narcan unless it's covered by insurance" and she "didn't want anyone to think that they had to pay for Narcan."  *Id*. at 546965.  She confirmed that neither she nor any other juror had provided any other outside information to the jury during the trial.  *Id*. at 546971.  The court dismissed the juror with the parties' agreement.  *Id*. at 546969-546970.

The court then questioned each remaining juror in counsel's presence.  *Id*. at 546973-547011.  The jurors explained that they had largely ignored the printout, *id*, several had not been present when the juror made her brief statement about the Narcan, *id*. at 546975, 546981, 547000, and at least two immediately told the juror her actions were inappropriate, *id*. at 546981, 546989, 546991, 547000, 547006, 547008-547009.  The court reiterated that the jury should not conduct outside

research or bring in outside information; every juror indicated that they understood the court's instruction and confirmed there had been no other instances of sharing of outside information. *Id*. at 546975-546976, 546978-546982, 546984-546996, 546998-547011, 547025-547026. The court instructed any jurors that may have retained the printout to throw it away. *Id*. at 546979, 546982, 546986, 546989, 546997. The next trial day, the court again told each juror individually to disregard the outside information and confirmed that they could follow that instruction. R.4078 (Tr.) at 547247, 547258-547271. Every juror assured the court that they could. *Id*. at 547259-547270.

B. **The Incident Of Juror Misconduct Did Not Prejudice Defendants, And The Court Cured Any Potential Prejudice With A Limiting Instruction**

This Court gives "[d]eference" to the district court's denial of a motion for a mistrial, "because '[t]he trial judge is in the best position to determine the nature of the alleged jury misconduct . . . [and] is also in the best position to determine appropriate remedies.'" *United States v. Trujillo*, 376 F.3d 593, 613 (6th Cir. 2004) (quoting *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir. 1995)). "[T]rial courts should, whenever possible, pursue alternatives less drastic than declaration of a mistrial." *Hamm v. Jabe*, 706 F.2d 765, 768 (6th Cir. 1983).

"The single most important factor in deciding a mistrial motion is the extent to which the defendant has been prejudiced." *United States v. Richmond*, 884 F.2d

581 (Table), 1989 WL 103334, at *3 (6th Cir. 1989) (cleaned up). Defendants must prove *actual* prejudice; even a "serious suspicion" will not suffice, and courts "do not presume prejudice has occurred." *United States v. Rugiero*, 20 F.3d 1387, 1390 (6th Cir. 1994); *United States v. Wheaton*, 517 F.3d 350, 362 (6th Cir. 2008). Furthermore, when any "prejudice is cured by instructions of the court, the motion for a new trial should be denied." *Holmes v. City of Massillon*, 78 F.3d 1041, 1046-47 (6th Cir. 1996) (citation omitted).

Both aspects of the prejudice analysis support the court's decision not to grant a mistrial. First, Appellants did not suffer actual prejudice. The outside information shared by the dismissed juror had no direct relevance to the core issues at trial: Appellants' egregious opioid dispensing practices. In any event, the jury heard evidence that Walgreens worked with governmental agencies to distribute naloxone for free, R.4057 (Tr.) at 546487, and that naloxone was available for free through Project Dawn—the very information contained in the printout, *see* R.4093 (Tr.) at 548088-548089 (Fraser).

Accordingly, there was "no reasonable likelihood" that the printout the jury viewed about naloxone "could have tainted the jury's deliberations." *Wheaton*, 517 F.3d at 361 (affirming district court's denial of mistrial). Instead, this case is like *United States v. Lartigue*, in which the Sixth Circuit affirmed that a jury's consideration of extraneous information was harmless because it was "merely

duplicative of evidence properly introduced in open court." 23 F.3d 409 (Table), 1994 WL 151337, at *10 (6th Cir. 1994) (per curiam) (citing *Hughes v. Borg*, 898 F.2d 695, 700 (9th Cir. 1990)).

Second, any potential prejudice was properly cured. As soon as the court discovered the juror misconduct, it "promptly undertook an investigation of the juror's alleged misconduct" and cured any possibility of prejudice by "admonishing the jury . . . and giving a curative instruction." *Wheaton*, 517 F.3d at 361. A new trial is unwarranted where prejudice is "cured by the judge's limiting instructions to the jury." *Holmes*, 78 F.3d at 1046; *United States v. Phibbs*, 999 F.2d 1053, 1068 (6th Cir. 1993) ("The trial judge cautioned the jury to disregard the testimony, and we believe that he cured any harm to defendants in doing so."). After the court addressed the misconduct, the jurors each attested that they ignored the information. *See*, *e.g.*, *Wheaton*, 517 F.3d at 361 (noting "court specifically asked the other jurors whether the use of the laptop had impacted their decision-making, and the jurors responded that it had not").

## C. The Court Should Reject Appellants' Argument For A Mistrial Notwithstanding Curative Instructions

The Court should reject Appellants' per se rule (at 82) that "[a] jury's consideration of outside evidence on a contested issue requires a mistrial, absent clear harmlessness." First, the court's instruction cured any prejudice, rendering the juror's misconduct harmless here. *See supra* Part V.B. Moreover, Appellants

cite (at 82-83) inapposite cases in support of their proposed rule, concerning misconduct that came to light *after* the case was submitted and no curative instruction could be given. *See Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 749 (6th Cir. 2021) (misconduct revealed "[f]ollowing Nian's conviction"); *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 212 (6th Cir. 1982) (misconduct revealed "[a]fter the verdict for the defendants had been rendered and the jury discharged"); *Stiles v. Lawrie*, 211 F.2d 188, 189 (6th Cir. 1954) (misconduct revealed "[a]fter the case had been submitted to the jury and they had retired to their deliberations"); *Dassault Systèmes, SA v. Childress*, 828 F. App'x 229, 245 (6th Cir. 2020) (misconduct revealed "after the jury returned its verdict").

Appellants cite no case reversing a decision not to declare a mistrial following curative instructions. In *Aluminum Co. of America v. Loveday*, their lone case (at 83) concerning contemporaneous discovery of juror misconduct, this Court *affirmed* the district court's grant of a new trial where a juror personally investigated the core disputed issue in the case—alleged harm to the plaintiff's cattle—by "visit[ing]" the site and sharing his "personal observation" with other jurors. 273 F.2d 499, 499 (6th Cir. 1959) (per curiam). That case is easily distinguishable on its facts because the outside information shared here had no relevance to the core disputed issues at trial. It also reaffirms Sixth Circuit law that

whether to grant a new trial should be "left to the sound discretion of the district court." *Wheaton*, 517 F.3d at 361.[14]

Appellants attack (at 85) the premise that curative instructions can address misconduct, arguing that instructions "do[] not necessarily cure unconscious bias that may have already formed." That argument ignores a long line of Sixth Circuit cases finding that curative instructions can obviate any potential prejudice to a defendant. *See Wheaton*, 517 F.3d at 361 (mistrial not warranted when the district court gave the jury "a curative instruction to remind them that the verdict must be based solely on the evidence presented at trial"); *Holmes*, 78 F.3d at 1046 (mistrial not warranted because any "prejudice would have been cured by the judge's limiting instructions to the jury"); *Phibbs*, 999 F.2d at 1068 (affirming that district court's "instruct[ion to] the jury to disregard" outside evidence "cured any harm to defendants").

Appellants' attempt to overturn the jury verdict based on harmless juror misconduct that the court properly handled also ignores this Court's admonition that, "whenever possible, [courts should] pursue alternatives less drastic than declaration of a mistrial." *Hamm*, 706 F.2d at 768. Appellants' proposed rule—

---

[14] Appellants emphasize (at 4, 20) that the Counties' counsel initially stated to the court that a mistrial was appropriate, but, as he later explained to the court, once he had the opportunity to research the issue fully, the circumstances did not warrant a mistrial. R.4078 (Tr.) at 547251.

that exposure to external evidence can *never* be cured—lacks support and impugns "the almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *see Holmes*, 78 F.3d at 1047 ("We find it error to infer that the jury did not or could not follow the judge's clear instructions in this regard.").

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ *David C. Frederick*

W. MARK LANIER
M. MICHELLE CARRERAS
LANIER LAW FIRM
10940 W. Sam Houston Pkwy. N.
Suite 100
Houston, TX 77064
(713) 659-5200
wml@lanierlawfirm.com
mca@lanierlawfirm.com

PETER H. WEINBERGER
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East
Suite 1700
Cleveland, OH 44114
(216) 696-3232
pweinberger@spanglaw.com

DAVID C. FREDERICK
MINSUK HAN
ARIELA M. MIGDAL
TRAVIS G. EDWARDS
KATHLEEN W. HICKEY*
DAREN ZHANG
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
mhan@kellogghansen.com
amigdal@kellogghansen.com
tedwards@kellogghansen.com
khickey@kellogghansen.com
dzhang@kellogghansen.com

* Admitted only in Massachusetts;
supervised by members of the firm

HUNTER J. SHKOLNIK
SALVATORE C. BADALA
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007
hunter@napolilaw.com
sbadala@napolilaw.com

FRANK L. GALLUCCI
PLEVIN & GALLUCCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113
(216) 861-0804
FGallucci@pglawyer.com

*Counsel for Plaintiffs-Appellees Trumbull County and Lake County, Ohio*

February 14, 2023

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to the Court's November 17, 2022 briefing order granting Plaintiffs-Appellees 26,000 words for their response brief, that this brief complies with the applicable type-volume limitation because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1), the brief contains 25,741 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word 2016 in a proportionally spaced typeface (Times New Roman, 14 point).

 /s/ *David C. Frederick*
David C. Frederick
*Counsel for Plaintiffs-Appellees*

February 14, 2023

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d) and Sixth Circuit Rule 25(f), I certify that, on February 14, 2023, I caused a true and correct copy of the foregoing Consolidated Brief for Plaintiffs-Appellees Trumbull County and Lake County, Ohio, to be served upon all counsel of record through the Court's CM/ECF system.

/s/ David C. Frederick
David C. Frederick
*Counsel for Plaintiffs-Appellees*

# ADDENDUM

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g)(1), Plaintiffs-Appellees hereby designate the following filings in the district court's record as relevant to the disposition of this appeal:

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 3282 | Order Designating Trumbull County and Lake County Cases as Track Three Cases | 04/30/2020 | 492977-492978 |
| 3326 | Plaintiff Trumbull County Supplemental and Amended Allegations To Be Added to Short Form for Supplementing Complaint and Amending Defendants and Jury Demand | 06/05/2020 | 494941-495152 |
| 3327 | Plaintiff Lake County Supplemental and Amended Allegations To Be Added to Short Form for Supplementing Complaint and Amending Defendants and Jury Demand | 06/05/2020 | 495153-495359 |
| 3487 | Stipulation of Dismissal as to Certain Walmart Defendants | 09/21/2020 | 501379-501381 |
| 3488 | Defendant CVS's Answer and Affirmative Defenses to County of Lake's Supplemental and Amended Allegations | 09/21/2020 | 501382-501498 |
| 3489 | Defendant CVS's Answer and Affirmative Defenses to County of Trumbull's Supplemental and Amended Allegations | 09/21/2020 | 501499-501614 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 3490 | Defendant Walmart's Answer and Affirmative Defenses to County of Trumbull's Supplemental and Amended Allegations | 09/21/2020 | 501615-501775 |
| 3491 | Defendant Walmart's Answer and Affirmative Defenses to County of Lake's Supplemental and Amended Allegations | 09/21/2020 | 501776-501935 |
| 3493 | Defendants Walgreens' Answer and Affirmative Defenses to County of Lake's Supplemental and Amended Allegations | 09/21/2020 | 502023-502172 |
| 3494 | Defendants Walgreens' Answer and Affirmative Defenses to County of Trumbull's Supplemental and Amended Allegations | 09/21/2020 | 502173-502322 |
| 3793 | Joint Submission Regarding Jury Instructions and Verdict Form | 07/19/2021 | 514600-514654 |
| 3995 | Transcript of Jury Trial Volume 2 | 10/05/2021 | 540420-540694 |
| 3999-7 | Plaintiffs' Exhibit P-08954 (Settlement Agreement between M.D. Fla. U.S. States Attorney's Office on behalf of the Drug Enforcement Admin. and CVS (May 12, 2015) (redacted)) | 10/05/2021 | 540869-540877 |
| 3999-11 | Plaintiffs' Exhibit P-08494 (CVS Caremark Retail Pharmacy, Frank Veres, DO) | 10/05/2021 | 554915 |
| 3999-16 | Plaintiffs' Exhibit P-08955 (Settlement Agreement between D. Md. U.S. States Attorney's Office on behalf of the Drug Enforcement Admin. and CVS (Feb. 12, 2016) (redacted)) | 10/05/2021 | 555072-555078 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 3999-17 | Plaintiffs' Exhibit P-08954 (Settlement Agreement between M.D. Fla. U.S. States Attorney's Office on behalf of the Drug Enforcement Admin. and CVS (May 12, 2015) (redacted)) | 10/05/2021 | 555079-555087 |
| 4000 | Transcript of Jury Trial Volume 3 | 10/06/2021 | 540897-541189 |
| 4005 | Transcript of Jury Trial Volume 4 | 10/07/2021 | 541222-541566 |
| 4008 | Transcript of Jury Trial Volume 5 | 10/08/2021 | 541569-541789 |
| 4017 | Transcript of Jury Trial Volume 6 | 10/12/2021 | 542216-542520 |
| 4023 | Transcript of Jury Trial Volume 7 | 10/13/2021 | 542760-543064 |
| 4026 | Transcript of Jury Trial Volume 8 | 10/14/2021 | 543154-543424 |
| 4029-19 | Plaintiffs' Exhibit P-14711 (Administrative Memorandum of Agreement between U.S. Dep't of Justice, Drug Enforcement Admin. and Wal-Mart Stores, Inc. (Mar. 11, 2011)) | 10/15/2021 | 544438-544444 |
| 4029-21 | Plaintiffs' Exhibit P-15604 (CVS 2006 Pharmacist Incentive Plan) | 10/15/2021 | 544458-544464 |
| 4029-22 | Plaintiffs' Exhibit P-15962-A (U.S. Dep't of Justice, Drug Enforcement Admin., *Controlled Substance and Legend Drug Diversion; A Law Enforcement and Regulatory Perspective* (May 30/31, 2015)) | 10/15/2021 | 544465-544478 |
| 4029-27 | Plaintiffs' Exhibit P-20695 (CVS WeCARE Workflow Performance Reporting Metrics Toolkit (redacted)) | 10/15/2021 | 555126-555150 |
| 4029-28 | Plaintiffs' Exhibit P-21572 (Walmart, Pharmacy Facility Management Incentive Plan FYE 2012) | 10/15/2021 | 544512-544532 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 4029-31 | Stipulation Regarding the *Holiday CVS* Matter and Plaintiffs' Exhibit P-42147 (Decision and Order, *Holiday CVS, L.L.C. d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,316 (Oct. 12, 2012) (redacted)) | 10/15/2021 | 555174-555182 |
| 4029-35 | Plaintiffs' Exhibit P-00015 (Settlement and Memorandum of Agreement between U.S. Dep't of Justice, Drug Enforcement Admin. and Walgreens (June 11, 2013)) | 10/15/2021 | 555151-555166 |
| 4032 | Transcript of Jury Trial Volume 9 | 10/15/2021 | 544680-544887 |
| 4036-1 | Plaintiffs' Exhibit P-20808 (Email attaching Walgreens, Prescription Drug Abuse PowerPoint) | 10/18/2021 | 544914-544938 |
| 4036-3 | Plaintiffs' Exhibit P-26321-A (Walgreens Dispensing Data (2006-2019)) | 10/18/2021 | 604829-604831 |
| 4036-7 | Plaintiffs' Exhibit P-24039 (Email string re Walgreens Fx Integrity reports for the month of May are now available (May 3-7, 2018)) | 10/18/2021 | 545013-545014 |
| 4036-8 | Plaintiffs' Exhibit P-15068 (Email attaching Walgreens Good Faith Dispensing policy and checklist) | 10/18/2021 | 545015-545030 |
| 4036-9 | Plaintiffs' Exhibit P-15085 (Email string attaching Walgreens, Good Faith Dispensing DM Webinar (2015)) | 10/18/2021 | 545031-545042 |
| 4036-10 | Plaintiffs' Exhibit P-24019 (Email attaching Walgreens Increase Rx Sales and Prescription Counts Action Plan for Market #29 (2012)) | 10/18/2021 | 545043-545109 |
| 4041 | Transcript of Jury Trial Volume 10 | 10/18/2021 | 545151-545448 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 4046-6 | Plaintiffs' Exhibit P-19827 (Email string re November 8th DEA meeting at NABP (Nov. 8-9, 2012)) | 10/19/2021 | 545510-545512 |
| 4046-14 | Plaintiffs' Exhibit P-26319-A (CVS Dispensing Data (2006-2019)) | 10/19/2021 | 545605-545607 |
| 4046-16 | Plaintiffs' Exhibit P-26322-A (Walmart Dispensing Data (2006-2018)) | 10/19/2021 | 545611-545613 |
| 4050 | Transcript of Jury Trial Volume 11 | 10/19/2021 | 545631-545915 |
| 4055-16 | Plaintiffs' Exhibit P-20829 (Email attaching Draft of Colorado State Board of Pharmacy Policy, Policy No. 40-11) | 10/20/2021 | 546162-546166 |
| 4055-18 | Plaintiffs' Exhibit P-20852 (Walmart email string re RTF Jan 2015 Sorted by State and Market (Feb. 13, 2015)) | 10/20/2021 | 546171 |
| 4055-21 | Plaintiffs' Exhibit P-21113 (Settlement Agreement between U.S. Dep't of Justice, Drug Enforcement Admin. and Wal-Mart Stores, Inc. (Feb. 15, 2007)) | 10/20/2021 | 555476-555480 |
| 4057 | Transcript of Jury Trial Volume 12 | 10/20/2021 | 546180-546496 |
| 4064 | Transcript of Jury Trial Volume 13 | 10/21/2021 | 546550-546842 |
| 4065 | Transcript of Jury Trial Volume 14 | 10/22/2021 | 546843-547027 |
| 4067-1 | Exhibit 1 to Defendants HBC Service Company and Giant Eagle, Inc.'s Motion for a Mistrial, Printout of Northeast Ohio, Free Naloxone (Narcan) is Available | 10/24/2021 | 547050-547051 |
| 4075 | Plaintiffs' Counterproposal for Jury Instructions on Applicable CSA Duties | 10/25/2021 | 547224-547228 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 4075-1 | Plaintiffs' Additional Proposed Jury Instructions Regarding "Unlawful Conduct" | 10/25/2021 | 547229-547231 |
| 4078 | Transcript of Jury Trial Volume 15 | 10/25/2021 | 547243-547490 |
| 4090 | Transcript of Jury Trial Volume 16 | 10/26/2021 | 547736-548037 |
| 4093 | Transcript of Jury Trial Volume 17 | 10/27/2021 | 548051-548207 |
| 4094-11 | Plaintiffs' Exhibit P-15317 (Administrative Memorandum of Agreement between U.S. Dep't of Justice, Drug Enforcement Admin. and Walgreens (Apr. 7, 2011)) | 10/28/2021 | 548286-548292 |
| 4094-13 | Plaintiffs' Exhibit P-17254 (Email string re incident at Walgreens store 7832 (Feb. 16-19, 2018)) | 10/28/2021 | 555293-555301 |
| 4094-14 | Plaintiffs' Exhibit P-19529 (Walgreens Staff Pharmacist Bonus Program) | 10/28/2021 | 548304-548306 |
| 4094-15 | Plaintiffs' Exhibit P-19566 (Email attaching Walgreens DEA Guidance (2010)) | 10/28/2021 | 548307-548314 |
| 4094-17 | Plaintiffs' Exhibit P-19607 (Email attaching Walgreens Draft of Pharmacist Controlled Substance Dispensing Opportunities) | 10/28/2021 | 548322-548324 |
| 4094-18 | Plaintiffs' Exhibit P-19821 (Walgreens Pharmacy Manager Bonus Program) | 10/28/2021 | 548325-548329 |
| 4094-25 | Plaintiffs' Exhibit P-25492 (Walgreens, Internal Audit Report (Dec. 12, 2014)) | 10/28/2021 | 548375-548399 |
| 4094-33 | Plaintiffs' Exhibit P-26890 (Walmart email string re Pill Mills (June 17-18, 2013)) | 10/28/2021 | 548448-548449 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 4094-34 | Plaintiffs' Exhibit P-26892 (Walmart email string re The Wellness Clinic of Roland (Feb. 21-22, 2013)) | 10/28/2021 | 548450-548453 |
| 4094-36 | Defendants' Exhibit WAG-00018 (Walgreens Good Faith Practices (Aug. 1, 1998)) | 10/28/2021 | 548737-548738 |
| 4094-37 | Defendants' Exhibit WAG-00071 (Walgreens Good Faith Practices/Fraudulent Prescriptions) | 10/28/2021 | 548739-548740 |
| 4094-38 | Defendants' Exhibit WAG-00211 (Walgreens Controlled Substance Prescriptions & Good Faith Dispensing (June 20, 2011)) | 10/28/2021 | 548741-548742 |
| 4104-4 | Plaintiffs' Exhibit P-06457 (Email attaching CVS Store feedback from Phase II of CS Documentation Pilot (June 2018)) | 11/01/2021 | 549317-549322 |
| 4104-6 | Plaintiffs' Exhibit P-06566 (CVS email string re pain management doctor (Nov. 26-Dec. 1, 2014)) | 11/01/2021 | 549329 |
| 4104-11 | Plaintiffs' Exhibit P-08397 (CVS email attaching Overview and non responsive documents (Mar. 22, 2013)) | 11/01/2021 | 549345-549369 |
| 4104-16 | Plaintiffs' Exhibit P-08408 (Email string re CVS Store 4606 – controlled substance dispensing program follow-up Q1 (Mar. 5-21, 2014)) | 11/01/2021 | 549414 |
| 4104-19 | Plaintiffs' Exhibit P-04568 (Trumbull County Mental Health and Recovery Board, *Resolution: Responding to Ohio's Opiate Epidemic* (Apr. 18, 2017)) | 11/01/2021 | 549434 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 4104-31 | Plaintiffs' Exhibit P-15733 (CVS Interview of David Demangone, MD (Apr. 17, 2015)) | 11/01/2021 | 549695-549696 |
| 4104-39 | Plaintiffs' Exhibit P-08403 (Email from Michelle Travassos, CVS (Apr. 25, 2016)) | 11/01/2021 | 553728 |
| 4109 | Transcript of Jury Trial Volume 20 | 11/01/2021 | 550265-550542 |
| 4111 | Transcript of Jury Trial Volume 21 | 11/02/2021 | 550544-550825 |
| 4113-9 | Plaintiffs' Exhibit P-15656 (CVS Pharmacy Huddle Guide) | 11/03/2021 | 551022-551027 |
| 4115 | Transcript of Jury Trial Volume 22 | 11/03/2021 | 551149-551439 |
| 4118 | Transcript of Jury Trial Volume 23 | 11/04/2021 | 551446-551739 |
| 4128-8 | Plaintiffs' Exhibit P-02300 (Walmart POM 1311 (Mar. 2011)) | 11/08/2021 | 552470-552473 |
| 4128-9 | Plaintiffs' Exhibit P-21228 (Walmart POM 1311 (Feb. 2009)) | 11/08/2021 | 552474-552476 |
| 4128-10 | Defendants' Exhibit WMT-00134 (Walmart POM 1311 (Feb. 2017)) | 11/08/2021 | 552477-552483 |
| 4128-15 | Defendants' Exhibit WMT-00568 (Walmart POM 1316 (Feb. 2010)) | 11/08/2021 | 552508-552509 |
| 4128-18 | Defendants' Exhibit WMT-01027 (Walmart Considerations for Dispensing Controlled Substance Prescriptions) | 11/08/2021 | 552513-552518 |
| 4128-19 | Defendants' Exhibit WMT-01155 (Walmart, *Leadership Message on Controlled Substances*) | 11/08/2021 | 552519-552522 |
| 4128-25 | Plaintiffs' Exhibit P-26697 (Walmart email string re Web site access for "Ohio automated Reporting System" (Jan. 25, 2007)) | 11/08/2021 | 552534-552535 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 4128-31 | Plaintiffs' Exhibit P-26705 (Walmart email from J. Creel to S. Pati *et al.* (July 29, 2018)) | 11/08/2021 | 552582-552583 |
| 4128-33 | Plaintiffs' Exhibit P-20809 (Email attaching Ohio State Bd. of Pharmacy Presentation, *OARRS, A Guide for Law Enforcement* (2014)) | 11/08/2021 | 552610-552726 |
| 4128-43 | Defendants' Exhibit CVS-00945 (CVS, *Federal Guidelines for Controlled Substances*, No. ROPP-047561 (Oct. 1, 2014)) | 11/08/2021 | 552777-552790 |
| 4128-46 | Defendants' Exhibit CVS-01263 (CVS Health, *Corresponding Responsibility* (2015)) | 11/08/2021 | 552868-552875 |
| 4128-49 | Plaintiffs' Exhibit P-23305 (CVS, *Schedule II Drugs Pharmacy Operations Manual*, Policy No. ROPP-0011 (Sept. 2008)) | 11/08/2021 | 552886-552901 |
| 4128-50 | Plaintiffs' Exhibit P-23330 (CVS Interview of Frank Veres, DO (Mar. 29, 2018)) | 11/08/2021 | 552902-552904 |
| 4128-54 | Defendants' Exhibit CVS-00980 (CVS Course #800670 DEA & Pharmacy Regulatory Training (Sept. 2012)) | 11/08/2021 | 553446-553505 |
| 4128-55 | Plaintiffs' Exhibit P-20699 (CVS Caremark Dispensing Guidelines for Pain Management (Dec. 10, 2010)) | 11/08/2021 | 553506-553507 |
| 4132 | Transcript of Jury Trial Volume 25 | 11/08/2021 | 553022-553345 |
| 4133 | Transcript of Jury Trial Volume 26 | 11/09/2021 | 553519-553726 |
| 4146-1 | Defendants' Proposed Track Three Jury Instructions and Verdict Form | 11/12/2021 | 554067-554104 |
| 4153 | Transcript of Jury Trial Volume 28 | 11/15/2021 | 554615-554909 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 4169-35 | Plaintiffs' Exhibit P-21927-A (CVS, 2016 Year End Performance Review for Kenneth B. Cook) | 11/22/2021 | 557019 |
| 4176 | Verdict Form | 11/23/2021 | 556137-556144 |
| 4220 | Order Regarding Abatement Proceeding | 01/04/2022 | 570402 |
| 4232 | Plaintiffs Lake and Trumbull Counties' Submissions of Separate Abatement Plans | 01/18/2022 | 570849-570853 |
| 4241 | Plaintiffs' Omnibus Opposition to Defendants' Motions for Judgment as a Matter of Law Under Rule 50(b) and Memorandum of Law in Support | 01/20/2022 | 571133-571262 |
| 4295 | Opinion and Order Denying Defendants' Rule 50(b) Motions for Judgment as a Matter of Law | 03/07/2022 | 572075-572137 |
| 4296 | Opinion and Order Denying Defendants' Motion for New Trial | 03/07/2022 | 572138-572210 |
| 4315 | Track Three Defendants' Joint Submission Concerning Plaintiffs' Abatement Plan | 03/18/2022 | 574273-574278 |
| 4319 | Order Granting Plaintiffs' Motion To Compel Defendants To Submit an Abatement Plan | 03/21/2022 | 574286-574287 |
| 4337 | Track Three Defendants' Abatement Plan | 03/28/2022 | 575463-575475 |
| 4438 | Transcript of Abatement Bench Trial Volume 1 | 05/10/2022 | 579478-579702 |
| 4446 | Transcript of Abatement Bench Trial Volume 2 | 05/11/2022 | 580120-580403 |
| 4447 | Transcript of Abatement Bench Trial Volume 3 | 05/12/2022 | 580404-580631 |

| Record Entry # | Description | Date | Page ID # |
|---|---|---|---|
| 4455 | Transcript of Abatement Bench Trial Volume 4 | 05/16/2022 | 580649-580946 |
| 4460 | Transcript of Abatement Bench Trial Volume 5 | 05/17/2022 | 582058-582329 |
| 4592-9 | Plaintiffs' Exhibit P-23127 (Expert Report of Dr. John Burke and Dr. Harvey Rosen (Apr. 22, 2022) (redacted)) | 07/22/2022 | 591603-591778 |
| 4593-7 | Defendants' Exhibit CVS-05020 (Lake County OUD Treatment Costs) | 07/22/2022 | 591818 |
| 4611 | Order Entering Abatement Plan and Injunctive Relief in Track Three Cases | 08/17/2022 | 596638-596713 |
| 4611-1 | Injunction Order | 08/17/2022 | 596714-596728 |
| 4614 | Judgment Order | 08/22/2022 | 598413-598415 |
| 4652 | Order of Appointment of Administrator and Special Master Regarding the Abatement Order and Injunction Order | 09/30/2022 | 599848-599855 |
| 4659 | Amended Notice of Appeal filed by Walmart Inc. | 10/05/2022 | 601199-601201 |
| 4660 | Amended Notice of Appeal filed by CVS Appellants | 10/05/2022 | 601202-601204 |
| 4663 | Amended Notice of Appeal filed by Walgreens Appellants | 10/05/2022 | 601210-601212 |
| 4893 | Amended Injunction Order | 02/10/2023 | 609039-609053 |